# Exhibit 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| ANTONIO DELA CRUZ, derivatively on behalf of Nominal Defendant SIX FLAGS ENTERTAINMENT CORP., <br><br> Plaintiff, <br><br> vs. <br><br> JAMES REID-ANDERSON, W. MARSHALL BARBER, RICHARD W. ROEDEL, KURT M. CELLAR, NANCY A. KRESJA, JON L. LUTHER, STEPHEN D. OWENS, DAVID MCKILLIPS, MARK KANE, and STEPHEN R. PURTELL, <br><br> Defendants, <br><br> and <br><br> SIX FLAGS ENTERTAINMENT CORP., <br><br> Nominal Defendant. | Civil Action No. 4:23-cv-0457-P <br><br> **VERIFIED FIRST AMENDED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Antonio Dela Cruz ("Plaintiff"), by and through his undersigned attorneys, brings this first amended stockholder derivative complaint for the benefit of nominal defendant, Six Flags Entertainment Corp. ("Six Flags" or the "Company"), against current and/or former members of its Board of Directors (the "Board") and certain of its current and/or former executive officers (the "Individual Defendants", defined herein), seeking to remedy the Individual Defendants' breaches of fiduciary duties.  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, such as filings by Six Flags with the U.S. Securities and Exchange Commission (the "SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, including the operative complaint from the securities fraud class action captioned *In re Six Flags Entertainment Corp.*, Civil Action No. 4:20-cv-00201-P (N.D. Tex.) (the "Securities Action"), which is currently on appeal, and other matters of public record, as well as non-public, Board-level corporate books and records obtained by Plaintiff pursuant to 8 *Del. C.* § 220 ("Section 220").

## I.    INTRODUCTION

1.      This is a stockholder derivative action brought for the benefit of nominal defendant Six Flags against the Individual Defendants, all of whom are current and/or former officers and directors of Six Flags, based on their non-exculpable breaches of fiduciary duty and other serious misconduct from 2018 to the present (the "Relevant Period"), as alleged in detail herein.

2.      Nominal defendant Six Flags is a Delaware corporation headquartered in Arlington, Texas. According to its public filings with the SEC, Six Flags is the world's largest regional theme park operator with over 24 parks across North America.

3.      This shareholder derivative action arises from the Individual Defendants'

materially false and misleading statements and omissions concerning the development of several multibillion-dollar Six Flags-branded parks in China, which the Individual Defendants represented to stockholders were scheduled to begin opening in 2019. The Individual Defendants expressly and repeatedly assured stockholders that Six Flags' China parks were on track to begin opening in 2019 and, indeed, that the "***timing of the parks***" "***remain[ed] exactly the same as previously disclosed***." In reality, construction was at a standstill and the Individual Defendants knew the Six Flags China parks could not possibly open on time. As stockholders gradually learned the extent to which the Individual Defendants misled them and the public, the price of Six Flags' common stock plummeted and billions of dollars' worth of stockholder value was lost.

4.     By the outset of the Relevant Period, the Individual Defendants had been touting for years Six Flags' agreement with Riverside Investment Group Co. Ltd. ("Riverside"), a Chinese real estate developer, to build multiple Six Flags-branded theme parks in China. Under the agreement, Riverside would pay Six Flags tens of millions of dollars in initial licensing fees for each agreed-upon park, and then even more substantial licensing and management fees after the parks opened. These parks were highly material to the Company and its stockholders because, unlike Six Flags' core domestic theme park business, Six Flags would recognize incredibly high profit margins on what the international licensing revenue would be, with 80%-90% of the fees going to Six Flags' earnings before interest, taxes, depreciation, and amortization ("EBITDA").

5.     This high-margin revenue -- which Six Flags would start receiving after it signed licensing deals, and without any significant capital investment on its part -- was particularly important to Six Flags' top executives in 2017. In addition to a standard salary and bonus incentive structure, under the direction of the Board, an incredibly lucrative incentive compensation plan was put in place at Six Flags called "Project 600", pursuant to which defendants James Reid-

2

Anderson ("Reid-Anderson"), the Company's then-Chief Executive Officer ("CEO") and F. Marshall Barber ("Barber"), the Company's then-Chief Financial Officer ("CFO"), would receive millions of dollars in equity compensation if Six Flags achieved approximately $600 million in "modified" EBITDA by year-end 2018. Given the Company's stagnating growth heading into the Relevant Period, defendants Reid-Anderson and Barber knew they would need to find a quick way to record a substantial amount of modified EBITDA in 2018 to trigger these enormous incentive payments.

6.     The China parks offered just such an opportunity. Between 2014 and 2017, Six Flags had agreed to open just two parks with Riverside. But in 2017, under the Individual Defendants' direction, Six Flags launched into an intense round of licensing activity with Riverside. Between February 2017 and May 2018, the Individual Defendants rushed to cause the Company to enter into *nine* additional agreements with Riverside, bringing the total number of planned China parks from two to *eleven* (grouped into three park centers) in just over a year. Each of those additional parks could add millions of dollars to the Company's annual modified EBITDA, without regard for the long-term success of the contracts. As such, these parks could help add up to 15% of the modified EBITDA which defendants Reid-Anderson and Barber needed to pocket their incentive payments.

7.     The Individual Defendants caused the Company to announce that the first park center, Six Flags Zhejiang, would open in 2019 and would include an elaborate theme park, water park, and children's park. The other two equally elaborate multi-park centers, Six Flags Chongqing and Six Flags Nanjing, were scheduled to open in 2020 and 2021, respectively.

8.     Throughout 2018, stockholders and analysts intensely focused on these massive Chinese developments and their progress. Indeed, analysts raised questions at every opportunity

3

about whether the Company's Chinese developments were on track to open on the schedule which the Individual Defendants previously announced. In response, the Individual Defendants stated firmly and repeatedly that the parks were on schedule and were expected to begin opening in 2019, consistent with the previously announced schedule.

9.     In stark contrast to their repeated assurances to stockholders, however, the Individual Defendants knew by no later than April 2018 that construction of Six Flags' China parks was not making any meaningful progress at all.

10.     The operative complaint in the Securities Action, which was filed on July 2, 2020, is based in substantial part on the detailed account of a confidential witness referred to as "Former Employee 1" or "FE 1", described therein as Six Flags International's Director of International Construction and Project Management and having been responsible for overseeing the construction of the China parks and reporting on their progress internally at Six Flags.  The extensive account in the Securities Action of FE 1 confirms the utter lack of progress in developing the China parks, as well as the Individual Defendants' knowledge of those failures.  Indeed, per the account of FE 1 in the Securities Action, from the beginning of FE 1's tenure in May 2018, it was clear that the Six Flags parks were in serious jeopardy.

11.     According to the operative complaint in the Securities Action, FE 1 recounted that it was obvious that the parks would not open anywhere near on schedule. *First*, Riverside refused to fund (or was unable to fund) the most basic of theme park features -- the roller coasters and other rides that attract visitors and drive revenue. Although Riverside had, before the Relevant Period, initiated contracts with dozens of the world's major ride manufacturers, by the beginning of the Relevant Period, Riverside had ceased payments to those critical vendors. Furious, the ride manufacturers cut their losses and ceased construction or sold the rides to other third parties by

June 2018. This situation, according to the Securities Action, led to "bad blood" between Six Flags and many of the world's foremost ride manufacturers, its key business partners. FE 1 is alleged in the Securities Action to have told multiple Six Flags executives to sue Riverside, but they declined to do so.

12.     *Second*, per the operative complaint in the Securities Action, by the time FE 1 started in May 2018 -- when Six Flags Zhejiang was supposedly just 19 months away from opening and should have had substantial construction completed -- Riverside had not even commissioned basic construction drawings (or blueprints). Because Riverside did not have the funds to pay for those fundamental and critical tools, Riverside could not engage in any actual construction at all. At most, Riverside could clear some land based on "design drawings" that were mere conceptual guidance -- not actual plans from which park elements could be built.

13.     Indeed, over the course of 2018, Riverside continued to default on its obligations to multiple outside vendors and lost employees at a shockingly high rate, simply because it did not have the funds to pay them. In 2018, Riverside stopped paying Six Flags the licensing fees it owed the Company, notwithstanding the fact that Six Flags had satisfied all its obligations.

14.     The fact that the Six Flags China parks were not progressing and would not be constructed on schedule (or anywhere near on schedule) was reported to the Individual Defendants, who were fully informed about Riverside's failures. According to the operative complaint in the Securities Action, defendants Reid-Anderson and Barber, along with certain other executives and the members of the Board named as Individual Defendants herein, received regular reporting, including from FE 1's direct supervisor through presentations that FE 1 prepared, which included photographs and analyses demonstrating that construction was at a standstill and the park sites were largely empty fields filled with weeds. Simply put, the Individual Defendants knew

5

construction had stopped entirely, and unequivocally understood that their publicly announced timetable for opening could not be met. But, because this information would have had devastating consequences for, among other things, defendants Reid-Anderson's and Barber's incentive payments and, indeed, certain of the Individual Defendants had staked their careers on the success of the China parks, the Individual Defendants lied to stockholders about the progress being made.

15.     By early 2019, as construction in China came to a standstill, stockholders remained in the dark as to the true, derelict state of the Six Flags-branded developments in China. Indeed, in January 2019, analysts maintained their prior ratings for Six Flags and reported that they "***d[id] NOT see any material risk to [Six Flags'] China developments***" while continuing to parrot the Individual Defendants' public statements that each China park would contribute tens of millions of dollars of revenue per year to the Company's coffers. Stockholders were about to begin learning, however, that the rosy picture the Individual Defendants painted for them was not accurate -- all while the Individual Defendants persisted in touting the China parks' purported "continuing" development, keeping the full truth concealed.

16.     On February 14, 2019, the Individual Defendants surprised stockholders by causing Six Flags to announce a negative revenue adjustment of $15 million arising from supposedly modest delays in the expected opening dates of certain of the China parks. But rather than come clean at this point in time and disclose to stockholders, among other things, that Riverside lacked critical funding and could not pay its vendors, causing construction to grind to a halt, the Individual Defendants doubled down and continued falsely claiming ***for another year*** that their public timeline for the parks' opening was substantially on track, and that any delays were caused only by a "tough" macroeconomic environment affecting all private companies in China. Although the price of Six Flags stock dropped by over 14% on the February 14, 2019 news of the

6

$15 million write-down, it remained artificially inflated thereafter as the Individual Defendants reassured stockholders that the Company had "*a first-class partner in China with Riverside*" that had "*a lot of assets*" and was in "*great shape*" with "*the ability to source additional funding*." Stockholders relied on these positive statements, believing the Individual Defendants when they claimed Six Flags and Riverside were "*continuing to build those parks*."

17.     Throughout the rest of 2019 and into early 2020, the Individual Defendants repeatedly made similar false, positive statements about the Company's purported "*compelling*" "*international expansion opportunities*," while also representing that "*the situation in China is improving*," "*[t]here's ongoing building going on*," and any "*short-term delays…[we]re not material*." In sharp contrast to the Individual Defendants' representations that the China parks "*remain[ed] on schedule*," however, Riverside's financial condition was severely impaired and it failed to make any meaningful construction progress, all while laying off over 90% of its workforce and becoming mired in litigation with key vendors.

18.     By late 2019, there was no possibility for the China parks to open even on the delayed schedule, given how much construction remained to be done on the parks. Indeed, among other things, construction had not even begun on critical elements including roller coasters, Riverside owed payments to vendors and employees that it could not make, and the construction sites were barren and littered with stray water pipes and bricks.

19.     In October 2019, the Individual Defendants announced Six Flags' financial results for the third quarter of 2019, reporting an expected 26% decrease in revenues from the Company's international agreements while disclosing "a very high likelihood going forward that we will see changes in the timing of park openings." The Individual Defendants further announced that defendant Reid-Anderson would be leaving the Company on an accelerated timetable from what

7

had been previously communicated. Analysts were surprised, calling these disclosures "especially disappointing", and the price of Six Flags stock declined by more than 12%. The Individual Defendants falsely reassured stockholders again, however, denying there was "any material change in the time line of China," and thereby maintaining artificial inflation in the Company's stock.

20.     Stockholders eventually would learn the full truth on February 20, 2020.  A few weeks earlier, on January 10, 2020, the Individual Defendants had disclosed, among other things, that Riverside defaulted on its payment obligations to Six Flags, that the Company was holding Riverside in default, and that it was possible that all the Company's China projects would be terminated.  Six Flags' stock price declined by nearly 18% in response as analysts expressed shock, especially because "***management continued to tell anybody that would listen until very recently that incremental projects (and revenues) in China were likely***." Stockholders learned on January 10, 2020 that rather than "the next step in the evolution of Six Flags' international strategy" and the "significant growth represented by the international opportunity" the Individual Defendants had repeatedly touted, there was now "uncertainty about whether these parks will ever open" -- but stockholders were nevertheless again reassured by the Individual Defendants' representations about the possibility of "the continuation of one or more projects" in China.

21.     Finally, on February 20, 2020, stockholders learned the full truth -- that Six Flags' China parks would not be completed, and the Company's revenues and growth were and would continue to be substantially lower as a result. That day, the Individual Defendants disclosed that the Company had terminated its development agreements with Riverside and admitted Six Flags would not recognize ***any*** revenues or income from the development of Six Flags-branded parks in China. The Individual Defendants also announced the sudden departure of defendant Barber from the Company.

22.     Analysts were stunned, reporting that they "Didn't Think It Could Get Worse…But It Just Did," and that the "Second Shoe Finally Drop[ped]." In response, Six Flags' stock price declined by more than 16% to close at $31.89 per share, less than half of its Relevant Period high and, at that point in time, the Company's lowest stock price in over seven years.  This represented a loss of over *$2.4 billion* in stockholder value.  Nearly three and a half years later, the Company's stock price has not recovered and currently trades for approximately $24 per share.

23.     Unbeknownst to stockholders at the time, on February 18, 2020, Six Flags had received a subpoena from the SEC (the "SEC Subpoena") concerning the same events and issues described herein, which gave rise to the Securities Action. The SEC Subpoena demanded production of information concerning "all Board of Directors and Audit Committee meeting minutes; all agreements with Riverside Investment Group Co. Ltd.; documentation supporting the quarterly revenues recorded in connection with the Riverside agreements; documents concerning the cause of negative revenue adjustments related to the Riverside agreements; the identity of persons at Six Flags involved with the Riverside agreements; and all communications with and concerning Riverside." As described further below, however, the Individual Defendants kept stockholders in the dark regarding the existence of the SEC Subpoena for *fifteen months*, until May 18, 2021.  Upon information and belief, the SEC's investigation remains ongoing.

24.     Based on the events described herein, almost immediately after stockholders finally learned the full truth per the Individual Defendants' stunning February 20, 2020 disclosures, the Securities Action was filed in the U.S. District Court for the Northern District of Texas against Six Flags and defendants Reid-Anderson and Barber, alleging claims for fraud under the federal securities laws on behalf of investors who purchased or acquired Six Flags stock between April 24, 2018 and February 19, 2020 (the "Class Period").

25.     The operative complaint was filed in the Securities Action on July 2, 2020, and after the defendants subsequently moved to dismiss, the Securities Action was dismissed with prejudice by the Northern District of Texas on March 3, 2021. Following the dismissal with prejudice of the Securities Action, one of the co-lead plaintiffs to the Securities Action appealed.

26.     On January 18, 2023, the U.S. Court of Appeals for the Fifth Circuit reversed the dismissal of the Securities Action, finding that the defendants' challenged public statements from April 2018 through July 2019, were sufficiently alleged in the operative complaint to have been materially false and misleading, and to have been part of the defendants' scheme to defraud Six Flags investors during the Class Period.

27.     Among other things, with respect to the defendants' challenged statements in 2018, the Fifth Circuit found that "[t]he complaint contains several specific factual allegations from FE 1 about the disastrous state of the China parks throughout 2018 *that support the conclusion the parks would not open on schedule*" and raised "numerous factual allegations about inadequate construction to explain why a reassurance like 'our parks are progressing nicely towards their anticipated opening dates'" was materially misleading.

28.     As to scienter with respect to the defendants' challenged 2018 statements, the Fifth Circuit noted that defendants Reid-Anderson and Barber "were particularly incentivized in 2018 to increase high-margin international licensing deals to achieve the target EBITDA because revenue recognition occurred independently of the parks' long-term success" and "were motivated to receive equity awards of 600% and 300% of their base salaries."

29.     More importantly, the Fifth Circuit concluded that the allegations in the Securities Action regarding FE 1's: (a) "weekly presentations", the contents of which were related to defendant Reid-Anderson and the Board; and (b) "master reports" prepared for presentation to

10

defendant Reid-Anderson and the Board, were sufficient to support the inference that defendants Reid-Anderson and Barber had "*actual knowledge*" that their 2018 statements were misleading.

30.    The Fifth Circuit also held that the defendants' challenged public statements in February 2019, April 2019, and July 2019 were sufficiently alleged to be false and misleading. Among other things, the Fifth Circuit found that the operative Securities Action complaint "adequately alleges Defendants' positive statements about Riverside contained *actionable omissions about the company's true financial state*" and that "when Defendants told investors that Riverside has 'a lot of assets' and 'continues to pay,' and that their 'financing [for the parks] is in place,' *Defendants were omitting crucial information about Riverside's numerous financial woes* alleged by FE1."

31.    The Fifth Circuit concluded there was "*a strong inference of scienter*" based on the allegations in the Securities Action regarding FE 1's August 2019 resignation letter castigating the disastrous state of the parks and FE 1's regular reports, as well as FE 1's account of construction being "so non-existent that 'weeds [were] growing' on the theme park portion of the Zhejiang park in February 2019." The Fifth Circuit also found that a "core operations theory" contributed to the inference of scienter.[1]

32.    On May 14, 2020, Plaintiff issued an inspection demand to Six Flags pursuant to Section 220 (the "First Inspection Demand"), a true and correct copy of which is attached hereto

---

[1]    Per the Fifth Circuit's January 18, 2023 ruling, the dismissal of the Securities Action was reversed and the Securities Action was remanded to the Northern District of Texas for further proceedings consistent with the Fifth Circuit's opinion.  Several months later, however, on June 2, 2023, the Northern District of Texas dismissed the Securities Action a second time, with prejudice, based on its determination that the plaintiff lacked standing to sue.  This second, most recent dismissal of the Securities Action was not based in any way on the substantive merits of the allegations and claims asserted in the Securities Action.  An appeal is currently pending in the Fifth Circuit.

at Exhibit A.   Based on the non-public, Board-level, internal Company documents Plaintiff obtained from Six Flags in response to the First Inspection Demand (the "First 220 Production"), Plaintiff has uncovered additional evidence of the Individual Defendants' serious wrongdoing alleged herein.[2]   The First 220 Production, among other things, has revealed:



_____

[2]       Citations herein to materials in the First 220 Production obtained by Plaintiff from Six Flags are in the format: "SixFlags_____."

12

- ███████████████████████████████████

  ███████████████████████████████████

  █████████████████████████████

- ███████████████████████████████████

  ███████████████████████████████████

  ███████████████████████████████████

  ██████ ███ ███ ███ █████ ███ ███ █████ ████

  ████████████

- ███████████████████████████████████

  ███████████████████████████████████

  ███████████████████████████████████

  ███████████████████████████████████

  ███████████████████████████████████

  ████████ █████████████████████████

  ███████████████████████████████████

  ███████████████████████████████████

  ███████████████████████████████████

  ██████████████████████

- ███████████████████████████████████

  ███████████████████████████████████

  ███████████████████████████████████

  ██████████████████ ██████████████ ████████

  ███████████████████████████████████



33.    Shortly after the Fifth Circuit's January 18, 2023 ruling in the Securities Action, on February 1, 2023, Plaintiff issued a pre-suit litigation demand (the "Litigation Demand") to the Board under Delaware law, a true and correct copy of which is attached hereto at Exhibit B. The Litigation Demand is based in part on confidential information learned by Plaintiff via the First 220 Production.

34.    In the Litigation Demand, Plaintiff demanded that the Board initiate an independent, reasonable, good faith investigation regarding the allegations therein and take all necessary actions, including filing a lawsuit on the Company's behalf against its wayward "fiduciaries," in order to protect the Company's interests and recover the serious damages caused to Six Flags by their misconduct. In addition, the Litigation Demand noted that the three-year statute of limitations for breach of fiduciary duty claims under Delaware law would arguably expire as soon as February 20, 2023 (based on the February 20, 2020 disclosures that, among other things, Six Flags had terminated its development agreements with Riverside and would not recognize any revenues or income from the development of Six Flags-branded parks in China).

35.    To the extent that the Board might not have been prepared to promptly take the actions demanded by Plaintiff in the Litigation Demand prior to the arguable expiration of the applicable statute of limitations in late February 2023, Plaintiff demanded that the Board immediately secure tolling agreements from each of the individuals that were implicated or

potentially could be implicated in the alleged wrongdoing, including but not limited to the Individual Defendants named herein. Plaintiff further demanded in the Litigation Demand that no later than February 7, 2023, the Board provide written confirmation that such tolling agreements had been secured or would be timely secured.

36. On February 7, 2023, Plaintiff's Counsel received a letter from Aimee Williams-Ramey ("Ms. Williams-Ramey"), the Company's Chief Legal Officer, a true and correct copy of which is attached hereto at Exhibit C. Ms. Williams-Ramey's letter specifically noted Plaintiff's demand for tolling agreements to be secured posthaste given the applicable statute of limitations for breach of fiduciary duty claims under Delaware law. Ms. Williams-Ramey further represented that the Litigation Demand had been forwarded to the Board, and that the Board would consider matters in connection with the Litigation Demand at its next scheduled meetings, "which are presently set for March 7-8, 2023" – *i.e*., ***after the statute of limitations was at least arguably set to expire***.

37. Claims for relief belonging to the Company are, of course, valuable corporate assets. Directors of Delaware corporations, such as Six Flags, are duty-bound to protect and preserve the corporation's assets at all times.

38. The Board, in response to Plaintiff's demand that tolling agreements be secured immediately under the circumstances, told Plaintiff that this issue would not even be considered by the Board -- let alone acted upon -- until March 7-8, 2023, ***after*** the likely expiration of the statute of limitations for the Company's claims. Accordingly, the Board either acted recklessly by failing to promptly take the reasonable, basic steps necessary to ensure that Six Flags could timely assert its valuable claims, or worse, the Board deliberately chose to "run out the clock" and protect the Individual Defendants from the consequences of their misconduct.

15

39.     In either case, the Board's failure to expeditiously secure tolling agreements despite Plaintiff's explicit demands for tolling agreements under these circumstances – when the statute of limitations for Six Flags' breach of fiduciary duty claims under Delaware law had been set to expire shortly -- amounted to functionally ignoring and wrongfully refusing the Demand and failing to protect and preserve the Company's corporate assets, in violation of the Board's fiduciary duties to Six Flags and its stockholders.

40.     The Board's dereliction of duty left Plaintiff with no choice but to initiate this derivative action to ensure that the Company's valuable claims for relief based on the allegations in the Litigation Demand were properly and timely asserted.

41.     Nonetheless, after this derivative action was initiated by Plaintiff, on March 10, 2023, Plaintiff's counsel received a letter (the "Refusal"), a true and correct copy of which is attached at Exhibit "D", which was sent on behalf of the Board by Jay B. Kasner, Esq. ("Mr. Kasner") of the law firm Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden").  The Refusal stated that on March 7, 2023, Skadden attended the Board's regularly scheduled meeting and "presented to the Board on the [Litigation] Demand, advised the Board of its fiduciary duties and discussed certain considerations for deciding how to respond to the [Litigation] Demand."  The Refusal further indicated that on March 8, 2023, the Board met with Skadden again "to further consider the [Litigation] Demand."

42.     At the time that Skadden met with the Board on March 7 and 8, 2023 to make its presentation to the Board and to advise the Board regarding its response to the Litigation Demand, Skadden was serving *as co-lead defense counsel in the Securities Action*.  In connection therewith, Skadden represented (and continues to represent, as that case is currently on appeal in the Fifth Circuit) individual defendants Reid-Anderson and Barber, and of course Skadden has

16

served as their ***zealous advocates***, consistent with their duties as co-lead defense counsel.

43.     Indeed, on March 6, 2023, the day before Skadden first met with the Board to make a presentation to the Board and advise the Board regarding its response to the Litigation Demand, in its capacity as co-lead defense counsel in the Securities Action, Skadden submitted a joint status report to the Northern District of Texas in the Securities Action which stated defendants' position as to the claims and defenses as follows:

> Defendants deny Plaintiff's allegations. Six Flags had entered into a licensing agreement with Riverside to build Six Flags-branded theme parks in China. Six Flags accurately and timely described, among other things, the agreement with Riverside, Riverside's financial condition and the risks involved in such projects. Six Flags' international business was a small fraction of its overall business and China was only a portion of that business. Among other things, the Amended Complaint contains numerous mischaracterizations, takes statements out of context, and relies on so-called former employees who either mischaracterize information or did not have access to complete information regarding the business. In sum, none of the statements at issue was materially false or misleading when made nor were there any purported omissions that rendered any such statements materially false or misleading. Furthermore, to the extent any statements, including audited financial statements, could be deemed to be false and misleading, Defendants made such statements in good faith and did not possess the requisite scienter. Finally, Defendants contend that Plaintiff will be unable to prove loss causation because the price of Six Flags stock declined for reasons other than the revelation of an allegedly prior false or misleading statement.

44.     The Skadden attorneys listed as co-lead counsel for defendants in that March 6, 2023 joint status report in the Securities Action are Mr. Kasner, Scott D. Musoff ("Mr. Musoff"), and Jessie K. Liu ("Ms. Liu").

45.     Given that the Board was advised by decidedly, obviously non-independent counsel regarding its response to the Litigation Demand, it comes as no surprise that the Refusal informed Plaintiff that the Board elected, following advice provided by Skadden, ***not to conduct any factual investigation whatsoever in response to the Litigation Demand***, and that the Board had determined it was not in the best interests of the Company to take ***any of the actions demanded in the Litigation Demand***, with the exception of belatedly entering into tolling agreements.  *See*

Exhibit D.

46.     The Refusal was a predetermined outcome, since Skadden could not possibly and would never have advised the Board to conduct an investigation into, or initiate and prosecute any claims for relief against, ***its very own clients that Skadden was simultaneously, actively, and zealously defending in the Securities Action*** in response to substantially similar allegations of wrongdoing.

47.     Following receipt of the Refusal, Plaintiff issued an inspection demand under Section 220 to the Company on May 16, 2023 (the "Second Inspection Demand"), a true and correct copy of which is attached hereto at Exhibit E.  The Second Inspection Demand sought a production of documents related to the Refusal, particularly given that the Refusal stated that the Board rejected the Litigation Demand in its entirety, without conducting any investigation and after only two meetings held on March 7 and 8, 2023.

48.     Among other things, the Second Inspection Demand requested the production of documents "detailing how the Board determined that Skadden was independent for purposes of acting as counsel to the Board in connection with the Litigation Demand."  *See* Exhibit E.

49.     On June 27, 2023, Six Flags produced non-public, Board-level, internal Company documents (the "Second 220 Production") to Plaintiff in response to the Second Inspection Demand.[3] ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[3]     Citations herein to materials in the Second 220 Production obtained by Plaintiff from Six Flags are in the format: "SixFlags_DelaCruz_220-XXXXXXX."

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

50.   █████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

51.      A board of directors is duty-bound to independently investigate allegations in a shareholder demand promptly to satisfy its obligations to inform itself and to act reasonably and in good faith.  Here, in violation of its duties, the Board elected not to undertake any investigation at all.  The Board did so on the advice of non-independent counsel that was simultaneously, actively, and zealously defending certain of the individuals identified as wrongdoers in the Litigation Demand.  Indeed, the Board's decision not to investigate or bring any claims against anyone in response to the Litigation Demand was made on the advice of -- or in effect by – defendants' co-lead counsel in the Securities Action, Skadden, which had already pre-judged the allegations set forth in the Litigation Demand and which suffered from obvious, disabling conflicts.

52.      Where a board of directors inexplicably retains and is advised by conflicted

counsel in response to a shareholder demand, it amounts to a fiduciary failure that is fatal to the board's decision.  A Board's failure to investigate and/or its rejection of a shareholder demand, in an instance where a board has retained and been advised by conflicted counsel, raises a reasonable doubt that the board's decisions were adequately and independent informed and protected by the business judgment rule.  In such a rare case, the shareholder's complaint is entitled, on a wrongful demand refusal theory, to survive a motion to dismiss brought under Fed. R. Civ. P. 23.1.

53.     Accordingly, this derivative action on behalf of Six Flags should proceed.

## II.     JURISDICTION AND VENUE

54.     This Court has jurisdiction over all claims under 28 U.S.C. § 1332(a) because Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

55.     This Court also has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. § 1367.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

56.     In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

57.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because nominal defendant Six Flags is headquartered in this District and conducts business in this District.

## III.     THE PARTIES

### A.     Plaintiff

58.     Plaintiff is a current shareholder of Six Flags and has continuously held shares of Six Flags common stock since 2018.  Plaintiff is a citizen of California.

### B.   Nominal Defendant

59.     Nominal defendant Six Flags is a Delaware corporation with its principal executive offices located in Arlington, Texas.  The Company's common stock currently trades on the New York Stock Exchange ("NYSE") under the symbol "SIX."

### C.   The Individual Defendants

60.     Defendant Reid-Anderson served as a member of the Board from August 2010 until his retirement, effective November 18, 2019, and as CEO of the Company from August 2010 through February 2016, and from July 2017 until his retirement, effective November 18, 2019. Defendant Reid-Anderson is an individual defendant in the Securities Action, and is represented by Skadden in connection therewith.  Upon information and belief, defendant Reid-Anderson is a citizen of Illinois.

61.     Defendant Barber served as Executive Vice President and CFO of the Company from February 2016 until his retirement, effective August 31, 2020.  Defendant Barber is an individual defendant in the Securities Action, and is represented by Skadden in connection therewith.  Upon information and belief, defendant Barber is a citizen of Texas.

62.     Defendant Richard W. Roedel ("Roedel") served as a member of the Board from 2010 until May 2021.  Upon information and belief, defendant Roedel is a citizen of South Carolina.

63.     Defendant Kurt M. Cellar ("Cellar") served as a member of the Board from 2010 until May 2021.  Upon information and belief, defendant Cellar is a citizen of Connecticut.

64.     Defendant Nancy A. Kresja ("Kresja") served as a member of the Board from March 2017 until May 2021.  Upon information and belief, defendant Kresja is a citizen of Illinois.

65.     Defendant Jon L. Luther ("Luther") served as a member of the Board from 2010 until his resignation, effective May 6, 2020. Upon information and belief, defendant Luther is a

citizen of Florida.

66.     Defendant Stephen D. Owens ("Owens") served as a member of the Board from 2010 until his resignation, effective May 6, 2020. Upon information and belief, defendant Owens is a citizen of New York.

67.     Defendant David McKillips ("McKillips") joined the Company in 2006 and served as Senior Vice President of International Park Operations and President of Six Flags International Development Company from January 2018 until his departure from Six Flags on January 21, 2020. Upon information and belief, defendant McKillips is a citizen of Texas.

68.     Defendant Mark Kane ("Kane") served as President of Six Flags China Operations from September 2016 through February 2021, and thereafter served as Park President for Six Flags Darien Lake until his departure from the Company in January 2022. Upon information and belief, defendant Kane is a citizen of Texas.

69.     Defendant Stephen R. Purtell ("Purtell") joined the Company in 2012 and has served Six Flags in various roles since that time. From October 2016 until December 2020, defendant Purtell served as the Company's Senior Vice President, Investor Relations and Treasurer. From December 2020 until January 2022, defendant Purtell served as the Company's Senior Vice President, Investor Relations, Treasury, and Strategy. Since January 2022, defendant Purtell has served as the Company's Senior Vice President, Corporate Communications, Investor Relations, and Treasurer. Upon information and belief, defendant Purtell is a citizen of Texas.

70.     Defendants Reid-Anderson, Barber, Roedel, Cellar, Kresja, Luther, Owens, McKillips, Kane, and Purtell are collectively referred to herein as the "Individual Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

71.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual

Defendants owed the Company and its stockholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interests or benefit.  Each director and officer owed to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

72.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

73.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

74.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

        a.     manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

        b.     neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

23

c.      establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.      neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.      ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.      remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

75.      Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or

officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

### V.    FACTS

#### A.    Background of the Company, Its Business, and the Project 600 Incentive Compensation Plan

76.     Founded in 1961, Six Flags is the world's largest regional theme park operator. Throughout its more than 60-year history, Six Flags has primarily expanded through the acquisition of pre-existing regional parks. Six Flags' focus has historically been the North American market, with only a short-lived expansion into Europe through the acquisition of several European parks in 1998. Throughout the 2000s, Six Flags experienced a significant decline in revenue and had amassed over $1 billion in debt. Six Flags sought to address its debt and decline by selling off parks throughout the 2000s, including the European parks in 2004. Despite these sell-offs and changes to management throughout the decade, Six Flags was unable to reverse course, and the Company filed for Chapter 11 bankruptcy in 2009. Six Flags exited bankruptcy on May 3, 2010, and reissued stock on the NYSE in June 2010.

77.     As part of the Company's restructuring process, a series of strategic incentive plans were put in place, which entitled top Six Flags executives to significant equity awards if the Company's EBITDA goals were met. These plans were referred to as "Project 350" (with the goal of $350 million adjusted EBITDA by end of fiscal year 2011) and "Project 500" (with the goal of $500 million modified EBITDA by end of fiscal year 2015). Both these goals were accomplished in 2011 and 2015, with Six Flags achieving, on average, 10.6% annual EBITDA growth during

the five-year period.

78.     The Company's top executives were handsomely rewarded for this success. For example, defendant Reid-Anderson received a $34.5 million payout for achieving the Project 350 goals, and an additional $47.9 million when the Company achieved the Project 500 goals.

79.     Due to the success of the Project 350 and Project 500 incentive plans, the new "Project 600" plan was disclosed by the Company in October 2014. Project 600 entitled the Company's top executives and senior management, including defendants Reid-Anderson and Barber, to additional significant equity awards if the Company posted over $600 million modified EBITDA by fiscal year 2017, or 50% of the award if the Company achieved it in fiscal year 2018.

80.     The Company posted modified EBITDA of $477 million for fiscal year 2014 and would need to increase earnings by approximately 25% by fiscal year 2018 in order for the Company's top executives to receive the "late achievement" award for Project 600.

**B.      International Development Was Critical to the Company's Prospects and to the Receipt of Millions of Dollars in Bonuses for Certain of the Individual Defendants**

81.     The Individual Defendants were well-aware that international development was key to reaching the Project 600 targets. Accordingly, under the Individual Defendants' direction, Six Flags began to increase its focus on licensing efforts in international markets, which the Individual Defendants repeatedly told stockholders was one of the Company's five "key growth drivers" and part of a "five-pillar" strategy for growth. In pursuit of that goal, the Individual Defendants caused Six Flags to enter into licensing agreements with various international partners in China, the United Arab Emirates, Saudi Arabia, and Vietnam between 2014 and 2018. Pursuant to those agreements, the Company would receive initial fees from its international partners during the planning, design, and development phase of each park, and then would receive substantial continuing licensing and management fees once the parks opened.

26

82.     As the Individual Defendants repeatedly represented to stockholders, Six Flags depended on international licensing fees to drive present and future revenues and growth, because the profit margins the Company stood to realize from its international licensing agreements were far greater than profit margins derived from other revenue sources. For example, during the September 28, 2017 B. Riley Consumer Conference, an analyst asked, "what's the opportunity at this point" for international licensing, including from Six Flags' "partner in China." Defendant Reid-Anderson directed the question to the Company's Senior Vice President of Investor Relations and Treasurer, defendant Purtell, who defendant Reid-Anderson called "the initial driver of our international expansion." Defendant Purtell then responded as follows:

> Yes. So **international licensing is one of the biggest opportunities we have out there**, and it's still at the very early stages. **It requires no capital investment on our part** because it's a licensing model, **it's very high-margin revenue, 80% to 90% EBITDA margins**. And it's actually growing quite nicely. And we've got 5 parks that are under development right now, **4 in China** and 1 in Dubai. And we know that our partner in China intends to build multiple parks over the next decade. . .

83.     In contrast to the high profit margins that Six Flags' international licensing agreements represented, the Company's margins on operating revenues for its core domestic theme park business were far lower. For example, the Company reported for fiscal year 2017 net operating cash of $445 million, derived from total revenue of $1.359 billion, or a 32.7% margin. The 80% to 90% EBITDA margin which the Individual Defendants stated the international licensing agreements represented was approximately 2-3 times greater than the Company's margins on its operating revenues. Moreover, defendant Reid-Anderson represented that international licensing revenue for 2017 exceeded $38 million. At a 90% EBITDA margin, this represented approximately 8% of the Company's net operating cash.

84.     During a February 20, 2018 earnings conference call with stockholders and analysts, defendant Barber specifically identified an "increase in high-margin international

licensing revenue" as a key reason that Six Flags' reported "modified EBITDA margin was up 242 basis points in the quarter compared to prior year." Stockholders credited and relied on those representations. As analyst firm Wedbush later reported in February 2020, "Six Flags has been trading at a sizable premium to the rest of [its peer] group for years, *which we attributed primarily to the significant growth represented by the international opportunity*."

85.     Although the Individual Defendants did not break out the source for the Company's international licensing revenue by park, it is clear that the vast bulk of international licensing fees Six Flags recorded between April 2018 and February 2020 was attributable to the China parks. For example, during the Company's February 20, 2018 earnings conference call, defendant Reid-Anderson told stockholders that "[i]nternational licensing continues to gain momentum as revenue for the year exceeded $38 million." At the time, Six Flags had entered into international licensing agreements for seven parks in China and a single park in Dubai. Defendant Reid-Anderson later clarified during an October 24, 2018 conference call with stockholders and analysts that Dubai was "our smallest park" and "at the lower end" of the range of a $5-10 million EBITDA per-park contribution. Given the 80%-90% EBITDA margin that applied to the Company's international licensing agreements, Six Flags recognized approximately $6 million in revenue in 2017 for its Dubai licensing agreement. Accordingly, of the $38 million in revenue that Six Flags recognized in 2017 in connection with all its international licensing agreements, approximately $32 million was attributable to the Zhejiang and Chongqing developments, or 84% of Six Flags' international licensing revenue. This did not change between April 2018 and February 2020, when 11 of the 13 parks under development (discussed below) were located in China.

C.     **Prior to the Start of the Relevant Period, the Individual Defendants Announce Three Theme Park Projects in China and Purportedly Began Design, Development, and Construction for Openings in 2019, 2020, and 2021**

86.     As discussed above, under the Individual Defendants' direction, Six Flags planned its most ambitious international expansion in China. In late-June 2014, Six Flags announced the signing of an agreement with a Chinese real estate developer, Riverside, to build multiple Six Flags-branded theme parks in China. Six Flags' agreements with Riverside to develop parks in China represented the largest potential source of new revenue in its international licensing pillar. Ultimately, from 2016 to the first quarter of 2018, Six Flags recorded $70 million in revenue from its announced international parks, including those in China. Although the Individual Defendants did not announce the number of parks that Six Flags planned on licensing, the Individual Defendants later disclosed that Riverside was interested in developing "***20 parks, 10 properties***."

87.     Pursuant to the agreement with Riverside, Riverside would provide the capital investment for Six Flags developments in China. Riverside would pay Six Flags consulting and licensing fees during the development period of each park, and then licensing and management fees once the parks opened. While the Individual Defendants did not disclose the detailed terms of the arrangement with Riverside, the Individual Defendants represented that each "theme park" to be built in China would contribute $5 million to $10 million annually to the Company's EBITDA pre-opening, and $10 million to $20 million annually post-opening. The Individual Defendants also stated that smaller park concepts for China, including "water park[s]," "kid's park[s]," and "adventure park[s]," would each earn "$2 million to $4 million of EBITDA" before they open, and would "double[] to $4 million to $8 million" EBITDA after opening. Under the approach announced for the multi-park developments discussed below, which each included a theme park and multiple smaller parks, the EBITDA contribution from ten properties with twenty parks could

29

be upwards of $140 million yearly pre-opening, and $280 million yearly post-opening. According to these earnings projections, the three announced properties, Six Flags Zhejiang, Chongqing, and Nanjing, were projected to contribute, at minimum, $60 million yearly post-opening and could contribute upwards of $120 million.

88.     These potential earnings would have been astronomical relative to the Company's total earnings. According to the above-referenced EBITDA calculations, the Company's partnership with Riverside could increase Six Flags' EBITDA from $519 million in 2017 to nearly $800 million if Riverside developed 20 parks across 10 properties -- an increase of over 50%.

89.     In the years leading up to the Relevant Period, Six Flags and Riverside announced plans for three multibillion-dollar park projects, totaling 11 parks, to be built in three major population centers in China.

### 1.     Six Flags Zhejiang

90.     On October 20, 2015, the Individual Defendants caused Six Flags to announce the first of the three park projects, which the Individual Defendants stated would be built near Shanghai in Haiyan county, Zhejiang province ("Six Flags Zhejiang").[4] The Individual Defendants and Riverside claimed that Six Flags Zhejiang would be the anchor for a 30 billion yuan (USD $4.6 billion) mixed-use real-estate development along the Yangtze River Delta known as the "Zhejiang Riverside Themed Town." The Individual Defendants promoted this as "one of the most desired residential and retail communities in all of China, with the first-ever Six Flags branded theme parks serving as the centerpiece."

91.     In a Company press release issued on December 19, 2016, the Individual

---

[4]     Throughout the Relevant Period, the Individual Defendants interchangeably referred to Six Flags Zhejiang as the "Haiyan" parks, because the parks were located in Haiyan County in Zhejiang province. Bracketed references to "Zhejiang" herein replace "Haiyan."

Defendants describe the ambitious plans for the first two parks -- a theme park and a "Hurricane Harbor" water park -- as follows:

> Six Flags Zhejiang will be home to some of the most incredible roller coasters, rides and attractions in the world. The park will also feature elaborately-themed sections celebrating time-honored Chinese traditions, live shows and seasonal events along with a wide variety of culinary offerings and retail locations. Six Flags Hurricane Harbor will feature thrilling water slides, a massive wave pool, a relaxing Lazy River and an intricately designed children's water play area.

92. The Individual Defendants ultimately announced on October 26, 2017, that, in addition to the theme park and the Hurricane Harbor water park, Six Flags Zhejiang would include a Six Flags Kids World park, which the Individual Defendants claimed in an October 19, 2017 Company press release would "feature junior-sized versions of the company's world famous, record[]-breaking roller coasters, rides and attractions." The Individual Defendants announced that the park would include multiple themed sections specific to its Chinese parks, including Garfield, Tuzki Rabbit, and "Super Wings" themed rides and attractions.

93. The Individual Defendants announced that Riverside "broke ground" on Six Flags Zhejiang in January 2016. The Individual Defendants claimed that "construction [was] officially underway" by December 19, 2016. In July 2016, the Individual Defendants announced that Six Flags Zhejiang was expected to open in 2019.

94. The designs for Six Flags Zhejiang, scheduled to open in 2019, were elaborate:



### 2.    Six Flags Chongqing

95.    On February 21, 2017, the Individual Defendants announced that Six Flags had entered into definitive agreements with Riverside to build a second park complex, in Bishan, a district of the city of Chongqing ("Six Flags Chongqing") in Western China with a surrounding population of 120 million people. The Individual Defendants announced that Six Flags Chongqing would include four parks: a theme park and water park announced on February 21, 2017, and a Six Flags Kids World and a Six Flags Adventure Park announced on October 26, 2017. The Individual Defendants described the Six Flags Adventure Park as follows:

> For the more daring enthusiasts, Six Flags Adventure Park will be the ultimate in high adrenaline, action-packed thrills. From motocross bicycle races along rugged terrain, to whitewater rafting to zip lining or rock climbing hundreds of feet above the ground, guests will have the opportunity to reach beyond their comfort zone and safely push the boundaries of self-discovery in a beautiful, natural environment.

96.    In that same February 21, 2017 announcement, the Individual Defendants stated that Six Flags Chongqing was scheduled to open in 2020, which timeline the Individual Defendants

repeated in the October 26, 2017 announcement.

### 3.      Six Flags Nanjing

97.      On April 24, 2018, during the Relevant Period, the Individual Defendants announced that the Company would be partnering with Riverside to build a third park complex, in Nanjing, Jiangsu province ("Six Flags Nanjing"), the second largest city in Eastern China. The Individual Defendants announced three parks on April 24, 2018: a theme park, waterpark, and a Six Flags Adventure Park. In the Company's April 24, 2018 press release, the Individual Defendants announced that:

> The theme park and waterpark will boast state-of-the-art roller coasters, rides, waterslides and attractions along with elaborately-themed sections celebrating time-honored Chinese and American traditions. The theme park will also feature live performances along with exclusive, limited time only special events. Both parks will offer an extensive collection of culinary and retail locations.

98.      On May 29, 2018, the Individual Defendants announced that Six Flags Nanjing would also include a Six Flags Kids World, resulting in eleven planned parks for development in China across the three locations.

99.      In that same announcement, the Individual Defendants stated that Six Flags Nanjing was scheduled to open in 2021.

### D.      Six Flags Could Only Recognize International Licensing Fee Revenues If Riverside Showed Progress on the Parks and Made Its Licensing Payments to the Company

100.      Under U.S. Generally Accepted Accounting Principles ("GAAP"), Six Flags could recognize revenues in connection with its international licensing agreements if, among other things set forth in GAAP, it was probable that the Company would actually receive those revenues.

101.      GAAP constitutes the framework of guidelines for financial accounting used by accountants to prepare financial statements. The SEC has the statutory authority to codify GAAP and has delegated that authority to the Financial Accounting Standards Board ("FASB"). The

33

FASB has codified GAAP in its Accounting Standards Codification ("ASC"). As the Individual Defendants explained in Six Flags' periodic financial reports filed with the SEC on Forms 10-Q and 10-K during the Relevant Period, including, for example, the Company's quarterly report for the first quarter of 2018 filed on April 25, 2018, the Individual Defendants adopted FASB ASC 606, *Revenue from Contracts with Customers*, as well as the FASB's Accounting Standards Update ("ASU") Nos. 2016-08 and 2016-10, *Revenue from Contracts with Customers (Topic 606)* and *Principal versus Agent Considerations and Identifying Performance Obligations and Licensing*, respectively. Both ASU 2016-08 and 2016-10 explain in turn that:

> The core principle of the guidance in Topic 606 is that an entity should recognize revenue to depict the transfer of promised good or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services.

Among other things, ASU 2016-08 and 2016-10 require that a company may recognize revenue under Topic 606 only "***when (or as) the entity satisfies a performance obligation***."

102.    The GAAP provisions discussed in the preceding paragraphs governed the recognition of the Company's international licensing revenues during the Relevant Period. In Relevant Period SEC filings, including the Company's first-quarter 2018 Form 10-Q filed on April 25, 2018, the Individual Defendants purported to cause revenue derived from Six Flags' licensing agreements with Riverside to be recognized consistent with those governing requirements:

> We have entered into multiple agreements to assist third parties in the planning, design, development and operation of Six Flags-branded theme parks outside of North America. Pursuant to these agreements, we provide exclusivity, brand licensing, and other services to assist in the design, development and project management of Six Flags-branded theme parks, as well as initial and ongoing management services. Each significant deliverable qualifies as a separate unit of accounting. ***We recognize revenue under these agreements over the relevant service period of each unit of accounting [i.e., each park] based on its relative selling price, as determined by our best estimate of selling price***. Our best estimate of selling price is established consistent with our overall pricing strategy and includes, but is not limited to, consideration of current market conditions, various risk factors and our required return and profit objectives. We review the service

period of each unit of accounting on an ongoing basis and revise it as necessary throughout the year. Revisions to the relevant service periods of the units of accounting may result in revisions to revenue in future periods and are recognized in the period in which the change is identified.

103.    On a February 14, 2019 conference call with stockholders and analysts to discuss the Company's fourth-quarter 2018 earnings, defendant Reid-Anderson represented, consistent with those practices, that "we recognize revenue for each park ratably over the development period."

104.    In other words, the Individual Defendants caused revenue to be recognized for the China parks based on projected future revenues under the terms of the Company's partnership agreements with Riverside. During the period that the parks were purportedly under development and construction, under the Individual Defendants' direction the Company recognized pro rata amounts as revenue each quarter.

105.    As Six Flags' outside auditor KPMG LLP ("KPMG') has explained in its Revenue Recognition Handbook,[5] under Topic 606, the intellectual property for which Six Flags would recognize revenue under its licensing agreements with international partners such as Riverside was considered "symbolic" rather than "functional", as the intellectual property Six Flags licensed "does not have significant stand-alone functionality, and substantially all of the customer's benefit is derived from its association with the licensor's ongoing activities -- *e.g.* brands, trade names and franchise rights." Importantly, for symbolic intellectual property, "*[r]evenue is generally recognized over the license period using a measure of progress that reflects the licensor's progress toward completion of its performance obligation*."

106.    Accordingly, the Individual Defendants could not properly recognize revenue

---

[5]    KPMG, *Revenue Recognition Handbook*, available at https://frv.kpmg.us/content/dam/frv/en/pdfs/2017/revenue-recognition-handbook.pdf.

derived from the Company's international licensing agreements with Riverside, under GAAP and consistent with the Individual Defendants' representations to stockholders, if during the same period, Riverside failed to make "progress toward completion of its performance obligation[s]"-*i.e.*, making licensing payments to Six Flags as the contracts with Six Flags required and making progress in developing the China parks on the agreed-upon timetable. Any failure by Riverside to make licensing payments as required under the contracts with Six Flags or to make progress on the parks would represent a significantly reduced expectation of revenue or a longer time horizon over which the revenues would be recognized, such as due to delays in development timelines, and should be represented in a reduction in recognized revenue, under GAAP, to recognize that previously recorded revenues would have exceeded that amount earned based on the new timetable. Conversely, to the extent the Individual Defendants continued the Company's ratable revenue recognition in connection with the China parks, the Individual Defendants represented to stockholders that the expected timelines and future revenues from those parks had not changed. Indeed, as discussed below, later in the Relevant Period when the Individual Defendants were forced to disclose some (but not all) delays in the China parks, the Individual Defendants admitted Six Flags could not continue to recognize the full amount of licensing revenue at the rate which had been previously recorded.

> **E.     Construction of the Company's New Multi-Billion Dollar Chinese Theme Parks Would Require an Enormous Amount of Time, Manpower, and Capital**

107.     Of course, theme park construction is a capital-, labor-, and time-intensive process. As the Company's own disclosures have recognized, in the U.S. it would cost a competitor "$500 million to $700 million" and "a minimum of four years to construct" a "regional theme park" that would be "comparable to one of [the] major Six Flags-branded theme parks." The Six Flags China projects were not, however, planned to be "comparable" to Six Flags parks in the

U.S., but rather were planned as expansive multibillion-dollar resorts that would more closely resemble the USD $5.5 billion Disney Shanghai Resort and USD $6.5 billion Universal Studios Beijing Resort. Six Flags Zhejiang and the Zhejiang Riverside Themed Town, for example, cost USD $4.6 billion to develop.

108.    The construction of even a basic theme park requires multiple outside designers, consultants, engineers, and ride vendors. A company needs to identify the land, obtain necessary approvals, and raise significant investment. It must work with the multiple designers and consultants to develop a "master plan" that sets out the rough concept for the park, with the basic themed areas and plans for future expansion. After the master plan is in place, the company, designer, and its consultants must draft more detailed design documents, including architectural drawings, interior designs, signage, and attraction designs. Those, in turn, are used to generate specific construction drawings or blueprints for contractors and construction workers to plan and rely on during the on-site construction process. Because of the numerous essential steps and costs involved, even small parks or park expansions can easily take over four years and cost hundreds of millions of dollars.

109.    One of the most time-intensive and expensive aspects of theme park development is the design, development, and construction of the rides. A wooden rollercoaster can be built in eight months, a steel rollercoaster in 18 months, and a themed coaster -- for example, Garfield or Tuzki themed rides -- can take three to five years to be completed. The cost of a ride ranges between $1 million for a basic wooden rollercoaster and $30 million or more for a themed "dark ride," such as the Tuzki-themed dark rides announced for Six Flags Zhejiang and Chongqing. Rides require entire engineering teams, including project engineers for design and layout, electrical and design engineers for the control systems, structural engineers to ensure the safety and

soundness of the ride, and mechanical engineers to construct and install the structures.

110.     To put this in perspective, one of Six Flags China's would-be competitor theme parks, Disney Shanghai Resort, received land approval in November 2009 and officially opened in June 2016. Disney Shanghai broke ground and started major construction in April 2011. *100,000* workers were estimated to have worked on the park's construction, with upwards of *11,000* working on the park at any given time, and thousands more working on the resort infrastructure. A year before opening, its iconic Enchanted Storybook Castle was well under construction. Universal Beijing Resort, which broke ground in October 2016 and opened in September 2021, had *15,000* workers on site as of April 2020, approximately a year and half before opening.

111.     As discussed below, in stark contrast and unbeknownst to stockholders, a year before the opening date, Six Flags Zhejiang had no more than *several hundred* workers on site, and that already inadequate number dwindled into the double and single digits as workers went unpaid. The theme park's rides had not been paid for or delivered. Only *nine* Six Flags employees were in China supposedly overseeing the design, development, and construction of 11 parks.

### F.     By April 2018, The Company's China Projects Had Lost Necessary Government Funding

112.     Unbeknownst to stockholders, the Six Flags China projects were already encountering significant financial setbacks by April 2018, due to the Chinese government's decision to stop or withhold funding from the projects. In light of the scale and expense of the projects -- over $4 billion USD each -- each Six Flags China park involved partnerships with different local Chinese governments. Six Flags and Riverside partnered with, and required funding and approval from, the Zhejiang provincial government for Six Flags Zhejiang, the Bishan District government for Six Flags Chongqing, and the Lishui District government for Six Flags Nanjing.

113.     On April 9, 2018, the Chinese national government, through China's National Development and Reform Commission (the "NDRC"), announced plans to more tightly regulate China's theme-park industry. The plan was intended to curb "local debt risks" -- such as the risks taken by Six Flags' and Riverside's local and provincial government partners -- and reduce the construction of low-quality parks with poor construction standards. The NDRC's foremost target was "mega theme parks," which it defined as theme parks with investment of approximately USD $800 million or greater. In light of the significant debt risk that theme parks of that size posed for local governments, the NDRC announced that future "mega theme parks" would require the NDRC's approval, rather than approval only by provincial-level governments. Although the NDRC's policy did not apply to the Six Flags China projects because the agreements and approvals pre-dated the NDRC's policy change, the NDRC's announcement clearly signaled to local government officials that they should be more cautious in how they approve and fund theme park construction projects.

114.     By at least April 2018, the Chinese government began to re-evaluate its funding of the Six Flags China projects and its relationship with Riverside, and more specifically, Riverside's Chairman Li.  According to the account of FE 1 in the operative complaint in the Securities Action, the Chinese government did not want to fund Li Qi's projects anymore, and that decision had occurred before he arrived. Consequently, defendant Kane, then serving as General Manager and Park President of Six Flags Zhejiang, and defendant McKillips, then serving as Senior Vice President of International Park Operations and President of Six Flags International (and reporting directly to defendant Reid-Anderson), met with the Chinese officials in an attempt to keep the projects funded. Nonetheless, the local government that had approved and partnered to fund Six Flags Zhejiang withheld the funding and was no longer interested in working with

Riverside and Chairman Li. Per the account of FE 1 in the Securities Action, Riverside received no funding from its partners in the Chinese government for its Zhejiang development after April 2018.

### G. The Individual Defendants Misled Stockholders About Riverside's Ability to Navigate Regulations and Falsely Claimed Chinese Parks Would Open on Time

115.    The Individual Defendants' April 24, 2018 announcement of Six Flags Nanjing, on the heels of announcing three new parks in Zhejiang and Chongqing, sparked numerous questions from analysts concerning the status of the Six Flags China projects. On April 25, 2018, during the Company's first-quarter 2018 earnings conference call, a senior analyst from Oppenheimer & Co. Inc. noted, "[we are] also very encouraged by the parks that you announced in China" and asked, "[w]here are we as far as the Chinese expansion? Maybe what inning are we in? Or how many more opportunities do you think we're going to see there or that can be weighted towards just other regions of the world?" Defendant Reid-Anderson responded:

> [W]hen we announced the initial Riverside deals . . . we had focused in on being in the range of at least 10 parks within 10 years, and we're at 10 announced already. So when you look at the market itself, it's so encouraging because we've announced these 3 new parks. ***And we will not be stopping at 10 parks, I can assure you that, and our partner is very excited about being able to expand further with us***.

116.    During the same call, an analyst from William Blair & Company L.L.C. asked about the NDRC's announcement "that they would maybe put more scrutiny on these kind of large-scale theme park developments" and asked for any "kind of color or commentary there, if that impacts you guys or how that can impact the industry overall[.]" Defendant Reid-Anderson reassured stockholders that nothing had impacted the progress of the parks toward their scheduled opening dates, and touted Riverside's strength. Defendant Reid-Anderson represented to stockholders that:

> You've heard me talk about our partners, ***an incredible partnership with Riverside.***

***They are building 10 parks. They're on their way to building 10 parks***. We've talked about building multiple parks. There is no ban on theme park development in China. There are a series of guidelines that were issued regarding theme park developments. They're mostly focused on the real estate aspects of theme park development but also touched on enhanced theme park standards.

117.    Further, defendant Reid-Anderson stated outright that:

Our partner has not only successfully navigated the regulatory environment in China before but will continue to do so going forward. ***So right now, barring some other decision that's made, all our parks are progressing nicely towards their anticipating opening dates. And hence, we've announced 3 more parks. We're very confident***.

118.    Analysts credited defendant Reid-Anderson's statements. J.J.B. Hilliard, W.L. Lyons, LLC's ("JJB Hilliard") April 26, 2018 report remarked that "international demand seems strong based on recent development deals under a licensing structure," and "[t]here have been no delays or cost increases related to U.S./China trade relations [and] Management cited its expectation for no ban or prohibitions on its amusement park development in China, which is being spearheaded by a Beijing-based development company." JJB Hilliard rated the Company's stock as a Long-term Buy.

119.    The Individual Defendants continued to mislead stockholders throughout 2018. On June 20, 2018, defendant Barber attended the Oppenheimer Consumer Conference and discussed Riverside's and Six Flags' plans for theme parks in China. In response to an analyst question regarding "what do you think as far as the white space out there for international expansion," defendant Barber stated, "we had a lot of [parks] signed in the last few months but ***the pipeline is fantastic. I mean it's -- we have additional parks in China that our partner has said he wants to build [] 20 parks, 10 properties. He's been a very good partner for us***."

120.    Analysts specifically credited defendant Barber's June 20, 2018 statements regarding Riverside's intent to build 20 parks in China. In a July 25, 2018 update, Oppenheimer wrote that "[m]anagement notes potential to expand to 10-20 multi-park locations in China."

Oppenheimer rated the Company's stock as Outperform relative to the market.

121.    The Individual Defendants remained adamant throughout the summer and fall of 2018 that the progress of the China parks remained unchanged. During the Company's July 25, 2018 earnings conference call for the second quarter of 2018, defendant Barber stated, "that's right" when asked by an analyst whether the "opening timetable of the initial Chinese parks" remained "3 parks in late 2019 and another 4 in early 2020." Defendant Reid-Anderson went further and stated, "*[t]he timing of the parks remains exactly the same as previously disclosed, there's no change on any of those*. And so if you need more details off-line, we're happy to take you through that timing by park. Okay?" On the same call, defendant Reid-Anderson stated that Six Flags' upcoming international parks should "super charge revenue growth," and that the international deals made Six Flags "the ultimate growth and yield stock." Defendant Barber added that "revenue from international licensing should accelerate further, as we continue to add new licensing arrangements and over the long term begin opening new parks."

122.    Analysts credited the Individual Defendants' statements that the timeline for opening the Six Flags China parks remained unchanged. In a July 26, 2018 analyst report, Wedbush Securities wrote that "[m]anagement stated that international licensing will accelerate in the future with the announcement of new deals as well as the incremental contribution that comes with the eventual opening of the new parks. To that end, there is no change/setback in the expected openings of the initial international parks in late 2019 and early 2020." Wedbush maintained its "Neutral" rating.

123.    The Individual Defendants continued to deny any significant delays during the Company's October 24, 2018 earnings conference call for the third quarter of 2018. During the call, the Individual Defendants disclosed that issues with the Company's Dubai partner "makes

42

on-time opening in 2019 unlikely" for Six Flags Dubai. In response to a request from a Wedbush

securities analyst for an "update" on the China parks' construction, defendant Reid-Anderson drew

a distinction with the Dubai park, which was delayed, and asked defendant Barber to "go through

all the other parks which are on time." Defendant Barber provided a specific timetable for the

China parks:

> So you mentioned the Chinese parks. We–those start to come online in Zhejiang,
> the theme park, water park and kids' park are early 2020. The Chongqing parks are
> during 2020. That's a theme park, a water park, a kids' park and an adventure park.
> Those are mid-2020. And then Nanjing, those will start to open up in 2021. The
> water park, Kids World first, the adventure park in 2021 as well as in Nanjing. And
> then the Nanjing Theme Park will actually open up in 2022 midyear.

124.    The Wedbush analyst immediately seized on the apparent change in opening

dates, asking, "just to clarify, I thought the first round of Chinese parks were originally slated for

late next year. Did I get that wrong? Or did those get pushed back?" Defendant Barber clarified

that there was a minor "shift" in the opening date for Six Flags Zhejiang: "technically, it's the first

of 2020. . .earlier we were saying late 2019, which was in the fourth quarter. So it -- really the shift

is [a] month or 2. It's not much."

125.    Analysts credited defendant Reid-Anderson's statements that the "other parks []

are on time." In an October 24, 2018 report, SunTrust Robinson Humphrey noted that, despite

announced delays in the development of Six Flags Dubai, "[t]he remainder of SIX's international

projects remain on track." SunTrust Robinson Humphrey maintained its "Buy" rating.

### H.    By April 2018, Riverside Failed to Make Payments to Employees and Vendors, and the Individual Defendants Were Aware the Parks Would Not Open on Time

126.    By the beginning of April 2018, it was clear to the Individual Defendants that, in

reality, the Six Flags China projects were not "progressing nicely towards their anticipated opening

dates," that the "timing of the parks" did not "remain[] exactly the same as previously disclosed,"

Riverside was not an "incredible partner[]" that was "building 10 parks," or "on their way to building 10 parks," and Riverside was not capable of building "20 parks" at "10 properties." Rather, as the Individual Defendants were aware, construction on the parks was not progressing and the Six Flags China parks could not possibly open on time. Riverside lacked the multibillion-dollar financing required to build even a single park complex.

127.     According to the operative complaint in the Securities Action, in May 2018, Six Flags International's former Director of International Construction and Project Management, FE 1, arrived in China to manage the construction of the Six Flags China parks. It is alleged in the Securities Action that immediately before joining Six Flags, FE 1 was responsible for overseeing the construction of one of the most ambitious and well-known new attractions in the world, built by one of Six Flags' main competitors. In FE 1's role at Six Flags, FE 1 is alleged to have been responsible for protecting Six Flags' brand by overseeing the construction of the Six Flags' China parks and ensuring that Riverside was building the parks correctly and safely. FE 1 allegedly worked onsite at Zhejiang, but also traveled to the Chongqing site to perform site inspections and check its progress, and allegedly met often with Six Flags and Riverside personnel in Beijing. Per FE 1's account in the Securities Action, when FE 1 joined in May 2018, design development was complete for Zhejiang and mostly complete for Chongqing, and FE 1 was to oversee Riverside's building of those parks. And although the Individual Defendants had announced that Six Flags broke ground on Zhejiang in January 2016 -- which would make sense for a park to open in 2019 -- in reality, it was just starting.

128.     As alleged in the operative complaint in the Securities Action and discussed further herein, FE 1 immediately recognized from the beginning of FE 1's tenure at Six Flags what was apparent to everyone involved in the Six Flags China parks, namely: (1) there was absolutely

no way Six Flags could complete the construction of the Chinese parks on the schedule announced to the public, and (2) far from "progressing nicely," construction was effectively at a standstill, because Riverside had largely ceased funding the parks' development. Per the account of FE 1 in the Securities Action, upon FE 1's arrival in China, FE 1 learned right away that Riverside could not pay for the basic requirements to construct theme parks, and was not paying employees across functions, including design and creative teams and even food-service workers. It is alleged that FE 1 told senior executives at Six Flags almost immediately upon FE 1's arrival in May 2018 that the Company should declare Riverside "in breach of contract" and abandon the relationship due to Riverside's obvious failures to meet the terms of the contract, but Six Flags officials refused.

### 1. By April 2018, It Was Apparent That Six Flags' China Parks Would Not Be Constructed In Time For Their Publicized Start Dates

129.    As discussed above, Six Flags Zhejiang was to be Six Flags' flagship park in China, opening in 2019. However, no later than April 2018, it was clear that construction was well behind schedule and there was no way Riverside would be able to meet the schedule announced by the Individual Defendants to stockholders.

130.    Below is a photo of Six Flags Zhejiang from April 2018 demonstrating that, as of April 2018, almost no progress had been made on the enormous, $4.6 billion development that was supposed to open its doors within 19 months:



131.    In stark contrast, 24 months before Shanghai Disneyland opened, the Disney park

was well on its way to completion:



132.    Indeed, according to the account of FE 1 in the operative complaint in the

Securities Action, FE 1 recognized the projects were in jeopardy from the moment FE 1 arrived.

Per FE 1's account, only nine Six Flags employees had been sent to manage the development and

46

construction of 11 parks throughout China, with a "complete lack of monetary support." Per the operative complaint in the Securities Action, FE 1 contrasted that number with Disney, which FE 1 stated sent 10,000 people to China to build Shanghai Disneyland. The Securities Action quotes FE 1 as stating it was "common knowledge basically right away" at Six Flags when FE 1 arrived that the parks "wouldn't hit" the "[opening] dates provided to the media." The Six Flags China team is alleged in the Securities Action to have met regularly with defendant Kane, then serving as General Manager and Park President of Six Flags Zhejiang, and to have asked defendant Kane "why [the Company is] saying we'll hit this [opening] date." FE 1 and the Six Flags China team allegedly informed defendant Kane that they "[couldn't] build [Zhejiang] in 18 months" or open on time "even if everything was in [their] hands right now." As discussed below, the necessary materials were decidedly not in their hands at the time. During this time, the Individual Defendants continued to tell stockholders the parks were on schedule.

### 2. Riverside Did Not Invest in the Basic Building Blocks of a Theme Park, and Thus There Was No Way the Parks Would Be Built on Time

133.    According to the operative complaint in the Securities Action, FE 1 confirmed that, as of May 2018 and through FE 1's departure in September 2019, Riverside lacked the funding to make any meaningful progress on the Six Flags China parks and it was clear that the parks would not open on time. The Securities Action alleges that FE 1 identified two principal obstacles to the parks' construction that were the result of Riverside's lack of funding, and that these obstacles were apparent and well-known within the highest levels of Six Flags.

134.    *First*, it was known at the Company that Riverside had not paid and was unable to pay the major vendors who were supposedly constructing the primary features of the parks-roller coasters and other rides. As a result, construction of the rides had been cancelled or they had been sold to other parks. Without rides, the Six Flags China parks could not complete construction and

certainly could not open.

135.    As discussed above, theme park construction relies heavily on outside vendors to construct rides that are made to order and require years of lead time and planning. In particular, themed rides, like the Tuzki Rabbit-themed rides intended for Six Flags Zhejiang and Six Flags Chongqing, are custom-constructed and require years after ordering to deliver. According to the operative complaint in the Securities Action, FE 1 learned from "day one" in May 2018 that Riverside was unable to pay the vendors to complete and deliver the rides. Riverside's inability to pay the ride vendors is alleged to have been an issue before FE 1 even joined the project, and it is alleged that this issue was raised in earlier reports to Six Flags' management.

136.    Per the account of FE 1 in the Securities Action, nearly every major ride manufacturer was involved in the project (approximately 40 ride manufacturers), and every single one of those outside manufacturers had begun to construct rides for Six Flags and then had to cease construction or find another buyer. As a result, there was allegedly "bad blood" between Six Flags and its major ride partners for some time. It is alleged in the Securities Action that every theme park ride order Riverside placed ultimately was cancelled because Riverside was unable to pay for the rides to be built or shipped.

137.    *Second*, Riverside was unable to fund the significant construction work necessary to prepare the parks to be ready for the installation of rides, if Riverside ever obtained any. It is alleged in the Securities Action that under FE 1's oversight, Riverside was supposed to be constructing the infrastructure for the parks, such as roads, canals, pavilions, and the elaborate buildings that are a part of any theme park.

138.    As of May 2018, it is alleged that Riverside only had "design drawings" for the Six Flags Zhejiang and Six Flags Chongqing parks from FORREC, a Canadian entertainment

48

design company. However, to begin construction, Riverside needed to commission the creation of the basic and indispensable construction drawings, which construction crews rely on for construction specifications and instructions.

139.     As reported in the *Los Angeles Times* in 2015, "Contracts to complete concept drawings for Chinese theme parks bring in $500,000 to $7 million apiece, with more detailed construction plans priced at up to $15 million[.]" But Riverside did not have the funding to commission these fundamental blueprints.

140.     It is alleged in the Securities Action that in or around May 2018, FE 1 attended a meeting in Beijing with senior members of the Six Flags China team, including defendant Kane and Will Edwards (the Six Flags China Park Presidents), and FE 1 was informed that Riverside did not have the money to pay for the additional construction drawings and the process had "stalled out."

### 3.     Riverside's Financial Situation Only Deteriorated Further Over the Course of 2018

141.     As alleged in the Securities Action, by May 2018, Riverside had attempted to start construction on Six Flags Zhejiang based solely on the design drawings, a process that was unsafe, counterproductive, and resulted in no meaningful progress on the parks. Construction workers hired by Riverside dug holes and installed certain "pile foundations" intended to support the rides for which Riverside had not paid. It is alleged that in at least one instance, construction workers needed to tear out and re-install the pile foundations because they had been installed incorrectly due to being based on design drawings rather than the construction drawings they needed but did not have. The construction sites would allegedly have large open holes, some "over 100 feet deep" with "no protection."

142.     The operative complaint in the Securities Action alleges that FE 1 raised these

issues with Riverside and informed them that the construction work was putting peoples' lives in danger, but Riverside would "just laugh about it." FE 1 is quoted as describing Six Flags' contract with Riverside as "worthless" and "the most ridiculous thing" because it did not give Six Flags any way to force Riverside to make progress on construction or to meaningfully enforce the contract at all.

143.    Accordingly, construction progress was minimal. As FE 1 is alleged to have warned Six Flags officials, a business partner had been chosen for the Company that "will not be successful in building a safe and reliable theme park."

144.    By August 2018, Riverside also had fallen behind on its licensing payments to Six Flags. According to the account in the operative Securities Action complaint of the confidential witness referred to therein as "FE 2," described as a former Account Manager at Six Flags throughout 2018, Brett Petit, the Company's Senior Vice President of Marketing and Sales (who reported directly to defendant Reid-Anderson), as well as numerous employees in Six Flags' Marketing Department and International Department, discussed Riverside missing licensing payments by at least August 2018. The Marketing Department was allegedly working on the Six Flags China parks because the parks needed to follow Six Flags' branding requirements, but they questioned why they were doing marketing work for the parks when Riverside was unable to pay. The issue was worsening over time. According to the account of FE 2, Riverside remained past due on licensing payments as of the time FE 2 left the Company at the beginning of 2019, and it was apparent to Six Flags employees that it was just a matter of how long Six Flags would wait before deciding to "pull the plug."

145.    The Securities Action alleges that FE 1 similarly confirmed that during FE 1's time in China, Riverside failed to make licensing payments to Six Flags, which management told

FE 1 prevented the Company from purchasing critical items for FE 1's work, including a printer and larger screen to assist in reviewing drawings. According to the account of FE 1, the response from management was simply that "Riverside owe[s] us money, so we need to wait for it to come in," but even when Riverside did make payments to Six Flags, the Six Flags China team "never got funding for a damn thing."

146.    By the end of August 2018, Riverside already was unable or unwilling to make even relatively small payments that it owed to its vendors and partners. For example, Riverside owed a 7 million yuan (approximately USD $1 million) payment due August 30, 2018 to Guangdong Aofei Theme Cultural Technology Co., pursuant to an intellectual property ("IP") licensing agreement that allowed Riverside to use the "Super Wings" cartoon IP in connection with the Six Flags Zhejiang kids' park. This amount was miniscule in comparison to the 30 billion yuan (USD $4.6 billion) project development cost that had been announced for the entire Zhejiang Riverside Themed Town project, but Riverside was unable to pay it. Instead, Riverside proposed to Guangdong Aofei that Riverside pay 3 million and 4 million yuan (approximately USD $420,000 to $560,000) installments in December 2018 and March 2019, respectively, only to miss those payment dates as well.

147.    Riverside's financial condition worsened as time went on. As reported by citizen journalists in China, significant layoffs at Riverside occurred in August 2018, and Riverside was not paying severance owed to those former employees under severance agreements.[6] According to the operative complaint in the Securities Action, FE 1 confirmed that, throughout FE 1's time in China from May 2018 to September 2019, Riverside "laid off people constantly," and that "you'd have a floor in Beijing with 100 people and two weeks later there would be nobody there because

---

[6]    *The Fall of Riverside Group*, hetunwenlv (Dec. 17, 2019),
https://mp.weixin.qq.com/s/Mm1lHIrgMdS5c-RrwEUsjw.

51

Riverside dumped them." According to the account of FE 1, there was "huge turnover" due to Riverside employees "constantly being unpaid" and it was "the biggest turnover I've ever seen, it was constant, it never stopped."

148.    To address the lack of financing, Riverside sold the residential development associated with Six Flags Zhejiang to another real estate company, Sunac China Holdings Ltd. ("Sunac"). The proceeds from that sale, however, were insufficient to address Riverside's significant financing shortfall. By early 2019, it is alleged that the limited construction that had been occurring at Six Flags Zhejiang slowed to a "complete trickle." The retail component of Six Flags Zhejiang was deserted and all construction on it had stopped. Riverside could not even afford to pay cafeteria workers, who were threatening to leave. According to the account of FE 1 in the Securities Action, "you couldn't even get toilet paper" and it was "just insane."

149.    Per the account of FE 1 in the Securities Action, by February 2019, "there were already weeds growing" in the theme park portion of the Zhejiang park because there were no rides and no capital to move forward with construction. FE 1 is quoted as describing just "sitting on the job site watching grass grow taller than [FE 1]" because "nothing else was getting done" at Zhejiang other than some "busy work," such as workers assembling tubing for the waterpark. FE 1 is further quoted as stating that the waterslides "were just tubes and easy to do. The other attractions, the only thing that got done was driving pile foundations into the ground, nothing. It was the same situation in Chongqing, they didn't have the rides."

### 4.    The Individual Defendants Knew There Was No Progress at the Six Flags China Parks and the Parks Could Not Open on Time

150.    The Individual Defendants, including defendant Reid-Anderson and other Board members, were aware of these significant problems and that the parks would not open on time. As alleged in the operative complaint in the Securities Action, FE 1 prepared weekly presentations

52

and periodic reports on the progress of construction at the Six Flags China parks for defendant McKillips, who served as Senior Vice President of International Park Operations and President of Six Flags International until January 2020, in which capacity defendant McKillips had weekly or biweekly meetings with and oversaw the entire Six Flags team in China, and who in turn presented the presentations and reports by FE 1 to defendant Reid-Anderson and to the Board.[7] These presentations and reports showed that there was only minimal construction progress and that there were vendor payment and safety issues, including missed payments by Riverside to vendors and designers.

151.     According to the account of FE 1 in the Securities Action, FE 1's reports showed that almost "nothing happened" and that there was "no progress" on the parks. The only work that was being done was on the Zhejiang and Chongqing water parks because they had "already bought the tubes," but Riverside could not even afford the water pumps or machinery needed to run water slides. Despite this obvious lack of progress, the Individual Defendants continued to claim throughout 2018 that the China parks were "on time" although, per FE 1's account in the Securities Action, "it was pretty much common knowledge" that "the timelines were just way too aggressive."

152.     Despite these massive and worsening problems, which the Individual Defendants, were aware of, the Individual Defendants continued to mislead stockholders while Riverside continued to fail to meet its obligations. Indeed, analysts credited the Individual Defendants' false representations that the China parks were proceeding on schedule. For example, in a January 17, 2019 analyst report, Wells Fargo "reiterate[d] our Market Perform rating" and stated that Six Flags was "Fairly Valued," stressing that:

---

[7]     In 2018 and 2019, defendants Reid-Anderson, Roedel, Cellar, Kresja, Luther, and Owens each served on the Board.

> We view the sizable scale developments in China with partner Riverside Investment Group, as critical to the international component of the SIX story. ***We do NOT see any material risk to [Six Flags'] China developments*** from current trade/tariff issues nor slowing Chinese economy. (emphasis in original).

Wells Fargo further reported that "Each international park is expected to contribute $5MM-$10MM/year to EBITDA pre-opening, and $10MM-$20MM/year post-opening."

> ### I.    On February 19, 2019, the Individual Defendants Announce a $15 Million Downward Revenue Adjustment for Six Flags in the Fourth Quarter of 2018, But Falsely Reassure Stockholders That "Construction Is Continuing"

153.    On February 14, 2019, the Individual Defendants surprised stockholders by announcing that the opening dates of the Six Flags China parks would be delayed by several months, and as a result, the Company would be forced to take a negative revenue adjustment of $15 million for the fourth quarter of 2018. Rather than admitting the truth -- which was that Riverside had made no material progress on the parks and was unable to fund completion of the projects -- the Individual Defendants falsely blamed the delays on "a challenging macroeconomic environment" that "many companies [we]re experiencing," while falsely reassuring stockholders that "construction [wa]s continuing."

154.    In an SEC Form 8-K and press release announcing the Company's financial results for fourth-quarter and full-year 2018, the Individual Defendants announced "an unfavorable revenue adjustment of $15 million related to the company's international agreements due to delays in the expected opening dates of some of the parks in China caused by a challenging macroeconomic environment," which "resulted in a 38 percent decline in sponsorship, international agreements and accommodations revenue compared to the fourth quarter of 2017." Similarly, in an earnings conference call that same day, February 14, 2019, defendant Reid-Anderson disclosed that the Company's revenue growth "would have been approximately $15 million higher if not for our fourth quarter adjustment to reflect delays in some of the China parks'

opening schedules caused by recent macroeconomic events that many companies are experiencing." Defendant Reid-Anderson admitted that "*we now expect our [Zhejiang] parks to begin opening in mid- to late 2020 versus 2019, our Chongqing parks to begin opening in mid to late 2021 versus 2020, and Nanjing to begin opening in late 2022*," a 6-to-12 month delay.

155.    In other words, because the opening dates for the China parks were delayed, the pre-opening fees would be stretched over a greater number of quarters, resulting in smaller per-quarter revenue. This revenue correction, which was no doubt recorded because the Company's auditor had raised concerns during its year-end audit that Riverside was not paying Six Flags its licensing fees, was an admission by the Individual Defendants that the Company's revenue had been recorded improperly in the previous quarters, when Riverside was equally derelict in meeting its obligations. In reality, because the Individual Defendants knew or were reckless in not knowing that Riverside was unable to develop the Six Flags China parks at all, *no* revenue for the China parks should have been recorded.

156.    Stockholders were surprised to learn that Six Flags' China projects faced delays. Analysts expressed their concerns about both the disclosed delays to park development in -- and revenues from -- China, as well as whether those problems were greater than disclosed. For example, on February 15, 2019, analyst Wedbush reported that "our 2020 estimate is down $22M, as we push back the openings of all three Chinese parks." Similarly, *TheStreet.com* ran an article on February 14, 2019, titled "Six Flags Sinks as Revenue Misses Estimates Because of 'Challenging' China," reporting that "Six Flags Entertainment Corp. plunged more than 15%" in response to the Company's disclosure.

157.    In response to the disclosures that the China projects were delayed and the delay negatively impacted the Company's revenues, Six Flags' stock price declined by over 14%, falling

from $63.87 per share on February 13, 2019 to $54.87 at the close of trading on February 14, 2019.

158.     During the conference call on February 14, 2019, the Individual Defendants made false, reassuring statements that were intended to and did mitigate stockholders' negative reaction to the news of delays in developing the Company's branded parks in China, and associated negative financial consequences. The Individual Defendants blamed the delays on "macroeconomic" conditions that purportedly affected *all* private companies doing business in China, rather than on Six Flags-specific and Riverside-specific problems, including Riverside's longstanding but undisclosed inability to fund Six Flags projects supposedly under development. Specifically, the Individual Defendants represented that they had "performed a comprehensive review of our project timelines jointly with [Riverside]," and as a result "ha[d] reasons to believe conditions could improve in China during the . . . second half of 2019," which purportedly enabled the Company's China parks to be slightly delayed but otherwise remain on track.

159.     During the February 14, 2019 earnings conference call, defendant Reid-Anderson reassured stockholders that "construction is continuing" on the China parks, while stressing "that the 2020 [revenue] goal, getting there is possible," and that the Company's announced international parks, including the China projects, "will contribute to our long-term growth." Defendant Reid-Anderson further reassured stockholders that problems with the China parks were only "short-term international setbacks," reinforcing his "belie[f] our stock price is fundamentally undervalued."

160.     In direct response to an analyst question from Janney Capital Markets asking the Individual Defendants to "talk a little bit more about your partner over there [in China]," including "[h]ow healthy are they right now" and "about the financing behind some of these projects[,] [a]re there any potential issues as far as having enough funds to continue to do construction," defendant

56

Reid-Anderson reassured stockholders that "[w]e really have *a first-class partner in China with Riverside*," which had "so far successfully navigated the political and the regulatory environment there" and experienced only those problems that were supposedly "being experienced by every other private company in China."

161.     Defendant Reid-Anderson then asked defendant Barber to add his thoughts on Riverside -- and then quickly had to interrupt when defendant Barber almost admitted Riverside was missing payments to Six Flags. Specifically, defendant Barber, in speaking about Riverside, reassured stockholders and analysts that:

> [Liquidity] has been tougher for other companies. But he [Chairman Li]'s in good shape. *There's some gap*. . . .
>
> Defendant Reid-Anderson: *He continues to pay*.

162.     Defendant Barber quickly caught himself, continuing that Chairman Li "continued to pay us, and that's important," was "providing the funding for the development of the parks," had "the ability to source additional funding," and was "excited about the fact that [Riverside is] in pretty good shape, although in a tough environment." But this was not true. As discussed above, Riverside was missing or delaying payments and did not have the assets or liquidity to fund the developments.

163.     Defendant Reid-Anderson added the "important" point that "*[w]e are continuing to build those parks, and they are still progressing*. So that is ongoing as we speak," and told stockholders that "the financing is in place, and the financing then gets expanded as time goes on."

164.     The Individual Defendants' statements falsely assured stockholders that Six Flags' China parks were still progressing as Riverside navigated ongoing macroeconomic issues supposedly beyond their control. But the Individual Defendants failed to disclose that, as FE 1 stated in the operative complaint in the Securities Action and subsequent events have confirmed,

at the time, "there was no meaningful construction at all," and no material construction progress had been made on any of the China theme parks. Accordingly, while the Individual Defendants claimed the parks would be delayed only 6-12 months, Six Flags was functionally in the same position in February 2019 as it had been in mid-2018, when FE 1 first allegedly told Six Flags executives that the Company should put Riverside into breach of contract. According to the account of FE 1, who had been overseeing the construction of the Six Flags China parks for nine months by this point, there had been no progress made that would justify the incredibly tight turnaround that defendant Reid-Anderson's comments represented. Indeed, according to the operative complaint in the Securities Action, FE 1 said expressly that any claim that construction was continuing at the time was "not true."

165.    The Individual Defendants' claims about a "challenging macroeconomic environment" during late 2018 and into 2019 were also false. As alleged in the Securities Action, the Six Flags China team was aware at the time that defendants Reid-Anderson and McKillips had started to blame the lack of progress on "macroeconomic issues," and members of the team would "laugh about it" after meetings and ask each other how defendants Reid-Anderson and McKillips came up with that explanation. According to the Securities Action, FE 1 recounted traveling throughout China during this period, and everywhere FE 1 went there was ongoing construction. There was no indication that "macroeconomic issues" were affecting construction.

166.    Construction was not only happening throughout China, it was happening on the exact land Riverside was supposed to develop as part of the "Zhejiang Riverside Themed Town." According to the account of FE 1, Sunac quickly developed the land it had purchased from Riverside, and a commercial center and condominiums were built in less than 30 days. Riverside, by comparison, had not been able to develop the land during the three years it had supposedly been

58

doing construction on the Zhejiang Riverside Themed Town.

167.     The Individual Defendants' false reassurances had their desired effects, however, as stockholders remained in the dark. Analysts, trusting the Individual Defendants, downplayed concerns about Riverside and development of the China parks. For example, on February 15, 2019, Wedbush maintained its "Neutral" rating for Six Flags stock, noted approvingly that despite the disclosed delays in the China projects, "Management went on to say…they expect many of these factors to show improvement in the back half of 2019," and "Management stressed *the parks are still progressing as Riverside navigates the ongoing issues*." Berenberg similarly reported on February 15, 2019 that although "the feasibility of these [international] opportunities is likely being questioned. . .we see international expansion as a low risk/high reward strategy…albeit one that will likely take longer than originally thought to come to fruition."

168.     On March 7, 2019, the Individual Defendants unexpectedly announced in a Form 8-K filed with the SEC that Six Flags had commenced a search for a successor to defendant Reid-Anderson to serve as the Company's CEO, and that defendant Reid-Anderson would retire by the end of February 2020.

>    **J.     On April 23 and 24, 2019, the Individual Defendants Deny Any Additional Delays and Falsely Represent That "China Is Improving" and "There's Ongoing Building Going On"**

169.     On April 23, 2019, the Individual Defendants caused the Company to issue a press release and SEC Form 8-K announcing the Company's financial results for the first quarter of 2019, and falsely pointed to the Company's international developments including in China as key drivers of the Company's purportedly positive financial condition and future growth. The Individual Defendants reported that the Company's revenues declined by $1 million, or 1%, from the first quarter of 2018, which decline would have been greater if it were not for "*an increase in revenue from international agreements*." The press release quoted defendant Reid-Anderson

pointing to "*international expansion opportunities*," among other factors, as leaving the Company "very well-positioned to deliver our tenth consecutive year of record financial performance in 2019."

170.    During an earnings conference call with stockholders and analysts the next day, the Individual Defendants continued to falsely represent to stockholders that the Company's China parks would drive positive financial results. In that call, defendant Reid-Anderson told stockholders that Six Flags' "long-term international opportunities remain[] compelling," and represented that the Company had:

> [O]nly begun to build out our international function and expertise and realize the potential of this strategy. *In the next 10 years, up to 1 billion people will enter the middle class, and the vast majority of them will be in emerging markets like China and India. . .We continue to work with our international partner in China, meeting government officials for each of our 3 park complexes, and we believe conditions in China have slowly begun to improve.*

171.    Moreover, during the April 24, 2019 earnings conference call, the Individual Defendants again told stockholders that any delays in opening the China parks would be minor and would not have long-term negative consequences on the Company's financial condition. Specifically, defendant Reid-Anderson stated that "[l]ike virtually every theme park project in these markets, we have experienced some opening delays. But we should not lose sight of the fact that *these short-term delays and lumpy revenue patterns are not material in the context of the long-term opportunity*." In response to analyst questions that directly inquired about delays to the China parks, defendant Reid-Anderson reiterated that "[w]e've got parks in China. . .that are proceeding. *[Zhejiang] in China is proceeding very nicely. . .There are no delays that we're aware of on any of the [China] parks*." Defendant Reid-Anderson further represented that "*the situation in China is improving*. And as I said earlier, our partner Riverside remains very committed to developing Six Flags parks. *There's ongoing building going on*…We'll update you

probably on the second quarter on any developments there." In response to a question from a Wells Fargo analyst, defendant Reid-Anderson again assured stockholders that "***the issues that we're facing aren't specific to us***, they're being faced by basically all companies, especially private companies in China," but that "Riverside [was] very successfully navigating the political and regulatory environment."

172.    The Individual Defendants' positive misstatements continued to mislead stockholders, as the Individual Defendants continued to falsely represent that delays in developing the China parks were due to macroeconomic factors affecting all private companies in China and that the China parks were under construction and would drive earnings and future growth. As the account of FE 1 in the Securities Action has corroborated and subsequent events have confirmed, however, by this time Riverside's unique financial difficulties had been apparent for over a year and no further material construction progress had been made at any of the China parks. Accordingly, the Individual Defendants' claims that construction was "ongoing" were false and materially misled stockholders.

173.    The Individual Defendants' false reassurances had their desired effects. Analysts credited the Individual Defendants' statements and dismissed concerns about development of the China parks. For example, on April 24, 2019, William Blair reported that "[e]ncouragingly, management indicated work continues at each site and there have now been several meetings with various levels of local government (which have included representatives from Six Flags and its Chinese partner)…***[T]he company did indicate that conditions in China have been slowly improving***." Wedbush likewise reported on April 25, 2019, that "management indicated…that the situation is improving." And in an April 24, 2019 report, SunTrust Robinson Humphrey relayed the Individual Defendants' expectation that the Chongqing and Nanjing parks would "receive

61

approval over the next 6-12 months," while the Zhejiang park "remain[s] on track to open as planned."

### K.    Between May 2019 and July 2019, the Individual Defendants Continued to Falsely Claim That Delays Were "Temporary" and Construction on the China Parks Remained Ongoing

174.    On May 22, 2019, the Individual Defendants made a presentation at the B. Riley FBR Investor Conference. During that conference, in response to a request to "update us on the current development plans and the timeline in China," defendant Barber represented that "we have 11 parks in China in 3 locations that were either in construction phase or design and development phase or master development phase," including specifically that "*[Zhejiang] is in construction. Chongqing is pretty far through master -- through design and development*." As the account of FE 1 in the Securities Action has confirmed, however, at the time, material construction had halted at Zhejiang, including no theme park rides under construction, and Riverside had failed to pay key vendors, and was unable to do so due to Riverside's massive financing gap.

175.    The Individual Defendants continued to make false, reassuring statements to stockholders concerning purported progress of the Six Flags-branded parks in China. On May 30, 2019, analyst Wedbush reported on "investor meetings in Chicago and Milwaukee with Six Flags CFO Marshall Barber and SVP of Investor Relations Steve Purtell." According to Wedbush, "investors were at least as interested in the [C]ompany's…international (asset-light) initiatives" as they were in the Company's domestic park business, and "management seem[ed] to have a high degree of confidence that these [China] projects will eventually be completed."

176.    On June 5, 2019, during a presentation at the William Blair Growth Stock Conference, defendant Purtell stressed that the Company's international development agreements would be a growth driver for Six Flags, telling stockholders that "[o]ur partners are funding the entire park. [W]e're earning $5 million to $10 million of EBITDA per year per park before the

park opens. Once the park opens, it switches to a royalty model and then [] the amount we're going to earn is roughly going to double from $10 million to $20 million per theme park per year."

177.    Shortly afterwards, on June 10, 2019, defendants Barber and Purtell made a presentation at the Stifel Cross Sector Insight Conference. There, in response to an analyst's question "About China, you got -- you have 11 parks going in China, ***any worries there, over time***?," defendant Purtell assured stockholders that "[i]f you look at what we have in China, we have 3 locations which have 3 to 4 parks each that are being built, so there's 11 parks in China being built," and that there was "***no new news to report***" concerning the developments and "***no reason to believe***" that previously disclosed timelines "***will not continue to hold***."

178.    The Individual Defendants disclosed the Company's financial results for the second quarter and first half of 2019 in a press release and Form 8-K filed with the SEC on July 24, 2019. That same day, the Individual Defendants held a conference call with stockholders and analysts to discuss the Company's financial results. During that call, defendant Reid-Anderson represented that positive progress continued on the Company's China projects. Specifically, defendant Reid-Anderson told stockholders that "in China, our partner continues to make progress obtaining local government support for our Chongqing parks," and "***[c]onstruction in both [Zhejiang] and Chongqing continues***." Further, defendant Barber stated that, regarding Riverside's work in Chongqing, "our partners have been progressing with the government approval process and ***construction has continued***," and "we are pleased with their ***consistent progress*** and are cautiously optimistic that both ***[Zhejiang] and Chongqing will remain on schedule***."

179.    On the July 24, 2019 earnings call, defendant Reid-Anderson likewise represented that the Company's "international franchise" was a key growth driver, including "8 parks in 3

locations under construction," and "work[] to restart construction on 4 additional parks in Nanjing, China." Directly responding to an analyst's request for an "update on construction" regarding "the first China site [Zhejiang]," defendant Reid-Anderson stated that "the parks that we've talked about, both in [Zhejiang] and Chongqing, ***the construction has continued there***. [W]e are progressing at both of those parks." When asked if the Individual Defendants were representing that "the [China] timeline overall has improved, stayed the same, or slipped a little since 90 days ago," defendant Reid-Anderson replied that "***the timeline that we described 180 days ago still holds right now***, and the same as it was 90 days ago.  And if anything changes, ***we will update you and all of our shareholders***."  In other words, defendant Reid-Anderson claimed the Zhejiang park was still on track to open within a year (or perhaps just over a year), and that the other parks would follow.

180.    All these statements continued to mislead stockholders. The situation in China had not improved -- in fact, as later reported by Chinese media company Phoenix New Media in December 2019, Riverside performed mass layoffs in July and August 2019, cutting its staff down significantly.[8]  Riverside also faced dozens if not hundreds of lawsuits, reaching over 200 lawsuits by December 2019.[9]

181.    Analysts credited the Individual Defendants' false assurances that the China parks' development was continuing as planned. For example, in a July 24, 2019 report, Macquarie Research stressed that the Company's "***int'l story has improved***," pointing specifically to the

---

[8]      iFeng, *The Truth About The Layoffs At Shanshui Wenyuan*, (Dec. 14, 2019), https://travel.ifeng.com/c/7sNOq290EVF.

[9]      iFeng, *Equity of Cultural Tourism Companies Under Riverside Group Frozen*, Beijing Business Today (Dec. 23, 2019), https://ihouse.ifeng.com/news/2019_12_23-52499222_0.shtml.

Individual Defendants' representations "that Chongqing revenue recognition was flowing again with the project back on track, and with no change to the last timeline given." William Blair reported that day that "the revised projected opening timelines for the company's licensed parks in China remain intact, and its partner made progress with the government for the parks in Chongqing. The company also remains hopeful to resume development and revenue recognition for the parks in Nanjing later this year or early next year." And on July 25, 2019, Jefferies reported that one of the "Key Takeaway[s]" of the Company's earnings announcement was "positive commentary on China," Wells Fargo reported "management confirmation that the timeline for China park development is intact," and Wedbush reported "China Turning the Corner," which the analyst called "the bigger news" reported by the Individual Defendants.

**L.**     **On October 22 and 23, 2019, the Individual Defendants Reported Cutting Back on Revenue Recognition For International Licenses and <u>Again Blamed Macroeconomic Conditions</u>**

182.     On October 22, 2019, the Individual Defendants issued a press release and a Form 8-K filed with the SEC to announce the Company's financial results for the third quarter and year-to-date 2019. The Individual Defendants reported, in direct contrast to months of positive statements, "an expected 26 percent decrease in sponsorship, international agreements and accommodations revenue."

183.     During the next day's earnings conference call, on October 23, 2019, the Individual Defendants admitted Six Flags' park openings in China could be delayed further, disclosing that "there's a very high likelihood going forward that we will see changes in the timing of park openings," and that "it's unrealistic to think" that the timeline for development in China was "going to be exactly as we've outlined," but placed blame for any delays on conditions in China, rather than Riverside's continued utter failure to obtain financing. For example, defendant Barber gave as reasons for further delays that "discussions with the local government [in Nanjing]

are still ongoing," and that "the city of Chongqing has made the decision to open 1 park per year, which moved up the opening of our adventure park by 6 months and delayed the opening of our kids park by 15 months, resulting in a net reduction of revenue recognition in the quarter the Chinese market continues to be very challenging for our partner."

184.    The Individual Defendants again discussed the Company's 26% decline in sponsorship, international agreement, and accommodations revenue for the third quarter of 2019 compared to the third quarter of 2018. Defendant Reid-Anderson acknowledged that "the international numbers were, obviously, not as expected by The Street." Defendant Barber similarly answered an analyst's question regarding the Chongqing park by disclosing that, although he was "not going to break out individual revenue per park or per market," "[t]he biggest impact, obviously, for the quarter was the fact that we don't have Dubai . . . *and we also don't have Nanjing, which we were recording last year*." Defendant Barber further disclosed "an impact for…Chongqing."

185.    Analysts reacted to the Individual Defendants' disclosures with surprise and concern. For example, on October 23, 2019, Macquarie Research reported the Company was taking "Two steps forward, one step back" in connection with international parks, noting that "Mgmt. focused on the challenging Chinese regulatory environment when announcing further complications." Wells Fargo reported on October 23, 2019 that the analyst was "clearly disappointed by SIX's Q319 shortfall in admissions and sponsorship/international revenues which drove the Adj EBITDA miss," which it characterized as "especially disappointing" given other positive trends, and Wedbush similarly reported that the 26% decline in sponsorship, international agreements, and accommodations revenue exceeded their estimate of a 19% decline (and consensus estimates of an 18% decline).

186.     In response to these disclosures, Six Flags' stock price declined by more than 12%, falling from $51.23 per share on October 22, 2019 to $44.88 at the close of trading on October 23, 2019.

187.     On the October 23, 2019 earnings conference call, the Individual Defendants made false reassuring statements to mitigate stockholders' negative reaction to the devastating news of additional delays and approval problems with the China parks. In response to an analyst's question, defendant Barber denied that there was "any material change in the time line of China over the last 90 days." Analysts credited those reassuring false statements. For example, in an October 24, 2019 report, SunTrust Robinson Humphrey noted that, despite delays in the development of Six Flags Dubai, "[t]he remainder of SIX's international projects remain on track." SunTrust Robinson Humphrey maintained its "Buy" rating.

188.     On the next day, October 24, 2019, the Individual Defendants announced that defendant Reid-Anderson would be retiring very shortly, effective November 18, 2019, and would be replaced by Michael Spanos ("Mr. Spanos"), the former President and CEO of PepsiCo's Greater China Region. As SunTrust Robinson Humphrey reported on October 24, 2019, although this news was "not necessarily a complete surprise" given that it had previously been announced that defendant Reid-Anderson would leave Six Flags by February 2020, "the timing is somewhat curious as SIX just reported 3Q19 results 48 hours ago and it did not appear that an announcement was imminent."

      **M.**     **On January 10, 2020, the Individual Defendants Disclose Riverside's Defaults on Payments and the Potential Termination of All Six Flags China Projects**

189.     By early 2020, stockholders still believed, based on the Individual Defendants' materially false statements, misrepresentations, and omissions, that the China parks' development was proceeding roughly on schedule.

190.    On January 10, 2020, the Individual Defendants caused Six Flags to file a Form 8-K with the SEC in which the Individual Defendants admitted that, rather than merely delayed, the entire future of the Company's China projects was in jeopardy. That day, the Individual Defendants disclosed that the Six Flags-branded parks in China continued to encounter challenges and had not progressed as expected.

191.    Moreover, the Individual Defendants disclosed that Riverside had defaulted on its payment obligations to Six Flags, which caused one-time charges of $10 million to the Company, and that Six Flags was holding Riverside in default, as FE 1 had allegedly encouraged senior executives to do since May 2018. The Individual Defendants further disclosed that in the fourth quarter of 2019, Six Flags did not realize any revenue in connection with its agreements with Riverside, and rather expected a *negative* revenue adjustment of $1 million related to those agreements.  Specifically, the Individual Defendants disclosed that:

> The development of the Six Flags-branded parks in China has encountered continued challenges and has not progressed as Six Flags Entertainment Corporation (the 'Company') had expected. ***The Company's partner in China, Riverside Investment Group ("Riverside"), continues to face severe challenges*** due to the macroeconomic environment and the declining real estate market in China. ***This has led Riverside to default on its payment obligations to the Company and, as such, the Company has delivered formal notices of default under its agreements***. While the Company continues to work with Riverside and each of Riverside's governmental partners, the eventual outcome is unknown and could ***range from the continuation of one or more projects to the termination of all the Six-Flags branded projects in China***.

> In the fourth quarter of 2019, the Company will realize no revenue from the China international agreements and expects a negative $1 million revenue adjustment related to the China international agreements that will offset a portion of the revenue of the Company's remaining international agreements. In addition, the Company expects aggregate one-time charges of approximately $10 million related to the China international agreements. . .For 2020. . .the loss of all the China projects would result in no revenue for that market if Riverside does not cure the default and the Company is not able to engage other partners to complete any of the projects.

192.    As *TheStreet.com* noted in a January 10, 2020 article, the Company's stock

"slumped on Friday after the theme-park developer disclosed that a payment default by a partner could prompt the company to end all its projects in China." In response to the January 10, 2020 corrective disclosures, Six Flags' stock price declined by nearly 18%, falling from $43.76 per share on January 9, 2020 to $35.96 per share at the close of trading on January 10, 2020.

193.    The harsh reaction to the Individual Defendants' disclosures reflected stockholders' developing (but far from complete) understanding of the Company's deeply troubled China projects. Multiple analysts expressed their surprise and downgraded Six Flags on this news. For example, in a January 10, 2020 report, Wedbush downgraded Six Flags from "buy" to "neutral," and pointed to news of Riverside's defaults as the "primary reason" for the downgrade. Wedbush reported that "2020 was expected to mark the next step in the evolution of Six Flags' international strategy," but given the Company's negative disclosures, "the start of the year has left this business on life support." Indeed, as Wedbush wrote:

> Six Flags has been trading at a sizable premium to the rest of the group for years, ***which we attributed primarily to the significant growth represented by the international opportunity***. Based on management's previously communicated timetable, we previously estimated China revenue contributions of $31M in 2020, $44M in 2021, $51M in 2022, and $59M in 2023, ***while management continued to tell anybody that would listen until very recently that incremental projects (and revenues) in China were likely***.

194.    Also on January 10, 2020, William Blair reported that "the confirmation of the default position clearly comes as a disappointment…and clearly brings into question any remaining hopes about the viability of the company's broader international licensing opportunity," while attributing "the pullback in the shares Friday morning" to "the impact of this news," which the analyst reported was not fully reflected in prior stock price declines. Likewise, analyst Janney downgraded the Company from "buy" to "neutral," while reporting that Six Flags "announced its partner in China had defaulted on its obligations, creating uncertainty about whether these parks will ever open. Given these issues, we think it's difficult to defend the stock at current levels."

69

And *The Deal Pipeline* reported on January 10, 2020 that the Company "has run into more than a little trouble with its China-based partners" and "has seen its China-focused ambitions more or less go under" given Riverside's disclosed defaults.

195.    On January 10, 2020, the Individual Defendants made false reassuring statements to mitigate stockholders' negative reaction to the devastating news that Riverside defaulted on payments and the future of the China parks was in jeopardy. In their disclosures that day, the Individual Defendants repeatedly represented the possibility of "the continuation of one or more projects" in China, despite lacking any reasonable basis that the China projects would continue.

196.    Analysts credited that reassurance, which tempered their negative reactions to the otherwise overwhelmingly negative news. For example, in its January 10, 2020 report, Janney acknowledged the possibility of "the termination of all SIX branded projects in China," but considered that dire outcome only one "eventual outcome[]," which also included "the continuation of one or more projects." Jefferies similarly reported that day that "the eventual outcomes could include the continuation of one park or termination of all parks," and pointed to "[i]nternational agreements in China" as a catalyst for the Company. Oppenheimer reported that day that, "[w]hile Riverside has defaulted on its payments to the company, SIX continues to work with Riverside and its government partners on a solution." And William Blair similarly reported on January 10, 2020 that, "[w]hile the company continues to work with Riverside to find a path forward, the eventual outcome is unknown, which includes a range of potential outcomes," including "the continuation of one or more of the projects."

N.    **On February 20, 2020, the Individual Defendants Disclose the Termination of the Company's Agreements With Riverside and a Resulting $10 Million Quarterly Revenue Decrease**

197.    On February 20, 2020, stockholders finally learned the full, ugly truth: that the Six Flags-branded parks the Company was developing in China with Riverside would not be

70

completed, and that Six Flags' revenues and future growth were substantially lower as a result. On that day, the Individual Defendants caused Six Flags to disclose its financial results for the fourth quarter and full-year 2019 in a press release and Form 8-K filed with the SEC. The Individual Defendants disclosed that the Company had terminated its development agreements with Riverside due to Riverside's default on its payment obligations during 2019. The Individual Defendants admitted that, as a result, the Company would not recognize *any* revenues or income from the development of Six Flags-branded parks in China. The potential for 20 parks generating hundreds of millions of dollars of revenue per year had gone up in smoke.

198.     In addition, the Individual Defendants announced a dismal earnings outlook for Six Flags in 2020, driven by "significantly lower revenue contribution from the Company's international development agreements."

199.     In the Company's February 20, 2020 earnings release, the Individual Defendants disclosed that: "During 2019, the company's partner in China defaulted on its payment obligations to the company. As a result, in February 2020 the company terminated the development agreements. It is unlikely that the company will recognize any revenue or income in 2020 related to the development of parks in China."

200.     The Individual Defendants further disclosed that "full-year revenue growth was…offset by…a 3 percent decline in sponsorship, international agreements, and accommodations revenue," and the Company's reported "decrease in net income was primarily due to…charges of approximately $10 million related to the company's China development agreements…and…the recording of a valuation allowance related to foreign tax credits due to the termination of the company's China development agreements," among other factors.

201.     Also on February 20, 2020, the sudden departure of the Company's CFO,

defendant Barber, was announced. Defendant Barber's tenure as CFO of Six Flags would end within mere days, on February 24, 2020.

202.    That same day, a conference call with stockholders and analysts was held to discuss the Company's earnings release. Neither defendant Reid-Anderson nor defendant Barber participated in the call, but their recently announced successors – the new CEO Mr. Spanos and Interim CFO Leonard Russ ("Mr. Russ") -- discussed the Company's financial performance, finally admitting what, according to the account of FE 1 in the Securities Action, was true and known to senior management by no later than April 2018: the China parks would not open on time (or at all), Riverside lacked the funding to construct the parks, and construction had stalled out.

203.    During the call, Mr. Russ purported to "provide additional details on the challenges we are facing related to our international development projects," again disclosing that:

> In China, our partner was unable to meet the financial terms of our contract. Last month, we issued default notices for a lack of payment. Since that time, they did not clear their defaults, and we terminated our agreements with them this month. **Therefore, we are planning with the assumption that there will be no revenue in 2020 from our activities in China**.

204.    Mr. Russ further disclosed that "we are going to have some extra costs associated with China until we determine what's ultimately going to happen with the development of those parks as well as the cost of our international development group, which we're looking to kind of reallocate those resources into other areas of the business that'll actually help spur base business growth for the long term." Mr. Spanos further confirmed that Riverside "was unable to make payments" and the Company had "delivered notices of default."

205.    Stockholders were shocked by these disclosures. For example, on February 20, 2020, Janney reported that "We Didn't Think It Could Get Worse…But It Just Did," while William Blair reported that the "Second Shoe Finally Drops as the Price Reaches a New Bottom." Oppenheimer reported "Key Points" including a decline in adjusted EBITDA of $72 million,

"largely driven by the decline in revenues from soft attendance and termination of the China development agreements."

206.    In response to the news that the Company terminated its agreements with Riverside and would not realize any revenues from the China projects, Six Flags' stock price declined by more than 16%, falling from $38.02 per share on February 19, 2020 to close at $31.89 per share on February 20, 2020.  In all, Six Flags' stock declined by more than half from its Relevant Period high of $73.38 on June 22, 2018, to close at $31.89 on February 20, 2020, the Company's lowest stock price in over seven years.

**O.    The SEC Subpoena Is Issued to the Company in February 2020, Which the Individual Defendants Fail to Disclose to Stockholders for Well Over a Year**

207.    Unbeknownst to stockholders at the time, on February 18, 2020, Six Flags received the "SEC Subpoena concerning the same events and issues described herein, which gave rise to the Securities Action.

208.    The SEC Subpoena demanded production of information concerning "all Board of Directors and Audit Committee meeting minutes; all agreements with Riverside Investment Group Co. Ltd.; documentation supporting the quarterly revenues recorded in connection with the Riverside agreements; documents concerning the cause of negative revenue adjustments related to the Riverside agreements; the identity of persons at Six Flags involved with the Riverside agreements; and all communications with and concerning Riverside."

209.    The Individual Defendants, however, kept stockholders in the dark regarding the existence of the SEC Subpoena for *fifteen months*, until May 18, 2021.

210.    On May 18, 2021, in connection with a complaint filed in federal court by the Company against its insurer, Six Flags publicly disclosed the existence of the SEC Subpoena --

fifteen months after the SEC Subpoena was served on the Company. In the Company's complaint, it was also disclosed that Six Flags retained separate counsel for Messrs. Reid-Anderson and Barber in the Securities Action "*in light of the conflict that could arise in the joint defense of Six Flags and Messrs. Reid-Anderson and Barber*."[10]

## VI.    THE INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING STATEMENTS TO STOCKHOLDERS DURING THE RELEVANT PERIOD

### A.    First Quarter 2018 Financial Reporting and Earnings Call

211.    On April 24, 2018, the Individual Defendants caused Six Flags to issue a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for the first quarter of 2018. In that press release, the Individual Defendants announced "that revenue for the first quarter of 2018 increased by $29 million or 30 percent from the first quarter of 2017 to a record-high $129 million," which the Individual Defendants represented "resulted primarily from," among other reasons, "*the success of…the company's…international licensing program*." The release quoted defendant Reid-Anderson as stating that due in substantial part to "international licensing agreements," the Company was "poised to deliver another record year of financial performance in 2018," and that the Individual Defendants "remain[ed] laser-focused on exceeding $600 million of Modified EBITDA in 2018."

212.    In the Company's financial report for the first quarter of 2018, filed on SEC Form 10-Q on April 25, 2018, signed by defendants Reid-Anderson and Barber, the Individual Defendants reported that "[d]uring the first three months of 2018, our park earnings before interest, taxes, depreciation and amortization ("Park EBITDA") increased primarily as a result of a 27%

---

[10]    This naturally begs the question – in 2023, for purposes of evaluating and responding to the Litigation Demand, why did the Board fail to retain non-conflicted counsel and instead rely on advice from Skadden, which was simultaneously, actively, and zealously representing defendants in the Securities Action, including defendants Reid-Anderson and Barber?

increase in attendance, and *a 21% increase in sponsorship and international licensing revenue*." The Individual Defendants also represented that the Company's "unaudited condensed consolidated financial statements have been prepared in conformity with [GAAP]" and "[o]ur accounting policies reflect industry practices and conform to U.S. GAAP." Consistent with this purported GAAP compliance, the Individual Defendants represented that Six Flags "*recognize[d] revenue under these [international licensing] agreements over the relevant service period of each performance obligation based on its relative selling price, as determined by our best estimate of selling price*," and that "*[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year*."

213.    That same day, during the Company's first-quarter 2018 earnings conference call with analysts and stockholders, in response to an analyst's question concerning "how much you-during the quarter you had in international licensing revenue," defendant Barber responded, "We did not say, but *it's about $9 million. It's just under $9 million for the quarter*."

214.    The Individual Defendants' April 24, 2018 and April 25, 2018 statements above concerning international licensing revenue that the Company recognized were materially false and misleading.  By the end of the first quarter of 2018, Six Flags had entered into international licensing agreements for the Zhejiang and Chongqing sites in China, as well as a park in Dubai (the Nanjing and Saudi Arabia agreements had just been announced and presumably did not contribute to revenue for the quarter). It was materially false and misleading, as well as improper under GAAP, to recognize such revenue in connection with the Zhejiang and Chongqing sites, however, given that the represented timeline for the parks' opening could not be met, as evidenced by the fact that Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction

workers for work on any of the China parks. Accordingly, it was also materially false and misleading for the Individual Defendants to represent that they complied with GAAP and had "review[ed] the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year" because, had they done so, Six Flags would have recognized substantially less, or no, revenue at the time in connection with its international licensing agreements with Riverside.

215.    In addition, during the April 25, 2018 earnings conference call with analysts and stockholders, defendant Reid-Anderson provided an update on the Company's international licensing business, including on the ten parks that the Individual Defendants had announced were in progress in Zhejiang, Chongqing, and Nanjing, and remarked that the "3 new parks in [Nanjing] China are expected to begin opening in 2021."

216.    During the call, an analyst stated that he was "very encouraged by the parks that you announced in China," and asked defendant Reid-Anderson, "Where are we as far as the Chinese expansion? Maybe what inning are we in? Or how many more opportunities do you think we're going to see there or that can be weighted towards just other regions of the world?" Defendant Reid-Anderson responded as follows:

> [W]hen we announced the initial Riverside deals, I said that the discussions with our partner, and we had had [sic] focused in on really being in the range of at least 10 parks within 10 years, and we're at 10 announced already. ***We will not be stopping at 10 parks, I can assure you that, and our partner is very excited about being able to expand further with us***.

217.    During the same call, an analyst also asked defendant Reid-Anderson, "I guess just following up on China specifically there, we have seen some, I guess, news flow from the National Development and Reform Commission that they would maybe put more scrutiny on these kind of large-scale theme park developments. Any kind of color or commentary there, if that impacts you guys or how that can impact the industry overall?"  Defendant Reid-Anderson

76

responded as follows:

> We obviously keep track of what's going on in all of the countries in which we operate. And I think the way to think about it is really as follows. You've heard me talk about our partners, an incredible partnership with Riverside. ***They are building 10 parks. They're on their way to building 10 parks***. We've talked about building multiple parks. There is no ban on theme park development in China. There are a series of guidelines that were issued regarding theme park development. They're mostly focused on the real estate aspects of theme park development but also touched on enhanced park standards. They're not laws, but they do portend greater regulation of theme park development, in line with what we have in North America or Europe or around the world generally. ***Our partner has not only successfully navigated the regulatory environment in China before but will continue to do so going forward***. And I think it's really good to have regulations that make sense. So right now, barring some other decision that's made, ***all our parks are progressing nicely towards their anticipated opening dates***. And hence, we've announced 3 more parks. We're very confident.

218.    Defendant Reid-Anderson also emphasized the importance of the multiple Six Flags China parks as a hedge against other developments. Defendant Reid-Anderson stated:

> The international piece of this is going to continue to grow as we build our resources and expertise—we can run multiple projects annually. ***We're in this position where we've developed all these incremental parks, 12 parks coming, we've got a great pipeline of deals that provide a hedge against any one single deal or any one single market***. China is the biggest of all, and the vision of both Six Flags and Riverside is to build multiple parks.

219.    The above statements made by defendant Reid-Anderson during the first-quarter 2018 earnings conference call were materially false and misleading when made. The statements that "all our parks are progressing nicely towards their anticipated opening dates," that "[t]hey are building 10 parks," that "[t]hey're on their way to building 10 parks," and that "3 new parks in [Nanjing] China are expected to begin opening in 2021" were materially false and misleading because construction was at a standstill at the time the statements were made. Practically no progress on construction had been made at Six Flags Zhejiang during the three years since it broke ground in January 2016, and future construction on any of the parks was unlikely because Riverside still did not have the funding to pay for the necessary manpower, construction drawings

or theme park rides.

220.     Defendant Reid-Anderson's statements that Six Flags "will not be stopping at 10 parks" in China, that Six Flags had "developed all these incremental parks [with] 12 parks coming," and that Six Flags has "got a great pipeline of deals that provide a hedge against any one single deal or any one single market," were materially false and misleading because, at the time the statements were made, Riverside was Six Flags' sole Chinese partner and it had lost financing from and the support of the local Chinese governments necessary for the construction of Six Flags theme parks in China. Six Flags could not develop "10 parks" in China or deliver on a "pipeline of deals" there because Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction workers for work on the Six Flags China parks.

221.     Defendant Reid-Anderson's statements concerning Riverside were also materially false and misleading when made and omitted material facts necessary to make the statements not misleading. The statements that Six Flags had an "incredible partnership with Riverside" and that Riverside had "not only successfully navigated the regulatory environment in China before but will continue to do so going forward" were materially misleading because, at the time the statements were made, Riverside already had lost financing from and the support of the local Chinese governments and its financial condition had already deteriorated to the point that it could not fund the development and construction of the China projects.

### B.     The June 2018 Goldman Sachs Lodging, Gaming, Restaurant, and Leisure Conference

222.     On June 5, 2018, defendant Barber spoke at the Goldman Sachs Lodging, Gaming, Restaurant and Leisure Conference (the "GS Conference"). During the GS Conference, Barber stated:

78

So our partner in China has—we have 3 locations there now with 11 parks. He has said he wants to do 10 or 11, 10 to 20 locations, with multiple parks in each. Given that we're already at 11, I think 20 parks is possible. I think China could be larger. We could have more parks in China than we have in the U.S. for too many more years. So I think it's a great market for us. It's 4x the size of the United States with half the theme parks in it. So I think that's sort of China specifically.

223.    The above statements made by defendant Barber during the GS Conference were materially false and misleading when made. It was misleading to state that it "[was] possible" for Riverside to build "20 parks" in China when, at the time these statements were made, Riverside had lost financing from and the support of local Chinese governments. Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing, and Six Flags Nanjing projects.

### C.    The June 2018 Oppenheimer Consumer Conference

224.    On June 20, 2018, defendant Barber spoke at the Oppenheimer Consumer Conference (the "Oppenheimer Conference"). During the Oppenheimer Conference, defendant Barber stated that "we have additional parks in China that our partner has said he wants to build[,] 10 parks-20 parks, 10 properties. He's been a very good partner for us."

225.    The above statements made by defendant Barber during the Oppenheimer Conference were materially false and misleading when made. It was misleading to state that Riverside wants to build "20 parks, 10 properties," and that Riverside has "been a very good partner for us" when, at the time the statements were made, Riverside had lost financing from and the support of the local Chinese governments. Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing, and Six Flags Nanjing projects.

###### D.  Second Quarter 2018 Financial Report and Earnings Call

226.   On July 25, 2018, the Individual Defendants caused Six Flags to issue a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for the second quarter of 2018. In that release, the Individual Defendants announced "that revenue for the second quarter of 2018 increased $23 million or 5 percent from the second quarter of 2017 to $445 million," which the Individual Defendants represented "resulted primarily from," among other reasons, "*a 9 percent increase in sponsorship, international licensing and accommodations revenue*." The release quoted defendant Reid-Anderson as attributing the Company's "continued strong momentum and execution in the quarter" to "expand[ing] our global footprint." Moreover, in the release, the Individual Defendants stated that, "[f]or the first six months of 2018, revenue was $574 million, a 10 percent increase compared to the prior year period, driven primarily by," among other things, "*a 12 percent increase in sponsorship, international licensing and accommodations revenue*."

227.   In the Company's financial report for the second quarter of 2018, filed on SEC Form 10-Q on July 25, 2018, signed by defendants Reid-Anderson and Barber, the Individual Defendants reported that, "[d]uring the first six months of 2018, our park earnings before interest, taxes, depreciation and amortization ("Park EBITDA") increased primarily as a result of," among other things, "*a 12% increase in sponsorship, international licensing and accommodations revenues*." Further, the Individual Defendants reported in the second-quarter 2018 Form 10-Q that "[r]evenue for the three months ended June 30, 2018 totaled $445.4 million, an increase of $23 million, or 5%," compared to the second quarter of 2017, attributable in substantial part to "*a 9% increase in sponsorship, international licensing and accommodations revenue*." The Individual Defendants also represented that the Company's "unaudited condensed consolidated financial statements have been prepared in conformity with [GAAP]", and "[o]ur accounting policies reflect

80

industry practices and conform to U.S. GAAP." Consistent with this purported GAAP compliance, the Individual Defendants represented that Six Flags "*recognize[d] revenue under these [international licensing] agreements over the relevant service period of each performance obligation based on its relative selling price, as determined by our best estimate of selling price*," and that "*[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year*."

228.     That same day, during the Company's second-quarter 2018 earnings conference call with analysts and stockholders, defendant Barber represented that during the first half of 2018, "*international licensing revenue was up $4.6 million or 24%.*" In response to an analyst's question about "[i]nternational revenue and EBITDA contribution in Q2 versus the comp last year," defendant Barber responded that "*we had $14.7 million of revenue in the second quarter* and the EBITDA margin is in the 80% range as well, as it has been." And in response to another analyst's question about if there was "any benefit from the Chinese park [*i.e.*, Nanjing] announced in late June to the international piece," defendant Barber responded:

> So we actually announced the park in China -- or the parks in China, in April, I believe. But yes, in terms of the run rate, *it's about $15 million in Q3. That will go up as we now have those 4 parks in China plus Saudi Arabia, we'll be in for a full quarter*. And then, that'll pretty much be the run rate until they open or until we announce new parks.

229.     Defendant Reid-Anderson added, "*[t]he revenue that we generated in Q2 for international is the highest in our history, and it's growing really nicely…we're registering records and we believe we will continue to do that*." Further, in response to an analyst's question regarding how "the international contribution…ramps over time," defendant Barber stated that "*if you look at the $14.7 million, you add in a little bit for a full quarter for the 4 parks in China* plus the one park in Saudi Arabia, I think you'll get to a pretty good run rate going forward until we start opening parks or until we sign more deals."

81

230.     The Individual Defendants' July 25, 2018 statements above concerning international licensing revenue that the Company recognized were materially false and misleading. By the end of the second quarter of 2018, Six Flags had entered into international licensing agreements for the Zhejiang, Chongqing, and Nanjing sites in China, as well as developments in Saudi Arabia and Dubai. It was materially false and misleading, as well as improper under GAAP, to recognize such revenue in connection with the China parks, however, given that the represented timeline for the parks' opening could not be met, as evidenced by the fact that Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing, and Six Flags Nanjing projects. Indeed, according to the account of FE 1 in the Securities Action, by this date, Riverside had procured no rides for any of its parks, no material progress on construction had occurred at any of the Six Flags China parks, and the Individual Defendants' publicly represented timeline for opening the China parks was impossible to meet based on the lack of progress to that point. Accordingly, it was also materially false and misleading for the Individual Defendants to represent that they complied with GAAP and had "review[ed] the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year" because, had they done so, Six Flags would not have recognized any revenue at the time in connection with its international licensing agreements with Riverside.

231.     Also during the July 25, 2018 earnings conference call, an analyst asked, "is there any update on the opening timetable of the initial Chinese parks? I think it was 3 parks in late 2019 and another 4 in early 2020, if I'm right?"  Defendant Barber responded, "That's right." Defendant Reid-Anderson followed up on defendant Barber's statement, and stated, "***[t]he timing of the parks remains exactly the same as previously disclosed, there's no change on any of those***."

232.     The above statement made by defendant Reid-Anderson during the second-quarter 2018 earnings conference call was materially false and misleading.  It was materially false and misleading to state that "[t]he timing of the parks remains exactly the same" and "there's no change on any of those" because, at the time, 17 months from Zhejiang's supposed opening date, no progress at all had been made on the construction of the parks despite Riverside breaking ground on construction of Six Flags Zhejiang in January 2016. By May 2018, the Six Flags China parks were already so behind schedule that, according to the operative complaint in the Securities Action, FE 1 informed Company executives that they "[couldn't] build [Zhejiang] in 18 months" or open on time "even if everything was in [their] hands right now" and that Six Flags should put Riverside in breach of contract due to Riverside's lack of progress.  The statement was also false and misleading because Riverside's lack of financing and lack of support from the local Chinese governments also made any future progress impossible. Riverside could not afford the 1,500 to 2,000 construction workers that would be necessary to build even one park, and only ever had 300 construction workers on site at maximum, which often dropped below 100. Riverside was unable to afford the basic construction drawings necessary for construction workers to follow to make significant construction progress. Riverside also had no theme park rides to even construct, because it failed to pay its ride vendors for commissioned rides, so all of Riverside's commissioned rides were cancelled by the vendors or sold to other theme parks. Per the account of FE 1 in the Securities Action, because the ride orders had been cancelled, Riverside and Six Flags were "not going to get the rides in time" to meet the opening date "even if they were able to catch the construction up" elsewhere. By this time, Riverside had even missed its scheduled licensing payments to Six Flags, which further showed that the parks were off track.

### E.     Third Quarter 2018 Financial Report and Earnings Call

233.     On October 24, 2018, the Individual Defendants caused Six Flags to issue a press

release, filed with the SEC on Form 8-K, announcing the Company's financial results for the third quarter of 2018. In that release, the Individual Defendants announced "that revenue for the third quarter of 2018 increased $39 million or 7 percent from the third quarter of 2017 to $620 million," which the Individual Defendants represented "was primarily driven by," among other reasons, "*a 42 percent increase in sponsorship, international licensing and accommodations revenue*." The release quoted defendant Reid-Anderson as attributing the Company's reported positive financial results to "[o]ur five key growth initiatives," including "pursuing additional Six Flags-branded international parks." Moreover, in the release, the Individual Defendants stated that, "[f]or the first nine months of 2018, revenue was $1.2 billion, an 8 percent increase compared to the prior-year period, driven primarily by," among other things, "*a 23 percent increase in sponsorship, international licensing and accommodations revenue*."

234.    In the Company's financial report for the third quarter of 2018, filed on SEC Form 10-Q on October 24, 2018, signed by defendants Reid-Anderson and Barber, the Individual Defendants reported sponsorship, international agreements and accommodations revenue of *$35.891 million and $85.182 million for the third quarter of 2018 and the first nine months of 2018, respectively*. The Individual Defendants represented in the third-quarter 2018 Form 10-Q that, "[d]uring the first nine months of 2018, our park earnings before interest, taxes, depreciation and amortization ('Park EBITDA') increased primarily as a result of," among other things, "*a 23% increase in sponsorship, international licensing and accommodations revenues*." Further, the Individual Defendants reported in the third-quarter 2018 Form 10-Q that "[r]evenue for the three months ended September 30, 2018 totaled $619.8 million, an increase of $39.4 million, or 7%," compared to the third quarter of 2017, attributable in substantial part to "*a 42% increase in sponsorship, international licensing and accommodations revenue*." The Individual Defendants

also represented that the Company's "unaudited condensed consolidated financial statements have been prepared in conformity with [GAAP]" and "[o]ur accounting policies reflect industry practices and conform to U.S. GAAP." Consistent with this purported GAAP compliance, the Individual Defendants represented that Six Flags "*recognize[d] revenue under our international [licensing] agreements over the relevant service period of each performance obligation based on its relative stand-alone selling price, as determined by our best estimate of selling price,*" and that "*[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year*."

235.    That same day, during the Company's third-quarter 2018 earnings conference call with analysts and stockholders, defendant Reid-Anderson stated that Six Flags "continue[d] to grow through our international agreements," and as a result, "*our quarterly run rate for revenue has increased more than 50%*." Defendant Barber represented that in the third quarter of 2018, "year- over-year total revenue increased $39 million or 7% as a result of a 5% increase in attendance and *an $11 million or 42% growth in sponsorship, international licensing and accommodations revenue*" and, "[o]n a year-to-date basis, revenue was up $92 million or 8%, driven primarily by a 6% increase in attendance and *a 23% increase in sponsorship, international licensing and accommodations revenue*." In response to an analyst's question about "growth in international revenue during the quarter," defendant Barber reiterated, "it's $40 million. It's a growth of 40% over prior year, year-to-date." The analyst asked for confirmation whether "that's specifically just international," and defendant Barber responded, "That is international."

236.    The Individual Defendants' October 24, 2018 statements above concerning international licensing revenue that the Company recognized were materially false and misleading. By the end of the third quarter of 2018, Six Flags had entered into international licensing

agreements for the Zhejiang, Chongqing, and Nanjing sites in China, as well as developments in Saudi Arabia and Dubai. It was materially false and misleading, as well as improper under GAAP, to recognize such revenue in connection with the China parks, however, given that the represented timeline for the parks' opening could not be met, as evidenced by the facts that Riverside had already failed to make required licensing payments to Six Flags, and Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing, and Six Flags Nanjing projects. Indeed, according to the account of FE 1 in the Securities Action, by this date, Riverside had procured no rides for any of its parks, no material progress on construction had occurred at any of the Six Flags China parks, and the Individual Defendants' publicly represented timeline for opening the China parks was impossible to meet based on the lack of progress to that point. Accordingly, it was also materially false and misleading for the Individual Defendants to represent that they complied with GAAP and had "review[ed] the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year" because, had they done so, Six Flags would have recognized substantially less, or no, revenue at the time in connection with its international licensing agreements with Riverside.

237.    Also during the October 24, 2018 earnings conference call, an analyst asked for information regarding the Company's Dubai park opening date, "whether we should be pushing that back," and for an update on the "3 Chinese parks that were expected to open in the fourth quarter of next year as well."  Defendant Reid-Anderson disclosed that the Company's Dubai park was delayed and asked defendant Barber to "go through all the other parks which are on time." Defendant Barber responded:

So you mentioned the Chinese parks. We -- those start to come online in Zhejiang, the theme park, water park and kids' park are early 2020. The Chongqing parks are during 2020. That's a theme park, a water park, a kids' park and an adventure park. Those are mid-2020. And then Nanjing, those will start to open in 2021. The water park, Kids World first, the adventure park in 2021 as well in Nanjing. And then the Nanjing Theme Park will actually open up in 2022 midyear.

238.     The analyst also asked defendant Barber "to clarify" whether "the first round of Chinese parks," the Zhejiang parks, were "pushed back" from "late [2019]." Defendant Barber responded, "They have it's-technically, it's the first of 2020. I think ultimately -- earlier we were saying late 2019, which was in the fourth quarter. So it -- really the shift is [a] month or 2. It's not much."

239.     The above statements made by defendants Reid-Anderson and Barber during the third-quarter 2018 earnings conference call were materially false and misleading when made. Defendant Reid-Anderson's statement that the Six Flags China parks "are on time, " and defendant Barber's statements that the "theme park, water park and kids' park" in Zhejiang "start to come online" in "early 2020," the "Chongqing parks are 2020," Nanjing will "start to open in 2021" with the "Nanjing Theme Park" to "open up in 2022 midyear," and that the "shift" in the timeline "is [a] month or 2" and "not much" were materially false and misleading when made because, at the time, 14 months from Zhejiang's supposed opening date, no progress at all had been made on the construction of the parks despite Riverside breaking ground on construction of Six Flags Zhejiang in January 2016. By May 2018, the Six Flags China parks were already so behind schedule that, as alleged in the operative complaint in the Securities Action, FE 1 informed Company executives that they "[couldn't] build [Zhejiang] in 18 months" or open on time "even if everything was in [their] hands right now" and that Six Flags should put Riverside in breach of contract due to Riverside's lack of progress.  These statements were also false and misleading because Riverside's lack of financing and lack of support from the local Chinese governments also

made any future progress impossible. Riverside could not afford more the 1,500 to 2,000 construction workers that would be necessary to build even one park, and only ever had 300 construction workers on site at maximum, which often dropped below 100. Riverside was unable to afford the basic construction drawings necessary for construction workers to follow to make significant construction progress. Riverside also had no theme park rides to even construct, because it failed to pay its ride vendors for commissioned rides, so all of Riverside's commissioned rides were cancelled by the vendors or sold to other theme parks. Per the account of FE 1 in the Securities Action, because the ride orders had been cancelled, Riverside and Six Flags were "not going to get the rides in time" to meet the opening date "even if they were able to catch the construction up" elsewhere. By this time, Riverside had even missed its scheduled licensing payments to Six Flags, which further showed that the parks were off track.

### F.     Fourth Quarter 2018 and Full Year 2018 Financial Report and Earnings Call

240.     On February 14, 2019, the Individual Defendants caused Six Flags to issue a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for fourth-quarter and full-year 2018. In that release, the Individual Defendants announced that, for the year 2018, "revenue increased $105 million or 8 percent to $1.5 billion," driven in substantial part by "*a 7 percent increase in sponsorship, international agreements and accommodations revenue*."

241.     That same day, during the Company's fourth-quarter and full-year 2018 earnings conference call with analysts and stockholders, defendant Reid-Anderson stated that in 2018, Six Flags "*increased revenue from our international agreements by 10%*," and that "*[o]ur international agreements continue to be a significant contributor to revenue growth as revenue approached $42 million in 2018*." Defendant Barber represented that the reported increase in the Company's revenues for 2018 over 2017 was driven by, among other factors, "*a $4 million*

88

*increase in international agreements revenue*."

242.     In the Company's financial report for fourth-quarter and full-year 2018, filed on SEC Form 10-K on February 20, 2019, and signed by defendants Reid-Anderson, Barber, Cellar, Kresja, Luther, Owens, and Roedel (among others), the Individual Defendants reported sponsorship, international agreements and accommodations revenue of ***$100.116 million*** for the year ended December 31, 2018, and represented that the Company's increase in reported revenues over 2017 was "primarily driven by," among other factors, "***a 7% increase in sponsorship, international agreements and accommodations revenue***."

243.     The SEC Form 10-K filed on February 20, 2019 also included a report by Six Flags' outside auditor, KPMG, providing the auditor's opinion that "the consolidated financial statements referred to [in the report] present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017…in conformity with [GAAP]." Consistent with this purported GAAP compliance, the Individual Defendants represented that Six Flags "***recognize[d] revenue under our international [licensing] agreements over the relevant service period of each performance obligation based on its relative stand-alone selling price, as determined by our best estimate of selling price," and that "[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year***."

244.     The Individual Defendants' February 14, 2019 statements above concerning international licensing revenue that the Company recognized were materially false and misleading. By the end of 2018, Six Flags had entered into international licensing agreements for the Zhejiang, Chongqing, and Nanjing sites in China as well as developments in Saudi Arabia and Dubai, but had by that point reported decreased revenue recognition in connection with the Dubai

development and, contemporaneous with the February 14, 2019 earnings release, a $15 million revenue write-down related to the China parks. Revenues from the China parks still contributed to the reported financial results included in the $100.1 million in international licensing and related revenues reported in the 2018 10-Q, however, as well as the "lumpy" international licensing revenues that the Individual Defendants represented would be recognized in 2019. It was materially false and misleading, as well as improper under GAAP, to recognize such revenue in connection with the China parks, however, given that the represented timeline for the parks' opening could not be met, as evidenced by the facts that Riverside had already failed to make required licensing payments to Six Flags, and Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing, and Six Flags Nanjing projects. Indeed, according to the account of FE 1 in the Securities Action, by this date, Riverside had procured no rides for any of its parks, no material progress on construction had occurred at any of the Six Flags China parks, and the Individual Defendants' publicly represented timeline for opening the China parks was impossible to meet based on the lack of progress to that point. Accordingly, it was also materially false and misleading for the Individual Defendants to represent that they complied with GAAP and had "review[ed] the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year" because, had they done so, Six Flags would have recognized substantially less, or no, revenue at the time in connection with its international licensing agreements with Riverside.

245.    In addition, during the February 14, 2019 earnings conference call, defendant Reid-Anderson announced that "a comprehensive review of our project timelines jointly with our partner" had been completed at the Company, and the Individual Defendants expected "our

90

[Zhejiang] parks to begin opening in mid- to late 2020 versus 2019, our Chongqing parks to begin opening in mid to late 2021 versus 2020, and Nanjing to begin opening in late 2022," but "***our partner in China remains fully committed to developing and opening these parks, and construction is continuing***."

246.    Further, during the conference call, an analyst asked, "how healthy [is Riverside] right now," asked the Individual Defendants to "talk about the financing behind some of these projects," and if there were "any potential issues as far as having enough funds to continue to do construction." In response, defendant Reid-Anderson stated, "We are continuing to build those parks, and they are still progressing. And they're not just parks. They are -- there's much more beyond that. They're entertainment centers, housing developments all around the park. So ***that is ongoing as we speak***."

247.    Defendant Barber also responded to the analyst's question and stated that "[Riverside] has a lot of assets." Defendant Barber continued, assuring the analyst (and stockholders) of Riverside's liquidity before defendant Reid-Anderson interjected:

> Defendant Barber: [Liquidity] has been tougher for other companies. But [Chairman Li]'s in great shape. ***There's some gap***…
>
> Defendant Reid-Anderson: ***He continues to pay***.

248.    Defendant Barber caught himself and continued by stating that Riverside "continued to pay us, and that's important," was "providing the funding for the development of the parks," had "the ability to source additional funding," and was "excited about the fact that [Chairman Li]'s in pretty good shape, although in a tough environment."

249.    During the same conference call, an analyst also asked if "the financing for each park in China [is] entirely in place" or if it still "need[s] to be secured." Defendant Barber responded:

[T]he financing comes from many sources, including the federal government and the local governments [a]nd our partner as well.  So what I'd say is that the -- there's -- that Riverside is providing the funding for the development of the parks. They have the -- also have the ability to source additional funding from other lenders and equity investors as well as the government. So as these parks progress on from announcement going forward, their dollars will be -- will come as they're committed, and they'll come as the parks are being built.

Defendant Reid-Anderson responded further, stating "*[s]o the financing is in place, and the financing then gets expanded as time goes on* and parts are -- parks are added on."

250.    The above statement made by defendant Reid-Anderson concerning the new timeline for the parks was false and misleading when made. The statement that "we now expect our [Zhejiang] parks to begin opening in mid- to late 2020 versus 2019, our Chongqing parks to begin opening in mid to late 2021 versus 2020, and Nanjing to begin opening in late 2022," was materially false and misleading when made because, at the time, 17 to 23 months from Zhejiang's revised opening dates, no progress at all had been made on the construction of the parks despite Riverside breaking ground on construction of Six Flags Zhejiang in January 2016. By May 2018, the Six Flags China parks were already so behind schedule that, as alleged in the operative complaint in the Securities Action, FE 1 informed Company executives that they "[couldn't] build [Zhejiang] in 18 months" or open on time "even if everything was in [their] hands right now" and that Six Flags should put Riverside in breach of contract due to Riverside's lack of progress. There was also no significant progress on the parks between May 2018 and February 2019 that changed this fact and that would have allowed for the Six Flags Zhejiang parks to be completed by the revised mid-to-late 2020 opening date.  These statements were also materially false and misleading because Riverside's lack of financing and lack of support from the local Chinese governments also made any future progress impossible. Riverside could not afford the 1,500 to 2,000 construction workers that would be necessary to build even one park, and only ever had 300 construction workers on site at maximum, which often dropped below 100. Riverside was unable to afford the

92

basic construction drawings necessary for construction workers to follow to make significant construction progress. Riverside also had no theme park rides to even construct, because it failed to pay its ride vendors for commissioned rides, so all of Riverside's commissioned rides were cancelled by the vendors or sold to other theme parks. Per the account of FE 1 in the Securities Action, because the ride orders had been cancelled, Riverside and Six Flags were "not going to get the rides in time" to meet the original opening date "even if they were able to catch the construction up" elsewhere. This fact remained true as to the revised opening dates because Riverside still had failed to procure any rides even after the park delays were announced. By this time, Riverside had even missed its scheduled licensing payments to Six Flags, which further showed that the parks were off track.

251.     Likewise, the above statements by defendant Reid-Anderson concerning the construction progress at the parks were materially false and misleading. Defendant Reid-Anderson's statements that "[w]e are continuing to build those parks, and they are still progressing," that "construction is continuing" and "that is ongoing as we speak" were materially false and misleading because construction was at a standstill at the time the statements were made. Practically no progress on construction had been made at Six Flags Zhejiang during the three years since ground was broken in January 2016 and future construction on any of the parks was unlikely because Riverside still did not have the funding necessary to pay for the necessary manpower, construction drawings or theme park rides.

252.     The above statements by defendants Reid-Anderson and Barber concerning Riverside's financial condition were also false and misleading when made. Defendant Barber's statements that Chairman Li "[was] in great shape" or "pretty good shape" and that Chairman Li "continued to pay us," and defendant Reid-Anderson's statement that Chairman Li "continues to

pay us" and "the financing is in place" were materially false and misleading when, at the time the statements were made, Riverside and Chairman Li had lost financing from and the support of the local Chinese governments. Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, its licensing payments to Six Flags, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing and Six Flags Nanjing projects. Moreover, it was misleading to state that Riverside "continues to pay us" when Riverside had missed scheduled licensing payments to Six Flags and the Individual Defendants did not disclose that the "gap" defendant Barber started to reference was a gap in Riverside's licensing payments to Six Flags.

### G.   First Quarter 2019 Financial Report and Earnings Call

253.   On April 23, 2019, the Individual Defendants caused Six Flags to issue a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for the first quarter of 2019. In that release, the Individual Defendants announced that, for the first quarter of 2019, reported revenue of $128 million "declined $1 million or 1 percent from the first quarter of 2018," driven by a decrease in the number of guests visiting Six Flags parks, which decrease "*was almost entirely offset* by a 5 percent increase in total guest spending per capita *and an increase in revenue from international agreements*."

254.   In the Company's financial report for the first quarter of 2019, filed on SEC Form 10-Q on April 24, 2019, signed by defendants Reid-Anderson and Barber, the Individual Defendants reported sponsorship, international agreements and accommodations revenue of $23.135 million for the first quarter of 2019, and represented that the Company's reported revenue decline was "mostly offset by," among other factors, "*a 13% increase in sponsorship, international agreements and accommodations revenue*."   The Individual Defendants also represented that the Company's "unaudited condensed consolidated financial statements have been

prepared in conformity with [GAAP]" and "[o]ur accounting policies reflect industry practices and conform to U.S. GAAP." Consistent with this purported GAAP compliance, the Individual Defendants represented that Six Flags "***recognize[d] revenue under our international [licensing] agreements over the relevant service period of each performance obligation based on its relative stand-alone selling price, as determined by our best estimate of selling price,*" and that "[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year**."

255.    That same day, during the Company's first-quarter 2019 earnings conference call with analysts and stockholders, defendant Reid-Anderson stated that for the first quarter of 2019, "[d]espite the decrease in attendance…total revenue in the quarter was down less than $1 million, primarily a result of," among other things, "***an increase in revenue from international agreements**." In response to an analyst's request for "international revenue and EBITDA numbers" and "which parks, exactly, are contributing to that," defendant Barber represented that "***[t]he first quarter revenue was $11.4 million of international**," "***EBITDA was little over $9 million of EBITDA for international**," and that those revenues were attributed to "Saudi and ***Haiyan [i.e., Zhejiang]*** as well as the Dubai."

256.    The Individual Defendants' April 23, 2019 and April 24, 2019 statements above concerning international licensing revenue that the Company recognized were materially false and misleading. Although in February 2019 Six Flags had a downward revision to recognized revenues attributed to the China parks, based on defendant Barber's representation during the first-quarter 2019 earnings call, revenues attributed to the Zhejiang parks still contributed to the reported financial results included in the $22.135 million in international licensing and related revenues reported in the first-quarter 2019 10-Q, and the "$11.4 million of international" revenue and $9

million of "EBITDA for international" that the Individual Defendants represented. At the time, it was materially false and misleading, as well as improper under GAAP, to recognize such revenue in connection with the China parks, given that the represented timeline for the parks' opening could not be met, as evidenced by the facts that Riverside had already failed to make required licensing payments to Six Flags, and Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing, and Six Flags Nanjing projects. Indeed, according to the account of FE 1 in the Securities Action, by this date, Riverside had procured no rides for any of its parks, no material progress on construction had occurred at any of the Six Flags China parks, and the Individual Defendants' publicly represented timeline for opening the China parks was impossible to meet based on the lack of progress to that point. Accordingly, it was also materially false and misleading for the Individual Defendants to represent that they complied with GAAP and had "review[ed] the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year" because, had they done so, Six Flags would have recognized substantially less, or no revenue at the time in connection with its international licensing agreements with Riverside.

257.    During the April 24, 2019 earnings conference call, defendant Reid-Anderson also stated that "[w]e continue to work with our international partner in China, meeting government officials for each of our 3 park complexes, and we believe conditions in China have slowly begun to improve" and "we should not lose sight of the fact that these short-term delays and lumpy revenue patterns are not material in the context of the long-term opportunity." Defendant Reid-Anderson further stated, "We're cautiously optimistic, but the situation in China is improving. And as I said earlier, *our partner Riverside remains very committed to developing Six Flags parks.*

***There's ongoing building going on***. But it's just going to take a little while longer to open these parks, and we're working very closely with local governments to ensure that happens."  Defendant Reid-Anderson further addressed the Chongqing and Nanjing parks and stated "***the dates that we had described on the last call and still hold now really reflect awaiting government approval***."

258.     Defendant Reid-Anderson also was asked by an analyst whether "there is any…new incremental delays to any of the parks that we should be aware of or you foresee coming in the sort of near term." Defendant Reid-Anderson stated, "***No. There are no delays that we're aware of on any of the parks. The same timing as we outlined on the fourth quarter call***."

259.     During the call, defendant Barber also stated that "***in terms of what parks contributed to Q1 it's the [Zhejiang] parks because they're progressing nicely***. I think those -- the 2 parks, [Zhejiang] and Saudi Arabia, will be contributing as they'll be progressing nicely in the future."

260.     The above statements made by defendant Reid-Anderson during the first-quarter 2019 earnings conference call concerning the opening timeline of the parks were materially false and misleading when made. The statements that the opening dates described on the prior earnings call "still hold" and that "[t]here are no delays that we're aware of on any of the parks" were materially false and misleading when made because, at the time, 14 to 20 months from Zhejiang's revised opening dates, no progress at all had been made on the construction of the parks despite Riverside breaking ground on construction of Six Flags Zhejiang in January 2016. By May 2018, the Six Flags China parks were already so behind schedule that, as alleged in the operative Securities Action complaint, FE 1 informed Company executives that they "[couldn't] build [Zhejiang] in 18 months" or open on time "even if everything was in [their] hands right now" and that Six Flags should put Riverside in breach of contract due to Riverside's lack of progress. There

was also no significant progress on the parks between May 2018 and April 2019 that changed this fact and that would have allowed for the Six Flags Zhejiang parks to be completed by the revised mid-to-late 2020 opening date.  The statements were also materially false and misleading because Riverside's lack of financing and lack of support from the local Chinese governments also made any future progress impossible. Riverside could not afford the 1,500 to 2,000 construction workers that would be necessary to build even one park, and only ever had 300 construction workers on site at maximum, which often dropped below 100. Riverside was unable to afford the basic construction drawings necessary for construction workers to follow to make significant construction progress. Riverside also had no theme park rides to even construct, because it failed to pay its ride vendors for commissioned rides, so all of Riverside's commissioned rides were cancelled by the vendors or sold to other theme parks. Per the account of FE 1 in the Securities Action, because the ride orders had been cancelled, Riverside and Six Flags were "not going to get the rides in time" to meet the original opening date "even if they were able to catch the construction up" elsewhere. This fact remained true as to the revised opening dates because Riverside still had failed to procure any rides even after the park delays were announced. By this time, Riverside had even missed its scheduled licensing payments to Six Flags, which further showed that the parks were off track.

261.     The above statements made by defendants Reid-Anderson and Barber during the first-quarter 2019 earnings conference call concerning the progress of the parks were likewise materially false and misleading when made.  Defendant Reid-Anderson's statement that "[t]here's ongoing build going on" and defendant Barber's statements that the "[Zhejiang] parks" were "progressing nicely" in the first quarter of 2019 and that "they'll be progressing nicely in the future" were materially false and misleading because construction was at a standstill at the time

the statements were made. Practically no progress on construction had been made at Six Flags Zhejiang during the three years since ground was broken in January 2016 and future construction on any of the parks was unlikely because Riverside still did not have the funding to pay for the necessary manpower, construction drawings or theme park rides.

262.     The above statements made by defendant Reid-Anderson concerning Riverside and the conditions in China were also false and misleading when made. The statements that "the situation in China is improving," that "Riverside remains very committed to developing Six Flags parks" and that "we should not lose sight of the fact that these short-term delays and lumpy revenue patterns are not material in the context of the long-term opportunity" were materially false and misleading when made because, at the time the statements were made, Riverside had lost financing from and the support of the local Chinese governments. Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, its licensing payments to Six Flags, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing and Six Flags Nanjing projects. The "situation in China" also was not "improving," the delays were not "short-term," and there was no "long-term opportunity" because Riverside's financial condition continued to worsen over time.

### H.     The May 2019 B. Riley FBR Institutional Investor Conference

263.     On May 22, 2019, defendant Barber spoke at the B. Riley FBR Institutional Investor Conference (the "B. Riley Conference").  During the B. Riley Conference, defendant Barber stated, "*[T]here's been struggles over the last 4 or 5 years that we've been working with [Riverside] that they've always managed to get through*…[a]nd we're optimistic that [they] can get through this."

264.     The above statements made by defendant Barber during the B. Riley Conference were materially false and misleading when made. It was materially false and misleading to state

99

that Riverside had "always managed to get through" the "struggles over the last 4 or 5 years" during which Six Flags had worked with Riverside because, at the time these statements were made, Riverside already had lost financing from and the support of the local Chinese governments. Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, its licensing payments to Six Flags, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing, and Six Flags Nanjing projects.

### I.   <u>Second Quarter 2019 Financial Report and Earnings Call</u>

265.    On July 24, 2019, the Individual Defendants caused Six Flags to issue a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for the second quarter of 2019. In that release, the Individual Defendants announced that "***revenue for the second quarter of 2019 increased $32 million or 7 percent from the second quarter of 2018 to $477 million***," and that "[t]he revenue growth resulted primarily from," among other factors, "***a 14 percent increase in sponsorship, international agreements and accommodations revenue***," which included a $7.5 million settlement related to the company's discontinued project in Dubai." The Individual Defendants further reported that "***[n]et income for the quarter increased $5 million or 7 percent***, and diluted earnings per share increased 7 percent to $0.94, primarily due to," among other factors, "the company's international agreements," and "[f]or the first six months of 2019, revenue was $605 million, a 5 percent increase compared to the prior year period, driven primarily by," among other things, "***a 14 percent increase in sponsorship, international agreements and accommodations revenue***."

266.    In the Company's financial report for the second quarter of 2019, filed on SEC Form 10-Q on July 24, 2019, signed by defendants Reid-Anderson and Barber, the Individual Defendants reported sponsorship, international agreements and accommodations revenue of

***$33.047 million*** for the second quarter of 2019 and sponsorship, international agreements and accommodations revenue of ***$56.182 million*** for the first half of 2019, and represented that the Company's revenue was "primarily derived from," among other things, "***sponsorship, international agreements and accommodations, including revenue earned under international development contracts***." The Individual Defendants further reported that "[d]uring the first six months of 2019, our park earnings before interest, taxes, depreciation and amortization ('Park EBITDA') decreased relative to the comparable period in prior year," but that "***[t]hese decreases were partially offset by***," among other things, "***a 14% increase in sponsorship, international agreements and accommodations revenue***" and, similarly, that "***[d]uring the three month period ended June 30, 2019, Park EBITDA increased over prior year primarily as a result of***," among other things, "***a 14% increase in sponsorship, international agreements and accommodations revenue***." In addition, the Individual Defendants reported that "***[r]evenue for the three months ended June 30, 2019 totaled $477.2 million***, an increase of $31.8 million, or 7%," and "***[r]evenue for the six months ended June 30, 2019 totaled $605.4 million***, an increase of $31.0 million, or 5%," attributable to, among other things, "***a 14% increase in sponsorship, international agreements and accommodations revenue***," and that Six Flags' reported year-over-year decline in total revenue per capita for the second quarter of 2019 was "partially offset by," among other things, "***the increase in sponsorship, international agreements and accommodations revenue***." The Individual Defendants also represented that the Company's "unaudited condensed consolidated financial statements have been prepared in conformity with [GAAP]" and "[o]ur accounting policies reflect industry practices and conform to U.S. GAAP." Consistent with this purported GAAP compliance, the Individual Defendants represented that Six Flags "***recognize[d] revenue under our international [licensing] agreements over the relevant service period of each***

101

*performance obligation based on its relative stand-alone selling price, as determined by our best estimate of selling price*," and that "*[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year*."

267.    That same day, during the Company's second-quarter 2019 earnings conference call with analysts and stockholders, defendant Barber stated that "*second quarter [2019] revenue was up 7%*" and "*[r]evenue in the first half of the year was up 5%*," both "driven" in part by "*a 14% increase in sponsorship, international agreements and accommodations revenue*." Further, defendant Barber represented that "*[i]nternational agreements revenue was up $7.5 million or 32% in the first 6 months of 2019, with revenue of $20 million in the second quarter*," which "included a $7.5 million settlement related to the termination of our contract in Dubai, *and a cumulative catch up revenue adjustment related to Chongqing*." Moreover, defendant Barber represented that "*international revenue will remain lumpy going forward*." In response to an analyst's request for information on revenues attributable to the China parks, defendant Barber clarified that the Company's revenue figure included the three parks in Zhejiang, the four parks in Chongqing, and the park in Saudi Arabia, but did not include the park in Nanjing presumably because of the lack of progress on Nanjing.

268.    The Individual Defendants' July 24, 2019 statements above concerning international licensing revenue that the Company recognized were materially false and misleading. The Individual Defendants represented during the second-quarter 2019 earnings call that the $20 million in international licensing revenue that the Company recognized that quarter included revenue in connection with the Chongqing and Zhejiang parks, that revenues in connection with the Nanjing parks was forthcoming, and that revenues would be international licensing revenue would be "lumpy" moving forward. At the time, it was materially false and misleading, as well as

102

improper under GAAP, to recognize such revenue in connection with the China parks, given that the represented timeline for the parks' opening could not be met, as evidenced by the facts that Riverside had already failed to make required licensing payments to Six Flags, and Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing, and Six Flags Nanjing projects. Indeed, according to the account of FE 1 in the Securities Action, by this date, Riverside had procured no rides for any of its parks, no material progress on construction had occurred at any of the Six Flags China parks, and the Individual Defendants' publicly represented timeline for opening the China parks was impossible to meet based on the lack of progress to that point. Accordingly, it was also materially false and misleading for the Individual Defendants to represent that they complied with GAAP and had "review[ed] the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year" because, had they done so, Six Flags would have recognized substantially less, or no, revenue at the time in connection with its international licensing agreements with Riverside.

269.    During the July 24, 2019 earnings conference call with stockholders and analysts, defendant Reid-Anderson stated:

> And in China, our partner continues to make progress obtaining local government support for our Chongqing parks. ***Construction in both [Zhejiang] and Chongqing continues***.
>
> Though our partner has ongoing negotiations concerning the full integrated resort in Chongqing, ***we are pleased with their consistent progress and are cautiously optimistic that both [Zhejiang] and Chongqing will remain on schedule***.
>
> ***We have 8 parks in 3 locations under construction and are working to restart construction on 4 additional parks in Nanjing, China***. Our pipeline remains robust, and we are optimistic that we will be able to announce new locations in the coming years.

103

270.     Defendant Barber provided additional information on the status of the Chongqing park. Defendant Barber stated, "[O]ur partners have been progressing with the government approval process and ***construction has continued***. This adjustment brings us in line with the park opening schedule that was announced in our Q4 2018 earnings call. Going forward, we expect to continue recognizing revenue for Chongqing and are hopeful to resume development and revenue recognition for Nanjing later in the year or early next year."

271.     Defendant Reid-Anderson also was asked for an "update on construction" for the Zhejiang and Chongqing parks. Defendant Reid-Anderson stated that "I can tell you that the parks that we've talked about, both in [Zhejiang] and Chongqing, ***the construction has continued there***. And the timing that we had given you -- I think Marshall [Barber] referred to this as being on the fourth quarter call, ***those hold***. At this time, if there's ever an update, I promise you, we will give you an update. ***But we are progressing at both of those parks***."

272.     Defendant Reid-Anderson was further asked to provide more specific clarification on the timeline. An analyst asked "[s]o broadly, when you look at China collectively, would you say the timeline overall has improved, stayed the same, or slipped a little since 90 days ago?" Defendant Reid-Anderson responded that "***I think the timeline that we described 180 days ago still holds right now, Tim, and the same as it was 90 days ago***."

273.     The above statements made by defendants Reid-Anderson and Barber concerning the construction progress at the parks were materially false and misleading when made. Defendant Barber's statement that "construction has continued" on the Chongqing parks and defendant Reid-Anderson's statements that "[c]onstruction in both [Zhejiang] and Chongqing continues," that "[w]e have 8 parks in 3 locations under construction" that "both in [Zhejiang] and Chongqing, the construction has continued there" and "we are progressing at both of those parks" were materially

false and misleading because construction was at a standstill at the time the statements were made. Practically no progress on construction had been made at Six Flags Zhejiang during the three-and-a-half years since ground was broken in January 2016 and future construction on any of the parks was unlikely because Riverside still did not have the funding necessary to pay for the necessary manpower, construction drawings or theme park rides. Likewise, defendant Reid-Anderson's statement that they were "working to restart construction on 4 additional parks in Nanjing" was materially false and misleading when made because material construction in Nanjing had never started.

274.    Similarly, the statements made by defendants Reid-Anderson and Barber concerning the opening timeline for the parks were materially false and misleading when made. Defendant Reid-Anderson's statements that "the timing that we had given" on the fourth-quarter 2018 earnings conference call still "hold," that "the timeline we described 180 days ago still holds right now," and is "the same as it was 90 days ago," and defendant Barber's statement that progress was "in line with the park opening schedule that was announced in our Q4 2018 earnings call" were materially false and misleading when made because, at the time, 11 to 17 months from Zhejiang's revised opening dates, no progress at all had been made on the construction of the parks despite Riverside breaking ground on construction of Six Flags Zhejiang in January 2016. By May 2018, the Six Flags China parks were already so behind schedule that, as alleged in the operative complaint in the Securities Action, FE 1 informed Company executives that they "[couldn't] build [Zhejiang] in 18 months" or open on time "even if everything was in [their] hands right now" and that Six Flags should put Riverside in breach of contract due to Riverside's lack of progress. There was also no significant progress on the parks between May 2018 and July 2019 that changed this fact and that would have allowed for the Six Flags Zhejiang parks to be completed by the revised

mid-to-late 2020 opening date.  These statements were also materially false and misleading because Riverside's lack of financing and lack of support from the local Chinese governments also made any future progress impossible. Riverside could not afford the 1,500 to 2,000 construction workers that would be necessary to build even one park, and only ever had 300 construction workers on site at maximum, which often dropped below 100. Riverside was unable to afford the basic construction drawings necessary for construction workers to follow to make significant construction progress. Riverside also had no theme park rides to even construct, because it failed to pay its ride vendors for commissioned rides, so all of Riverside's commissioned rides were cancelled by the vendors or sold to other theme parks. Per the account of FE 1 in the Securities Action, because the ride orders had been cancelled, Riverside and Six Flags were "not going to get the rides in time" to meet the original opening date "even if they were able to catch the construction up" elsewhere. This fact remained true as to the revised opening dates because Riverside still had failed to procure any rides even after the park delays were announced. By this time, Riverside had even missed its scheduled licensing payments to Six Flags, which further showed that the parks were off track.

### VII.    THE SECURITIES ACTION

275.    Based on the events described herein, almost immediately after stockholders finally learned the full truth per the Individual Defendants' stunning February 20, 2020 disclosures, the Securities Action was filed in the Northern District of Texas against Six Flags and defendants Reid-Anderson and Barber, alleging claims for fraud under the federal securities laws on behalf of investors who purchased or acquired Six Flags stock during the Class Period (between April 24, 2018 and February 19, 2020).

276.    The operative complaint was filed in the Securities Action on July 2, 2020, and after the defendants subsequently moved to dismiss, the Securities Action was dismissed with

prejudice by the Northern District of Texas on March 3, 2021. Following the dismissal with prejudice of the Securities Action, one of the co-lead plaintiffs to the Securities Action appealed.

277.    On January 18, 2023, the U.S. Court of Appeals for the Fifth Circuit reversed the dismissal of the Securities Action, finding that the defendants' public statements from April 2018 through July 2019 -- ***the very same statements challenged herein by Plaintiff*** -- were sufficiently alleged in the operative complaint to have been materially false and misleading and part of a scheme to defraud Six Flags investors during the Class Period.

278.    Among other things, with respect to the defendants' challenged statements in 2018, the Fifth Circuit found that "[t]he complaint contains several specific factual allegations from FE1 about the disastrous state of the China parks throughout 2018 that ***support the conclusion the parks would not open on schedule***" and raised "numerous factual allegations about inadequate construction to explain why a reassurance like 'our parks are progressing nicely towards their anticipated opening dates'" was materially misleading.

279.    As to scienter with respect to the defendants' challenged 2018 statements, the Fifth Circuit noted that defendants Reid-Anderson and Barber "were particularly incentivized in 2018 to increase high-margin international licensing deals to achieve the target EBITDA because revenue recognition occurred independently of the parks' long-term success" and "were motivated to receive equity awards of 600% and 300% of their base salaries."

280.    More importantly, the Fifth Circuit concluded that the allegations in the Securities Action regarding FE 1's: (a) "weekly presentations" prepared for defendants McKillips and Kane, the contents of which were related in turn by defendant McKillips to defendant Reid-Anderson and the Board; and (b) "master reports" prepared for defendant McKillips to present to defendant Reid-Anderson and the Board, were sufficient to support an inference that defendants Reid-

Anderson and Barber had "***actual knowledge***" that their 2018 statements were misleading.

281.    Although they have not been named as defendants in the Securities Action, based on this conclusion by the Fifth Circuit, the only reasonable inference is that defendants McKillips, Kane, Cellar, Kresja, Luther, Owens, and Roedel also had "actual knowledge" that the 2018 statements to shareholders challenged in the Securities Action (and challenged herein) were misleading.  Defendants Cellar, Kresja, Luther, Owens, and Roedel each served as a member of the Board at the time the "weekly presentations" and "master reports" (and/or the contents thereof) prepared by FE 1 are alleged to have been shared with the Board by defendant McKillips.

282.    In reversing the dismissal of the Securities Action, the Fifth Circuit also held that the defendants' challenged public statements in February 2019, April 2019, and July 2019 were sufficiently alleged to be false and misleading. Among other things, the Fifth Circuit found that the operative Securities Action complaint "adequately alleges Defendants' positive statements about Riverside contained ***actionable omissions about the company's true financial state***" and that "when Defendants told investors that Riverside has 'a lot of assets' and 'continues to pay,' and that their 'financing [for the parks] is in place,' ***Defendants were omitting crucial information about Riverside's numerous financial woes*** alleged by FE1."

283.    The Fifth Circuit concluded there was "***a strong inference of scienter***" based on the allegations in the Securities Action regarding FE 1's August 2019 resignation letter castigating the disastrous state of the parks and FE 1's regular reports, as well as FE 1's account of construction being "so non-existent that 'weeds [were] growing' on the theme park portion of the Zhejiang park in February 2019." The Fifth Circuit also found that a "core operations theory" contributed to the inference of scienter.

284.    Per the Fifth Circuit's January 18, 2023 ruling, the dismissal of the Securities

Action was reversed and the Securities Action was remanded to the Northern District of Texas for further proceedings consistent with the Fifth Circuit's opinion. Several months later, however, on June 2, 2023, the Northern District of Texas dismissed the Securities Action a second time, with prejudice, based on its determination that the plaintiff lacked standing to sue. This second, most recent dismissal of the Securities Action was not based in any way on the substantive merits of the allegations and claims asserted in the Securities Action. An appeal is currently pending in the Fifth Circuit.

## VIII.   THE FIRST 220 PRODUCTION

285.    On May 14, 2020, Plaintiff issued the First Inspection Demand to Six Flags pursuant to Section 220. *See* Exhibit A. Based on the First 220 Production which Plaintiff obtained from Six Flags in response to the First Inspection Demand, Plaintiff has uncovered further evidence of the Individual Defendants' wrongdoing alleged herein.

286.    The First 220 Production, among other things, has revealed:

- ███████████████████████████████████████
  ███████████████████████████████████████
  ███████████████████████████████████████
  █████████████████████████████

- ███████████████████████████████████████
  ███████████████████████████████████████
  ███████████████████████████████████████
  ████████████████████████████████

- ███████████████████████████████████████
  ███████████████████████████████████████

██████████████████████████████

██████████████████

- ██████████████████████████████

██████████████████████████████

██████████████████████████████

████████████

- ██████████████████████████████

██████████████████████████████

██████████████████████████

- ██████████████████████████████

██████████████████████████████

██████████████████████████████

████ ████ ███ ████ █████ ███ ██ ████ ████

███████████████████

- ██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

█████ ████████████████████████

██████████████████████████████

██████████████████████████████



## IX.   DAMAGES TO SIX FLAGS

287.    As alleged above, the Individual Defendants' statements and the events described herein have caused great damages to the Company's assets, goodwill, and reputation.

288.    For example, Six Flags is suffering, and will continue to suffer, from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.  Further, as related litigation continues to unfold, Six Flags will be continue to be damaged by the professional fees, costs and expenses incurred because of those matters, not to mention the decline in productivity associated with the distractions that come with exposure to litigation.

289.    Six Flags has also incurred, and continues to be exposed to, damages in connection with the SEC Subpoena and the SEC's review of the statements and events described herein.

290.    The Individual Defendants have not fared nearly so badly, however.  On the contrary, as alleged herein, certain of the Individual Defendants have pocketed millions of dollars in compensation not justified by the Company's performance while under their stewardship, especially defendants Reid-Anderson and Barber.  As noted by the Fifth Circuit in its January 18, 2023 opinion, defendants Reid-Anderson and Barber "were particularly incentivized in 2018 to increase high-margin international licensing deals to achieve the target EBITDA because revenue recognition occurred independently of the parks' long-term success" and "were motivated to receive equity awards of 600% and 300% of their base salaries."  The Company has also incurred costs in connection with benefits paid to these Individual Defendants.

## X.    PLAINTIFF'S LITIGATION DEMAND HAS BEEN WRONGFULLY REFUSED, ON THE ADVICE OF NON-INDEPENDENT COUNSEL, AND THIS DERIVATIVE ACTION SHOULD PROCEED

291.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

292.    Plaintiff is a current stockholder of the Company.  Plaintiff has continuously held shares of the Company's stock since 2018 and Plaintiff was a stockholder of the Company at all times relevant to the Individual Defendants' wrongdoing alleged herein.

293.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

294.    Six Flags is a Delaware corporation.  The directors of a Delaware corporation owe the corporation and its stockholders the affirmative duty to protect the interests of the corporation at all times.  Moreover, corporate directors have an obligation to refrain from conduct that would injure the corporation and its stockholders.

295.    Following the Fifth Circuit's January 18, 2023 decision, on February 1, 2023, Plaintiff issued his pre-suit Litigation Demand to the Board.  *See* Exhibit B. The Litigation Demand

is based in part on confidential information learned by Plaintiff via the First 220 Production.

296.    In the Litigation Demand, Plaintiff demanded that the Board initiate an independent, reasonable, good faith investigation regarding the allegations therein and take all necessary actions, including filing a lawsuit on the Company's behalf against its wayward "fiduciaries," in order to protect the Company's interests and recover the serious damages caused to Six Flags by their misconduct. In addition, the Litigation Demand noted that the three-year statute of limitations for breach of fiduciary duty claims under Delaware law would arguably expire as soon as February 20, 2023 (based on the February 20, 2020 disclosures described herein that, among other things, Six Flags had terminated its development agreements with Riverside and would not recognize any revenues or income from the development of Six Flags-branded parks in China).

297.    To the extent that the Board might not have been prepared to promptly take the actions demanded by Plaintiff in the Litigation Demand prior to the arguable expiration of the applicable statute of limitations in late February 2023, Plaintiff demanded that the Board immediately secure tolling agreements from each of the individuals that were implicated or potentially could be implicated in the alleged wrongdoing, including but not limited to the Individual Defendants named herein.  Plaintiff further demanded in the Litigation Demand that no later than February 7, 2023, the Board provide written confirmation that such tolling agreements had been secured or would be timely secured.

298.    On February 7, 2023, Plaintiff's Counsel received a letter from Ms. Williams-Ramey, the Company's Chief Legal Officer.  *See* Exhibit C.  Ms. Williams-Ramey's letter specifically noted Plaintiff's demand for tolling agreements to be secured posthaste given the applicable statute of limitations for breach of fiduciary duty claims under Delaware law.  Ms.

113

Williams-Ramey further represented that the Litigation Demand had been forwarded to the Board, and that the Board would consider matters in connection with the Litigation Demand at its next scheduled meetings, "which are presently set for March 7-8, 2023" – *i.e.*, ***after the statute of limitations was at least arguably set to expire***.

299.    Claims for relief belonging to the Company are, of course, valuable corporate assets.  Directors of Delaware corporations, such as Six Flags, are duty-bound to protect and preserve the corporation's assets at all times.

300.    The Board, in response to Plaintiff's demand that tolling agreements be secured immediately under the circumstances, told Plaintiff that this issue would not even be considered by the Board -- let alone acted upon -- until March 7-8, 2023, ***after*** the likely expiration of the statute of limitations for the Company's claims. Accordingly, the Board either acted recklessly by failing to promptly take the reasonable, basic steps necessary to ensure that Six Flags could timely assert its valuable claims, or worse, the Board deliberately chose to "run out the clock" and protect the Individual Defendants from the consequences of their misconduct.

301.    In either case, the Board's failure to expeditiously secure tolling agreements despite Plaintiff's explicit demands for tolling agreements under these circumstances – when the statute of limitations for Six Flags' breach of fiduciary duty claims under Delaware law had been set to expire shortly -- amounted to functionally ignoring and wrongfully refusing the Demand and failing to protect and preserve the Company's corporate assets, in violation of the Board's fiduciary duties to Six Flags and its stockholders.

302.    The Board's dereliction of duty left Plaintiff with no choice but to initiate this derivative action to ensure that the Company's valuable claims for relief based on the allegations in the Litigation Demand were properly and timely asserted.

303.    Nonetheless, after this derivative action was initiated by Plaintiff, on March 10, 2023, Plaintiff's counsel received the Refusal, which was sent on behalf of the Board by Skadden. *See* Exhibit D.  The Refusal, signed by Mr. Kasner, stated that on March 7, 2023, Skadden attended the Board's regularly scheduled meeting and "presented to the Board on the [Litigation] Demand, advised the Board of its fiduciary duties and discussed certain considerations for deciding how to respond to the [Litigation] Demand."  The Refusal further indicated that on March 8, 2023, the Board met with Skadden again "to further consider the [Litigation] Demand."

304.    At the time that Skadden met with the Board on March 7 and 8, 2023 to make its presentation to the Board and to advise the Board regarding its response to the Litigation Demand, Skadden was serving ***as co-lead defense counsel in the Securities Action***.   In connection therewith, Skadden represented (and continues to represent, as that case is currently on appeal in the Fifth Circuit) individual defendants Reid-Anderson and Barber, and of course Skadden has served as their ***zealous advocates***, consistent with their duties as co-lead defense counsel.

305.    Indeed, on March 6, 2023, the day before Skadden first met with the Board to make a presentation to the Board and advise the Board regarding its response to the Litigation Demand, in its capacity as co-lead defense counsel in the Securities Action, Skadden submitted a joint status report to the Northern District of Texas in the Securities Action which stated defendants' position as to the claims and defenses as follows:

> Defendants deny Plaintiff's allegations. Six Flags had entered into a licensing agreement with Riverside to build Six Flags-branded theme parks in China. Six Flags accurately and timely described, among other things, the agreement with Riverside, Riverside's financial condition and the risks involved in such projects. Six Flags' international business was a small fraction of its overall business and China was only a portion of that business. Among other things, the Amended Complaint contains numerous mischaracterizations, takes statements out of context, and relies on so-called former employees who either mischaracterize information or did not have access to complete information regarding the business. In sum, none of the statements at issue was materially false or misleading when

made nor were there any purported omissions that rendered any such statements materially false or misleading. Furthermore, to the extent any statements, including audited financial statements, could be deemed to be false and misleading, Defendants made such statements in good faith and did not possess the requisite scienter. Finally, Defendants contend that Plaintiff will be unable to prove loss causation because the price of Six Flags stock declined for reasons other than the revelation of an allegedly prior false or misleading statement.

306.     The Skadden attorneys listed as co-lead counsel for defendants in that March 6, 2023 joint status report in the Securities Action are Mr. Kasner, Mr. Musoff, and Ms. Liu.

307.     Given that the Board was advised by decidedly, obviously non-independent counsel regarding its response to the Litigation Demand, it comes as no surprise that the Refusal informed Plaintiff that the Board elected, following advice provided by Skadden, ***not to conduct any factual investigation whatsoever in response to the Litigation Demand***, and that the Board had determined it was not in the best interests of the Company to take ***any of the actions demanded in the Litigation Demand***, with the exception of belatedly entering into tolling agreements.  *See* Exhibit C.

308.     The Refusal was a predetermined outcome, since Skadden could not possibly and would never have advised the Board to conduct an investigation into the conduct of, or initiate and prosecute any claims for relief against, ***its very own clients that Skadden was simultaneously, actively, and zealously defending in the Securities Action*** in response to substantially similar allegations of wrongdoing.

309.     Following receipt of the Refusal, Plaintiff issued the Second Inspection Demand under Section 220 to the Company on May 16, 2023.  *See* Exhibit E.  The Second Inspection Demand sought a production of documents related to the Refusal, particularly given that the Refusal stated that the Board rejected the Litigation Demand in its entirety, without conducting any investigation and after only two meetings held on March 7 and 8, 2023.

310.     Among other things, the Second Inspection Demand requested the production of

116

documents "detailing how the Board determined that Skadden was independent for purposes of acting as counsel to the Board in connection with the Litigation Demand." *See* Exhibit E.

311.    On June 27, 2023, Six Flags produced the Second 220 Production to Plaintiff in response to the Second Inspection Demand. ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████    ████████████████████    ██████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

312.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

313.    A board of directors is duty-bound to independently investigate allegations in a shareholder litigation demand promptly to satisfy its obligations to inform itself and to act

reasonably and in good faith.  Here, in violation of its duties, the Board elected not to undertake any investigation at all.  The Board did so on the advice of non-independent counsel that was simultaneously, actively defending certain of the individuals in the Securities Action that Plaintiff identified as wrongdoers in the Litigation Demand.  Indeed, the Board's decision not to investigate or bring any claims against anyone in response to the Litigation Demand was made on the advice of -- or in effect by – Skadden, which was simultaneously serving as co-lead defense counsel in the Securities Action, which had already pre-judged the allegations set forth in the Litigation Demand and which suffered from obvious, disabling conflicts.

314.    Where a board of directors inexplicably retains conflicted counsel in response to a shareholder litigation demand, it amounts to a fiduciary failure that is fatal to the board's decision.  A Board's failure to investigate and/or its rejection of a shareholder litigation demand, where a board has retained conflicted counsel, raises a reasonable doubt that the board's decisions were adequately and independent informed and protected by the business judgment rule.  In such a rare case, the shareholder's complaint is entitled, on a wrongful demand refusal theory, to survive a motion to dismiss brought under Fed. R. Civ. P. 23.1.

315.    Accordingly, Plaintiff may proceed with this derivative action which is designed to protect the interests of Six Flags.

## COUNT I

### Breach of Fiduciary Duty Against the Individual Defendants

316.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

317.    The Individual Defendants, as current or former Six Flags officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor,

oversight, reasonable inquiry, and supervision.

318.     By virtue of their positions as Six Flags directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

319.     Each Individual Defendant was required to: (a) use his or her ability to control and manage Six Flags in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of Six Flags rather than his or her own interests.

320.     By their acts alleged herein, including but not limited to causing Six Flags to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

321.     The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

322.     Six Flags has been injured as a direct and proximate result of the Individual Defendants' wrongful conduct.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

323.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

324.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Six Flags.

325.     Plaintiff, as a shareholder and representative of Six Flags, seeks restitution from

the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, salaries, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.      Directing Six Flags to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders holders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

C.      Awarding to Six Flags restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Date: August 22, 2023

**FEDERMAN & SHERWOOD**

*s/ William B. Federman*
William B. Federman
212 W. Spring Valley Rd.
Richardson, TX 75081
(405) 235-1560
WBF@federmanlaw.com

**POMERANTZ LLP**
Gustavo F. Bruckner
Samuel J. Adams
600 Third Avenue
New York, NY 10016
(212) 661-1100
gfbruckner@pomlaw.com
sjadams@pomlaw.com

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
(303) 861-3003
rusty@shumanlawfirm.com

**SHUMAN, GLENN & STECKER**
Brett D. Stecker
326 W. Lancaster Avenue
Ardmore, PA 19003
(303) 861-3003
brett@shumanlawfirm.com

*Counsel for Plaintiff Antonio Dela Cruz*

## **VERIFICATION**

I am the Plaintiff in this action. I currently own shares of Six Flags Entertainment Corporation ("Six Flags") and have been a Six Flags stockholder at all times since June 7, 2018. I have reviewed the allegations made in this Verified First Amended Stockholder Derivative Complaint, know the contents, and authorize its filing. To those allegations to which I have personal knowledge, I believe those allegations to be true. To those allegations which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _9_ day of August, 2023

_____
Antonio Dela Cruz

# Exhibit A



**Gustavo F. Bruckner**
Partner

May 14, 2020

<u>**VIA Federal Express Overnight**</u>

Board of Directors
Six Flags Entertainment Corporation
c/o Laura W. Doerre, Executive Vice President, General Counsel
924 Avenue J East
Grand Prairie, TX 75050

Re:    *Demand to Inspect Books and Records Pursuant to 8 Del. C. § 220*

To the Members of the Board of Directors of Six Flags Entertainment Corporation:

This letter serves as a stockholders' demand (the "Demand") for inspection of books and records pursuant to Delaware General Corporation Law, 8 *Del. C.* § 220 ("Section 220"). The law firms of Pomerantz LLP and Shuman, Glenn & Stecker represent Antonio Dela Cruz, Kathleen Friedhoff, and Kenny Rama (the "Stockholders"), the stockholders of Six Flags Entertainment Corporation ("Six Flags" or the "Company").[1] The Stockholders currently own shares of Six Flags common stock, which the Stockholders have held at all relevant times. A true and correct copy of the Stockholders' open holdings statements demonstrating the Stockholders' ownership of Six Flags stock are attached hereto as **Exhibit A**. The Stockholders have appointed the undersigned counsel as the Stockholders' attorneys-in-fact for the purposes of this demand by the Special Powers of Attorney attached hereto as **Exhibit B**. Also, enclosed as **Exhibit C** are verifications on behalf of the Stockholders confirming that the statements in this letter are true and correct to the best of the Stockholders' knowledge, information, and belief.

As set forth below, this Demand is related to potential breaches of fiduciary duties by current and/or former members of the Company's Board of Directors (the "Board") and its senior management team. The Stockholders hereby demand, pursuant to Section 220, the right (by the Stockholders' attorneys, consultants, or other agents), during the usual hours of business, to inspect and make copies of the books and records of the Company described below. The Demand is based on, among other things, the following.

---

[1]    The terms "Six Flags" and the "Company" include all Six Flags employees and directors, as well as all affiliates, joint ventures, and subsidiaries.



I. **Background**

A. **The Company's Agreement with Riverside and Efforts to Expand in China**

Six Flags is a Delaware corporation which maintains its corporate headquarters in Grand Prairie, Texas. According to its public filings, Six Flags is "the world's largest regional theme park company and the largest operator of waterparks in North America, with $1.5 billion in revenue and 26 parks across the United States, Mexico and Canada."

In June 2014, Six Flags entered into an agreement (the "Riverside Agreement") with Riverside Investment Group Co. Ltd. ("Riverside"), a Chinese real estate developer, to build multiple Six Flags-branded theme parks in China. Under the terms of the Riverside Agreement, Riverside would provide the capital investment for future developments in China and would pay Six Flags consulting fees during the development period of each park and then licensing and management fees once the parks opened.

Beginning in April 2018, however, under the direction of management and the Board, Six Flags issued a series of materially false and misleading public statements about the purported success of its international expansion efforts, particularly in China, and the Company's resulting future growth prospects. Specifically, these public statements misrepresented and failed to disclose that: (i) Riverside faced far more financial distress than was disclosed to Six Flags shareholders; (ii) as a result, there was a significant risk and a high likelihood that Riverside would default on its payment obligations under the Riverside Agreement to Six Flags; (iii) Six Flags' international strategy, which relied predominantly on Riverside to develop Six Flags-branded parks in China to drive revenue growth, was significantly less promising than was represented publicly; and (iv) as a result, statements about Six Flags' business, operations and future prospects lacked a reasonable basis when made. At the same time that these false and misleading statements were issued, the Board caused Six Flags to expend Company (*i.e.*, shareholders') money to repurchase 1.8 million of its own shares at artificially inflated prices.

B. **False and Misleading Statements**

On April 25, 2018, during the Company's first quarter 2018 earnings conference call, Six Flags' then-Chief Executive Officer ("CEO"), James Reid-Anderson ("Mr. Reid-Anderson"),[2] described the opportunity to expand international agreements revenue, stating "China is the biggest of all, and the vision of both Six Flags and Riverside is to build multiple parks."

---

[2]     Mr. Reid-Anderson served as a member of the Board from August 2010 until November 2019, and as CEO of the Company from August 2010 through February 2016, and from July 2017 until November 2019.

**600 Third Avenue, New York, New York 10016   tel: 212.661.1100   www.pomerantzlaw.com**

NEW YORK       CHICAGO       LOS ANGELES       PARIS



On July 25, 2018, Six Flags issued an earnings press release concerning its business, including its second quarter 2018 ("2Q18") financial results. The 2Q18 10-Q also announced significant new business, stating that "on May 29, 2018, the company and its partner in China, the Riverside Group, announced a licensing agreement to develop a Six Flags Kids World, the fourth park in the Nanjing entertainment complex and the eleventh park in China." The Kids World waterpark and adventure park was scheduled to open in 2021 with the theme park scheduled to open in 2022.

On July 25, 2018, Six Flags also hosted a conference call for shareholders and analysts. During the call, Mr. Reid-Anderson represented that "[o]ur international licensing program is growing exponentially and providing additional diversification to our portfolio, and the opportunity for future growth remains very compelling" and that the "timing of the [China] parks remains exactly the same as previously disclosed, there's no change on any of those." The Company's then-Chief Financial Officer ("CFO"), Marshall Barber ("Mr. Barber")[3] confirmed that Six Flags had also repurchased $81 million of its common stock during the quarter.

On October 24, 2018, Six Flags hosted a conference call for shareholders and market analysts. During the call, Mr. Reid-Anderson announced a delay in the opening dates for the Company's new Chinese parks from earlier statements of late 2019 to 2020 and into 2022, but stated that this was only a matter of a few months' difference from earlier announcements.

On February 14, 2019, Six Flags issued an earnings release concerning its business, including its fourth quarter and fiscal year 2018 ("FY18") financial results. This release touted record revenues, but also announced that "growth was offset by an unfavorable revenue adjustment of $15 million related to the company's international agreements due to delays in the expected opening dates of some of the parks in China caused by a challenging macroeconomic environment." The Company also announced the repurchase of an additional $111 million in Six Flag's stock. That same day, Mr. Reid-Anderson participated in a conference call for shareholders and analysts, during which he represented that revenues would have been higher "if not for our fourth quarter adjustment to reflect delays in some of the China parks' opening schedules caused by recent macroeconomic events that many companies are experiencing and from which our partner is not immune." He also announced that "we now expect our high-end parks to begin opening in mid- to late 2020 versus 2019, our Chongqing parks to begin opening in mid- to late 2021 versus 2020, and Nanjing to begin opening in late 2022."

On April 23, 2019, Six Flags issued an earnings release concerning its business, including its first quarter 2019 ("1Q19") financial results. The following day, Six Flags hosted a conference

---

[3]     Mr. Barber served as Executive Vice President and CFO of the Company from February 2016 until February 24, 2020, when the Company announced his retirement. Mr. Barber's effective retirement date is August 31, 2020.

**600 Third Avenue, New York, New York 10016   tel: 212.661.1100   www.pomerantzlaw.com**

NEW YORK      CHICAGO      LOS ANGELES      PARIS



call for shareholders and market analysts during which Mr. Reid-Anderson discussed the quarter's results.  When asked directly about whether the China parks were "on track for approval," he stated: "There are no delays that we're aware of on any of the parks. The same timing as we outlined on the fourth quarter call."

On July 24, 2019, Six Flags issued an earnings release concerning its business, including its second quarter 2019 ("2Q19") financial results.  The release quoted Mr. Reid-Anderson as saying, "I am confident 2019 will be the tenth consecutive record year for our shareholders as we continue to innovate and deliver on our five-pillar strategy to drive our business toward achieving our aspirational goal of $750 million of Modified EBITDA by 2021."

On October 23, 2019, Six Flags filed with the SEC its 3Q19 quarterly report on Form 10-Q for the period ended September 30, 2019.  Also, on October 23, 2019, Six Flags hosted a conference call for Six Flags shareholders and market analysts wherein Mr. Reid-Anderson responded to questions.  During the call, Mr. Reid-Anderson stated that "the Chinese market remains difficult, and we are likely to continue to recognize lumpy international agreements revenue until we see progress there from a macroeconomic, real estate and trade perspective."  As a result, the Company revealed that it would again postpone its park openings in China, with Mr. Reid-Anderson stating that "there's a very high likelihood going forward that we will see changes in the timing of park openings" and "it's unrealistic to think it's going to be exactly as we've outlined."  The Company further revealed that it was continuing to suspend revenue recognition related to four of its Chinese parks in development.

On this news, the trading price of Six Flags common stock fell from $51.23 per share on October 22, 2019 to $44.88 per share on October 23, 2019, or approximately 12%, wiping out $536 million in shareholder equity.

### C.    Analysts Begin Questioning the Viability of Riverside and the Truth Emerges

As 2019 continued to unfold, reports questioning the financial viability of Riverside emerged.  For example, on December 8, 2019, Riverside posted a statement on its Chinese website acknowledging its financial difficulties during 2019.  A month later, on January 6, 2020, Wedbush Securities issued an analyst report detailing Riverside's financial difficulties, which stated:

**Six Flags' Chinese Partner Facing More Financial Pressure**

Recent reports from various Chinese press outlets indicate that the Riverside Group, SIX's exclusive partner in China, is facing capital constraints. The reports suggest Riverside has fallen behind on payments to its lenders and contractors leading to multiple lawsuits against the Chinese developer and its subsidiaries.

600 Third Avenue, New York, New York 10016   tel: 212.661.1100   www.pomerantzlaw.com

NEW YORK        CHICAGO        LOS ANGELES        PARIS



One such contractor, Aofei Entertainment, who is in charge of developing promotional material for the Chinese Six Flags parks in Zhejiang has taken Riverside to court seven times already due to non-payment. Another contractor who developed one of the play areas at Zhejiang alleges they have not been paid for over six months. These contractors and others have successfully lobbied Chinese courts to institute an equity freeze on Riverside and its subsidiaries while their respective lawsuits await trial.

In addition, Riverside has recently undergone large scale layoffs. A statement from the company stated that due to a depressed real estate market in the country, the company's developments have encountered "bottlenecks". This has necessitated layoffs to hundreds of Riverside employees or up to 90% of its workforce according to Chinese media sources. Some of these former employees have reported that they have yet to receive full payment from Riverside for prior work.

Chinese reporters recently visited the Zhejiang park construction site and claimed that the development had been abandoned with no signs of ongoing construction. We note the Zhejiang park was the first Chinese park announced by Six Flags back in 2018 (2 years earlier than Chongqing and almost 3 years before Nanjing). Theoretically Zhejiang should be the furthest developed at this point, and if the reports are to be believed this is certainly a troubling signal for the two other projects.

Unable to conceal the truth any longer, on January 20, 2020, Six Flags filed a current report with the SEC on Form 8-K, which stated:

The development of the Six Flags-branded parks in China has encountered continued challenges and has not progressed as Six Flags Entertainment Corporation (the "Company") had expected. The Company's partner in China, Riverside Investment Group ("Riverside"), continues to face severe challenges due to the macroeconomic environment and the declining real estate market in China. This has led Riverside to default on its payment obligations to the Company and, as such, the Company has delivered formal notices of default under its agreements. While the Company continues to work with Riverside and each of Riverside's governmental partners, the eventual outcome is unknown and could range from the continuation of one or more projects to the termination of all the Six Flags-branded projects in China.

In the fourth quarter of 2019, the Company will realize no revenue from the China international agreements and expects a negative $1 million revenue adjustment



related to the China international agreements that will offset a portion of the revenue from the Company's remaining international agreements. In addition, the Company expects aggregate one-time charges of approximately $10 million related to the China international agreements and certain unrelated litigation matters in the fourth quarter. For 2020, while the Company does not foresee any significant additional one-time costs or expenses irrespective of the outcome of the Six Flags-branded projects in China, the loss of all the China projects would result in no revenue for that market if Riverside does not cure the default and the Company is not able to engage other partners to complete any of the projects.

On this news, the trading price of Six Flags common stock collapsed again, falling from $43.76 per share on January 9, 2020 to close at $35.96 per share on January 10, 2020, or nearly 18%, wiping out $660 million in shareholder equity.

On February 20, 2020, Six Flags issued an earnings release concerning its business, including its fourth quarter and fiscal year 2019 financial results, which stated that "during 2019, the company's partner in China defaulted on its payment obligations to the company. As a result, in February 2020 the company terminated the development agreements. It is unlikely that the company will recognize any revenue or income in 2020 related to the development of parks in China."

On this news, the trading price of Six Flags common stock collapsed again, falling from $38.02 per share on February 19, 2020 to $31.89 per share on February 20, 2020, or approximately 16%, wiping out an additional $518 million in shareholder equity.

## II.    The Stockholders' Proper Purposes

Under these circumstances, it is reasonable for Six Flags stockholders to utilize 8 Del. C. §220 to investigate whether the Company's senior officers and directors have fulfilled their fiduciary duties.  Based on the foregoing, the Stockholders make this § 220 demand for the proper purposes of:

    (a)    investigating mismanagement or wrongdoing and breach of fiduciary duties of loyalty, good faith and due care on the part of Six Flags' officers and directors with respect to the above-described matters;

    (b)    investigating the disinterestedness and independent ability of the Board to consider a demand to initiate and maintain litigation related to any breaches of fiduciary duties as detailed above, and determining whether it is necessary to institute class or derivative litigation to remedy such breaches of fiduciary duties; and



(c)     determining whether the current directors are fit to continue serving on the Board.

This demand to inspect the Company's books and records is undertaken in good faith and pertains to the Stockholders' interest in reviewing the manner in which Six Flags is being managed. The Delaware Court of Chancery has consistently found similar shareholders' demands to inspect a corporation's books and records for reasons such as this one to be proper. *See, e.g.*, *Melzer v. CNET Networks, Inc*., 934 A.2d 912 (Del. Ch. 2007) ("There is no shortage of proper purposes under Delaware law, but perhaps the most common proper purpose is the desire to investigate potential corporate mismanagement, wrongdoing or waste.") (internal quotation marks and citations omitted); *Grimes v. DSC Communications Corp*., 724 A.2d 561 (Del. Ch. 1998). The Stockholders are entitled to inspect all necessary books and records to satisfy these stated purposes. *See generally Wal-Mart Stores, Inc. v. Indiana Electrical Workers Pension Trust Fund IBEW*, 95 A.3d 1264, 1271 (Del. 2014). The below demands are necessary and essential to effectuate the Stockholders' purposes.

## III.     The Books and Records Requested

The Stockholders hereby demand, under oath, pursuant to Section 220, the right (by the Stockholders' attorneys, consultants, or other agents), during the usual hours of business, to inspect and make copies of the books and records of the Company described below. Unless otherwise indicated, this Demand pertains to books and records from January 1, 2017 through the date of production:[4]

1.     All minutes or Board books, reports, handouts, emails, and other materials provided or sent to the members of the Board, or any subcommittees thereof, concerning the status of the Company's international expansion efforts;

2.     All minutes or Board books, reports, handouts, emails, and other materials provided or sent to the members of the Board, or any subcommittees thereof, concerning the development of Six Flags branded parks in China;

3.     All minutes or Board books, reports, handouts, emails, and other materials provided or sent to the members of the Board, or any subcommittees thereof, concerning the Riverside Agreement;

4.     All minutes or Board books, reports, handouts, emails, and other materials provided or sent to the members of the Board, or any subcommittees thereof, regarding the financial condition and/or viability of Riverside;

---

[4]     To be clear, the Stockholders seek to investigate **_non-exculpated_** corporate misconduct.

600 Third Avenue, New York, New York 10016   tel: 212.661.1100   www.pomerantzlaw.com

NEW YORK        CHICAGO        LOS ANGELES        PARIS



5.      All minutes or Board books, reports, handouts, emails, and other materials provided or sent to the members of the Board, or any subcommittees thereof, regarding the possibility of Riverside defaulting on its payment obligations to the Company;

6.      All minutes or Board books, reports, handouts, emails, and other materials provided or sent to the members of the Board, or any subcommittees thereof, regarding the macroeconomic environment in China;

7.      All minutes or Board books, reports, handouts, emails, and other materials provided or sent to the members of the Board, or any subcommittees thereof, regarding the state of the real estate market in China;

8.      All communications between the Company and Riverside;

9.      All documents which have any bearing on the independence and disinterestedness, or lack thereof for purposes of futility of demand under Delaware law for any current member of the Board, including but not limited to, all documents reflecting any personal, business or familial relationships among any directors;

10.     The personnel file for each member of the Board, including any materials relating to the initial nomination, and any subsequent renomination, of each of the current members of the Board;

11.     All documents produced to any other stockholder or their counsel in response to a demand pursuant to Section 220 or in connection with any stockholder litigation that relates to the allegations contained herein;

12.     All documents created, modified or provided to the Board or any committee thereof concerning the independence or non-independence of any director, including any disclosure questionnaires and any books and records relating to appointment of directors to serve on any committee of the Board; and

13.     All director questionnaires for members of the current Board submitted to NYSE, or prepared internally within Six Flags for any purpose, relating to director independence.

To the extent the Board maintains any or all of its records in electronic form, including but not limited to e-mails and other electronic documents, such as text messages between Board members, such electronic documents are responsive to the above demands and should be produced. Please confirm whether the Board maintains any or all of its records in electronic form. Any such



electronic documents shall be produced in accordance with the Delaware Court of Chancery Guidelines to Help Lawyers Practicing in the Court of Chancery, found here: https://courts.delaware.gov/Chancery/docs/Complete_Guidelines.pdf.

## IV.    Conclusion

For purposes of the foregoing demand, the Stockholders request that the Company provide or otherwise make available all such information up to the date in which the Company actually and fully complies with the demand and requests herein.  The Stockholders further request that the Company provide or otherwise make available all additions, changes, and corrections to any of the requested information from the time of this demand to the time of any written confirmation that this inspection has concluded.

The Stockholders agree to bear all costs required to be paid by Section 220 that are incurred by the Company in connection with obtaining and furnishing the requested information and other materials.  The Stockholders further agree to enter into a reasonable confidentiality agreement concerning the use of all documents produced by the Company pursuant to this demand.

We believe that this demand letter complies with the provisions of Section 220 in all material respects.  If the Company believes this notice is incomplete or otherwise deficient in any respect, however, we request that you contact the undersigned immediately so that any alleged deficiencies may be addressed promptly.

600 Third Avenue, New York, New York 10016   tel: 212.661.1100   www.pomerantzlaw.com

NEW YORK        CHICAGO        LOS ANGELES        PARIS



Under Section 220, if you do not respond to this request within five (5) business days of the date of this demand letter, the Stockholders may apply to the Delaware Court of Chancery for an order compelling inspection.  We look forward to your prompt response.

Sincerely,

Gustavo F. Bruckner
POMERANTZ LLP

and

Brett D. Stecker
SHUMAN, GLENN & STECKER

**600 Third Avenue, New York, New York 10016   tel: 212.661.1100   www.pomerantzlaw.com**

NEW YORK        CHICAGO        LOS ANGELES        PARIS

# EXHIBIT A



**Roth Contributory IRA  of**
**ANTONIO DELA CRUZ**
**CHARLES SCHWAB & CO INC CUST**
**ROTH CONTRIBUTORY IRA**

Account Number
█3062

Statement Period
April 1-30, 2020

## Investment Detail - Bank Sweep

| Bank Sweep | Starting Balance | Ending Balance | % of Account Assets |
|---|---|---|---|
| Bank Sweep ᵡ,² | ██████ | ██████ | ██████ |
| **Total Bank Sweep** | ██████ | ██████ | ██████ |
| **Total Bank Sweep** | | ██████ | ██████ |

## Investment Detail - Equities

| Equities | Quantity | Market Price | Market Value *Cost Basis* | % of Account Assets | Unrealized Gain or (Loss) | Estimated Yield | Estimated Annual Income |
|---|---|---|---|---|---|---|---|
| ███████ | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ |
| ███████████ | | | ██████ | ██████ | | | ██████ |
| █████████ | ██████ | ██████ | ██████ | | | | ████████████ |
| █████████████ | | | ██████ | ██████ | ██████ | ██████ | ██████ |
| █████████ | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ |
| SIX FLAGS ENTERTAINM ᵠ SYMBOL: SIX | 11.1247 | 20.0100 | 222.61 *757.26* | ██████ | (534.65) | 4.99% | 11.12 |

Schwab has provided accurate gain and loss information wherever possible for most investments. Cost basis data may be incomplete or unavailable for some of your holdings.
Please see "Endnotes for Your Account" section for an explanation of the endnote codes and symbols on this statement.



MS KATHLEEN A FRIEDHOFF                    Account Number: ████/252

## *YOUR CMA ASSETS*

April 01, 2020 - April 30, 2020

**EQUITIES** (continued)

| Description | Symbol | Acquired | Quantity | Unit Cost Basis | Total Cost Basis | Estimated Market Price | Estimated Market Value | Unrealized Gain/(Loss) | Estimated Annual Income |
|---|---|---|---|---|---|---|---|---|---|
| ███████ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███████ | ███ | | ███ | | ███ | ███ | ███ | | ███ |
| ███████ | ███ | | ███ | | ███ | ███ | ███ | ███ | ███ |
| ███████ | ███ | | ███ | ███ | ███ | ███ | ███ | ███ | |
| ███████ | ███ | | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███████ | ███ | | ███ | ███ | ███ | ███ | | | |
| SIX FLAGS ENTMT CORP NEW | SIX | 05/28/19 | 100.0000 | 52.1700 | 5,217.00 | 20.0100 | **2,001.00** | (3,216.00) | |
| ███████ | ███ | | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███████ | ███ | | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███████ | ███ | | ███ | ███ | ███ | ███ | ███ | ███ | |
| ███████ | ███ | | ███ | ███ | ███ | ███ | ███ | ███ | ███ |

+

**5:44**  

 # Apr 30, 2020 



## Robinhood
85 Willow Rd, Menlo Park, CA 94025
support@robinhood.com

04/01/2020 to 04/30/2020
**Kenny Rama** Account #:

□ OPTIONS        ■ EQUITIES        ■ CASH AND CASH EQUIVALENTS

### Account Summary

| | OPENING BALANCE | CLOSING BALANCE |
|---|---|---|
| Net Account Balance | | |
| Total Securities | | |
| **Portfolio Value** | | |

**Portfolio Allocation**

### Income and Expense Summary

| | THIS PERIOD | YEAR TO DATE |
|---|---|---|
| Dividends | | |
| Capital Gains Distributions | | |
| Interest Earned | | |

This statement shall be conclusive if not objected to in writing within ten days (except with respect to debit card transactions). Errors and omissions exempted. Please address all communications to the firm and not to the individuals. Address changes or other material changes in your account should be directed to the office servicing your account. Kindly mention your account number. This statement should be retained for income tax purposes.

## PORTFOLIO SUMMARY

| EQUITIES/OPTIONS | SYM/CUSIP | ACCT TYPE | QTY | PRICE | MKT VALUE | EST. ANNUAL INCOME | % OF TOTAL PORTFOLIO |
|---|---|---|---|---|---|---|---|
| ███ | ██ | ███ | ██ | ███ | ███ | ███ | ███ |
| ███ | ██ | ███ | ██ | ███ | ███ | ███ | ███ |
| Six Flags Estimated Yield: 6.20% | SIX | Margin | 48 | $20.01 | $960.48 | $59.51 | ███ |
| **Total Securities** | | | | | ███ | ███ | ███ |
| **Brokerage Cash Balance** | | | | | | | |
| **Total Priced Portfolio** | | | | ███ | | | |

## ACCOUNT ACTIVITY

| DESCRIPTION | SYMBOL | ACCT TYPE | TRANSACTION | DATE | QTY | PRICE | DEBIT | CREDIT |
|---|---|---|---|---|---|---|---|---|
| ███ | | ███ | ███ | ███ | | | | ███ |
| ███ | ██ | ███ | ███ | ███ | ██ | ███ | ███ | |
| ███ | | ███ | ███ | ███ | ██ | | | |
| ███ | ██ | ███ | ███ | ███ | | | | ███ |
| ███ | ██ | ███ | ███ | ███ | ██ | ███ | | ███ |
| ███ | ██ | ███ | ███ | ███ | ██ | ███ | ███ | |
| **Total Funds Paid and Received** | | | | | | | ███ | ███ |

    

# EXHIBIT B

**POWER OF ATTORNEY**

**KNOW ALL PERSONS BY THESE PRESENTS** that Antonio Dela Cruz does hereby make, constitute, and appoint the law firms of Pomerantz LLP and Shuman, Glenn & Stecker (the "Attorneys") as his true and lawful attorneys-in-fact, and in his name, place, and stead and on his behalf, and for his use and benefit, to make the *Demand to Inspect Books and Records Pursuant to 8 Del. C. § 220* on his behalf as a stockholder of Six Flags Entertainment Corporation ("Six Flags" or the "Company") in the accompanying demand ("Demand") from the Attorneys to the Company, to discuss the demands and factual assertions described in the Demand with any representative of the Company, or such other counsel as may be designated by them or the Company, to modify or supplement the demands set forth in the Demand, to reach such agreements with respect to the scope of the demand set forth in the Demand, and to commence any litigation on his behalf, as the Attorneys deem appropriate.

Antonio Dela Cruz further grants to the Attorneys full power to do and perform all and every act that they may legally do through an attorney-in-fact, and every proper power necessary to carry out the purposes for which this power is granted, with full power of substitution and revocation, hereby ratifying and affirming that which the Attorneys or their substitutes shall lawfully do or cause to be done by virtue of the power conferred herein upon them.

The rights, power, and authorities of said attorneys-in-fact herein granted shall commence and shall be in force and effect from the date hereof, and such rights and powers shall remain in full force and effect until Antonio Dela Cruz tenders a written notice of termination.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of May, 2020.

_____

Antonio Dela Cruz

## <u>POWER OF ATTORNEY</u>

**KNOW ALL PERSONS BY THESE PRESENTS** that Kathleen Friedhoff does hereby make, constitute, and appoint the law firms of Pomerantz LLP and Shuman, Glenn & Stecker (the "Attorneys") as her true and lawful attorneys-in-fact, and in her name, place, and stead and on her behalf, and for her use and benefit, to make the *Demand to Inspect Books and Records Pursuant to 8 Del. C. § 220* on her behalf as a stockholder of Six Flags Entertainment Corporation ("Six Flags" or the "Company") in the accompanying demand ("Demand") from the Attorneys to the Company, to discuss the demands and factual assertions described in the Demand with any representative of the Company, or such other counsel as may be designated by them or the Company, to modify or supplement the demands set forth in the Demand, to reach such agreements with respect to the scope of the demand set forth in the Demand, and to commence any litigation on her behalf, as the Attorneys deem appropriate.

Kathleen Friedhoff further grants to the Attorneys full power to do and perform all and every act that they may legally do through an attorney-in-fact, and every proper power necessary to carry out the purposes for which this power is granted, with full power of substitution and revocation, hereby ratifying and affirming that which the Attorneys or their substitutes shall lawfully do or cause to be done by virtue of the power conferred herein upon them.

The rights, power, and authorities of said attorneys-in-fact herein granted shall commence and shall be in force and effect from the date hereof, and such rights and powers shall remain in full force and effect until Kathleen Friedhoff tenders a written notice of termination.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of May, 2020.

*Kathleen A. Friedhoff*
Kathleen Friedhoff

## <u>POWER OF ATTORNEY</u>

**KNOW ALL PERSONS BY THESE PRESENTS** that Kenny Rama does hereby make, constitute, and appoint the law firms of Pomerantz LLP and Shuman, Glenn & Stecker (the "Attorneys") as his true and lawful attorneys-in-fact, and in his name, place, and stead and on his behalf, and for his use and benefit, to make the *Demand to Inspect Books and Records Pursuant to 8 Del. C. § 220* on his behalf as a stockholder of Six Flags Entertainment Corporation ("Six Flags" or the "Company") in the accompanying demand ("Demand") from the Attorneys to the Company, to discuss the demands and factual assertions described in the Demand with any representative of the Company, or such other counsel as may be designated by them or the Company, to modify or supplement the demands set forth in the Demand, to reach such agreements with respect to the scope of the demand set forth in the Demand, and to commence any litigation on his behalf, as the Attorneys deem appropriate.

Kenny Rama further grants to the Attorneys full power to do and perform all and every act that they may legally do through an attorney-in-fact, and every proper power necessary to carry out the purposes for which this power is granted, with full power of substitution and revocation, hereby ratifying and affirming that which the Attorneys or their substitutes shall lawfully do or cause to be done by virtue of the power conferred herein upon them.

The rights, power, and authorities of said attorneys-in-fact herein granted shall commence and shall be in force and effect from the date hereof, and such rights and powers shall remain in full force and effect until Kenny Rama tenders a written notice of termination.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of May, 2020.

_____
Kenny Rama

# EXHIBIT C

## VERIFICATION PURSUANT TO 10 *DEL. C.* § 3927

Pursuant to Delaware Supreme Court Administrative Order No. 3 and 10 *Del. C.* § 3927, I, Antonio Dela Cruz, declare that:

1.     I own common stock of Six Flags Entertainment Corporation ("Six Flags" or the "Company") and have been a stockholder during all relevant times.

2.     I have reviewed the *Demand to Inspect Books and Records Pursuant to 8 Del. C.* § 220 (the "Demand") prepared by my counsel.

3.     The statements in the Demand as to me and my actions are true and correct, and as to other statements of fact and matters set forth therein, are true and correct to the best of my knowledge, information, and belief.

4.     Proof of my ownership in Six Flags common stock is attached to the Demand.

5.     I each declare under penalty of perjury under the laws of the State of Delaware that the foregoing is true and correct.

Executed on the 11th day of May, 2020.

Antonio Dela Cruz

_____
(Printed Name)


_____
(Signature)

## <u>VERIFICATION PURSUANT TO 10 *DEL. C.* § 3927</u>

Pursuant to Delaware Supreme Court Administrative Order No. 3 and 10 *Del. C.* § 3927, I, Kathleen Friedhoff, declare that:

1.    I own common stock of Six Flags Entertainment Corporation ("Six Flags" or the "Company") and have been a stockholder during all relevant times.

2.    I have reviewed the *Demand to Inspect Books and Records Pursuant to 8 Del. C.* § 220 (the "Demand") prepared by my counsel.

3.    The statements in the Demand as to me and my actions are true and correct, and as to other statements of fact and matters set forth therein, are true and correct to the best of my knowledge, information, and belief.

4.    Proof of my ownership in Six Flags common stock is attached to the Demand.

5.    I each declare under penalty of perjury under the laws of the State of Delaware that the foregoing is true and correct.

Executed on the 11th day of May, 2020.

Kathleen Friedhoff

_____
(Printed Name)


*Kathleen A. Friedhoff*
_____
(Signature)

## <u>VERIFICATION PURSUANT TO 10 *DEL. C.* § 3927</u>

Pursuant to Delaware Supreme Court Administrative Order No. 3 and 10 *Del. C.* § 3927, I, Kenny Rama, declare that:

1.    I own common stock of Six Flags Entertainment Corporation ("Six Flags" or the "Company") and have been a stockholder during all relevant times.

2.    I have reviewed the *Demand to Inspect Books and Records Pursuant to 8 Del. C.* § 220 (the "Demand") prepared by my counsel.

3.    The statements in the Demand as to me and my actions are true and correct, and as to other statements of fact and matters set forth therein, are true and correct to the best of my knowledge, information, and belief.

4.    Proof of my ownership in Six Flags common stock is attached to the Demand.

5.    I each declare under penalty of perjury under the laws of the State of Delaware that the foregoing is true and correct.

Executed on the 11th day of May, 2020.

Kenny Rama

_____
(Printed Name)


_____
(Signature)

# Exhibit B



**Gustavo F. Bruckner**

Partner

February 1, 2023

<u>**VIA Federal Express and Email**</u>

Board of Directors
Six Flags Entertainment Corp.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington DE 19808

Board of Directors
Six Flags Entertainment Corp.
1000 Ballpark Way, Suite 400
Arlington, TX 76011
investorrelations@sftp.com

> *Re:* *Litigation Demand Under Delaware Law to the Board of Directors of Six Flags Entertainment Corp. to Bring Suit Against Certain Individuals for Damaging Six Flags Entertainment Corp. and to Investigate Possible Breaches of Fiduciary Duties*

To the Members of the Board of Directors of Six Flags Entertainment Corp.:

We write on behalf of Antonio Dela Cruz and Kathleen Sherwood[1] (the "Stockholders"),[2] current and longtime holders of the common stock of Six Flags Entertainment Corp. ("Six Flags" or the "Company"), a Delaware corporation, to demand that the Company's Board of Directors (the "Board") do two things:

---

[1]     After the Inspection Demand (defined below) was served, Ms. Sherwood legally changed her last name from Friedhoff to Sherwood.

[2]     The Stockholders issued an inspection demand to Six Flags pursuant to 8 *Del. C.* § 220 ("Section 220") on May 14, 2020 (the "Inspection Demand").

**gfbruckner@pomlaw.com**

600 Third Avenue, New York, NY 10016   Main: 212.661.1100   Direct: 646.581.9941

NEW YORK   CHICAGO   LOS ANGELES   LONDON   PARIS   TEL AVIV

www.pomlaw.com

# POMERANTZLLP

- First, the Board must file suit against James Reid-Anderson ("Mr. Reid-Anderson")[3] and W. Marshall Barber ("Mr. Barber")[4] for Breach of Fiduciary Duty, Contribution, and Indemnification. As discussed herein, the U.S. Court of Appeals for the Fifth Circuit recently **reversed** the erroneous decision by the U.S. District Court for the Northern District of Texas to dismiss federal securities fraud claims against Messrs. Reid-Anderson and Barber in the securities fraud class action captioned *In re Six Flags Entertainment Corp*., Civil Action No. 4:20-cv-00201-P (N.D. Tex.) (the "Securities Action"), arising from a series of materially false and misleading statements made between April 24, 2018 and February 19, 2020 (the "Class Period"). To date, the Board has not taken any remedial action against Messrs. Reid-Anderson and Barber. Instead, the Board has permitted the Company to fund their defense of the securities fraud claims asserted against them by Six Flags investors.

- Second, the Stockholders demand that the Board commence an independent investigation into potential breaches of fiduciary duty and wrongdoing by certain other former officers and directors of Six Flags during the Relevant Period.[5] Specifically, the Board must undertake an independent investigation into whether Richard W. Roedel ("Mr. Roedel"),[6] Kurt M. Cellar ("Mr. Cellar"),[7] Nancy A. Krejsa ("Ms. Krejsa"),[8] Jon L. Luther ("Mr. Luther"),[9] Stephen

---

[3] Mr. Reid-Anderson served as a member of the Board from August 2010 until his retirement, effective November 18, 2019, and as Chief Executive Officer ("CEO") of the Company from August 2010 through February 2016, and from July 2017 until his retirement, effective November 18, 2019.

[4] Mr. Barber served as Executive Vice President and Chief Financial Officer ("CFO") of the Company from February 2016 until his retirement, effective August 31, 2020.

[5] The term "Relevant Period" herein refers to the period from April 24, 2018 through May 18, 2021.

[6] Mr. Roedel served as a member of the Board from 2010 until May 2021.

[7] Mr. Cellar served as a member of the Board from 2010 until May 2021.

[8] Ms. Krejsa served as a member of the Board from March 2017 until May 2021.

[9] Mr. Luther served as a member of the Board from 2010 until his resignation, effective May 6, 2020.

600 Third Avenue, New York, NY 10016   Main: 212.661.1100   Direct: 646.581.9941

NEW YORK   CHICAGO   LOS ANGELES   LONDON   PARIS   TEL AVIV
www.pomlaw.com



D. Owens ("Mr. Owens"),[10] Usman Nabi ("Mr. Nabi"),[11] David McKillips ("Mr. McKillips"),[12] and Mark Kane ("Mr. Kane")[13] breached their fiduciary duties in connection with the events and allegations described herein. Should the Board's investigation conclude that any or all these individuals (or any other current or former fiduciaries of the Company) breached their fiduciary duties to Six Flags, the Stockholders demand that the Board also institute litigation against such individuals to recover the damages their misconduct has caused the Company.

As discussed further herein, to the extent that the Board is not prepared to promptly take the actions demanded by the Stockholders in order to preserve the Company's claims arising from the allegations set forth in this demand, the Stockholders hereby demand that the Board cause the Company to enter into tolling agreements *immediately* with each of the individuals identified as wrongdoers in this demand forthwith, and that you provide written confirmation of the same no later than the close of business on ***Tuesday, February 7, 2023***.

## I.      Factual Allegations

### A.      <u>Six Flags' Business and Its Dependence on International Expansion</u>

Six Flags is a Delaware corporation which maintains its corporate headquarters in Arlington, Texas. According to its public filings with the U.S. Securities and Exchange Commission (the "SEC"), Six Flags is the world's largest regional theme park operator with over 24 parks across North America.

In October 2014, the Board announced the "Project 600" incentive compensation plan for the Company's top executives. Under the new Project 600 incentive compensation plan, Messrs. Reid-Anderson and Barber would receive $29 million and $3.6 million, respectively, if Six Flags

---

[10]      Mr. Owens served as a member of the Board from 2010 until his resignation, effective May 6, 2020.

[11]      Mr. Nabi served as a member of the Board from March 2017 until his resignation, effective January 30, 2020.

[12]      Mr. McKillips joined the Company in 2006 and served as Senior Vice President of International Park Operations and President of Six Flags International Development Company from January 2018 until his departure from Six Flags on January 21, 2020.

[13]      Mr. Kane served as President of Six Flags China Operations from September 2016 through February 2021, and then served as Park President for Six Flags Darien Lake until his departure from the Company in January 2022.

# POMERANTZLLP

reported $600 million in modified earnings before interest, taxes, depreciation, and amortization ("EBITDA") by 2017, and nearly half that amount if achieved by 2018.

For years leading up to the start of the Relevant Period, Management[14] focused on driving the Company's earnings growth through an aggressive international expansion strategy. Under Management's direction, Six Flags entered into licensing agreements between 2014 and 2018 with developers to build theme parks in China and elsewhere. Pursuant to those agreements, Six Flags would receive initial fees during the parks' development, and significantly more in licensing and management fees after the parks opened. Management represented to stockholders that international development was "one of the biggest opportunities we have" and would generate "very high-margin revenue," with "80% to 90% EBITDA margins," far exceeding the profit margins for the Company's other revenue sources.

The China parks were the Company's most important expansion. In June 2014, Management caused Six Flags to announce an agreement with Chinese developer Riverside Investment Group Co. Ltd. ("Riverside") to build Six Flags-branded theme parks in China. Management told stockholders that Riverside would develop "20 parks" at "10 properties" and that each theme park would generate $5-10 million EBITDA annually pre-opening and $10-20 million annually post-opening, with smaller parks generating $2-4 million pre-opening and $4-8 million post-opening, for a total of $140 million yearly pre-opening, and $280 million post-opening.

Prior to the start of the Relevant Period, Management announced that Six Flags Zhejiang would open in late 2019, and Six Flags Chongqing would open in 2020. On April 25, 2018, the day after the start of the Relevant Period, Management announced Six Flags Nanjing, which Management later said would open in 2021.

### B.     The China Parks Required Substantial Time, Labor, and Capital, But Riverside Lost Critical Funding and Government Approvals by the Start of the Relevant Period

Theme park construction is a very complicated process which requires multiple outside designers, consultants, engineers, and ride vendors, as well as land, approvals, capital, a high-level "master plan," and detailed design documents and drawings for use during the on-site construction process. One of the most expensive and time-intensive aspects is the design, development, and construction of rides. Unique themed coasters, such as the "Garfield" rides announced for Six

---

[14]     The term "Management" herein collectively refers to Messrs. Reid-Anderson, Barber, Roedel, Cellar, Luther, Owens, Nabi, McKillips, and Kane, and Ms. Krejsa.

600 Third Avenue, New York, NY 10016    Main: 212.661.1100    Direct: 646.581.9941

NEW YORK    CHICAGO    LOS ANGELES    LONDON    PARIS    TEL AVIV
www.pomlaw.com



Flags Zhejiang and Chongqing, can take three to five years to complete and cost $30 million or more. Rides also require extensive engineering teams.

Management promoted the Company's China parks as massive developments that would require time and capital outlays, similar to the $5.5 billion Disney Shanghai Resort and the $6.5 billion Universal Studios Beijing Resort. Those resorts each required over five years of construction, with over 10,000 workers onsite at any time.

As Management knew, Riverside required sponsorships by local Chinese governments to fund the over $4 billion (USD) needed for each Six Flags China park. But unbeknownst to Six Flags stockholders, by the start of the Relevant Period in April 2018 and shortly afterwards, Riverside lost the governmental approvals and funding that were required to construct the parks and to commission roller coasters and other rides.

### C.    Management Repeatedly Misleads Stockholders During the Relevant Period Regarding the Status of the China Parks

By the start of the Relevant Period in April 2018, stockholders and analysts were increasingly focused on the opening dates of the China parks, including Six Flags Zhejiang, which Management had announced would open in 2019. On April 25, 2018, during an earnings conference call, Mr. Reid-Anderson represented that this work was well underway through the Company's "incredible partnership with Riverside," with Riverside presently "building 10 parks," and "all our parks" in China "are progressing nicely towards their anticipated opening dates" – *i.e.*, within 20 months.

In response to repeated inquiries from stockholders and analysts, Messrs. Reid-Anderson and Barber continued to give reassurances that the China parks were on time, that construction continued, and that Riverside was a strong, stable partner. For example, on July 25, 2018, Mr. Reid-Anderson stated during an earnings conference call that "[t]he timing of the parks remains exactly the same as previously disclosed, there's no change on any of those," and that the Company's international parks should "super charge revenue growth" and make Six Flags "the ultimate growth and yield stock."

Given delays with other international development, the supposedly on-schedule timeline of the Company's China parks assumed even greater significance. On October 24, 2018, during an earnings conference call, Management disclosed delays to the Company's Dubai development, but after Mr. Reid-Anderson asked Mr. Barber to "go through all the other parks which are on time", Mr. Barber provided stockholders with a specific timetable for the China parks:

600 Third Avenue, New York, NY 10016    Main: 212.661.1100    Direct: 646.581.9941

NEW YORK    CHICAGO    LOS ANGELES    LONDON    PARIS    TEL AVIV
www.pomlaw.com

# POMERANTZLLP

[T]hose [parks] start to come online in Zhejiang, the theme park, water park and kids' park are early 2020. The Chongqing parks are during 2020. That's a theme park, a water park, a kids' park and an adventure park. Those are mid-2020. And then Nanjing, those will start to open in 2021. . . And then the Nanjing Theme Park will actually open in 2022 midyear.

And, although Mr. Barber acknowledged a minor "shift" in the opening timetable for Six Flags Zhejiang, he reassured stockholders that it was only a "month or 2," and "[it]'s not much."

Management also reported significant revenues from licensing fees Six Flags purportedly received from Riverside. For example, Management reported that Six Flags received $14.7 million in licensing revenues in the second quarter of 2018, primarily attributable to China. In October 2018, Mr. Barber announced quarterly international licensing revenue of $40 million for Six Flags, again primarily from China. Management represented to stockholders that the Company's international licensing revenue was recorded "ratably" -- *i.e.*, proportionally over the number of quarters before Six Flags expected the parks to open. Management also represented that the Company's financial reports complied with generally accepted accounting principles ("GAAP"), under which revenue could only be recorded if Riverside continued to make "progress toward completion of its performance obligation[s]" -- the parks' construction. Accordingly, if a park's development was delayed, Six Flags was required pursuant to GAAP to record lower revenue per quarter, ratably across the delayed timetable.

> ### D. Contrary to Management's Representations to Stockholders, There Was No Meaningful Construction at the China Parks and Riverside Failed to Make Licensing Payments

Contrary to Management's public representations to stockholders, before and during the Relevant Period there was no meaningful construction on the China parks, it was impossible to meet Management's publicly announced schedule, and Riverside failed to finance the parks or pay Six Flags' licensing fees.

The operative complaint in the Securities Action, filed on July 2, 2020, alleges per the account of a confidential witness referred to therein as "Former Employee 1" or "FE1",[15] that FE1 arrived in China in May 2018 to personally oversee all construction at the China parks and report on their progress to the Company's headquarters.  It is alleged in the Securities Action that FE1

---

[15]    FE1 is described in the operative complaint in the Securities Action as Six Flags International's former Director of International Construction and Project Management, who was responsible for overseeing construction of the China parks for Six Flags until his resignation in August 2019 (discussed further herein).



had worked for industry leaders in the theme park design and development sector for nearly 30 years. FE1 is alleged to have worked onsite at Zhejiang, and to have interacted daily with the Riverside team there. FE1 is further alleged to have traveled to Chongqing to perform site inspections and to have met and worked with Six Flags and Riverside personnel in Beijing.

According to the account of FE1, when FE1 arrived in China it was "common knowledge basically right away" at Six Flags that the parks "wouldn't hit" the "dates provided to the media" and stockholders. It is alleged that FE1 and the Six Flags China team regularly met with Mr. Kane, the General Manager and Park President of Six Flags Zhejiang, and informed Mr. Kane that they "[couldn't] build [Zhejiang] in 18 months" and open on time "even if everything was in [their hands] right now" -- which it was not. It is further alleged that FE1 directly told senior Company executives almost immediately upon his arrival in China that Six Flags should declare Riverside "in breach of contract" and abandon the partnership given Riverside's problems.

Per the account of FE1, notwithstanding undisclosed efforts by Mr. Kane and Mr. McKillips, the Senior Vice President of International Park Operations and President of Six Flags International (who reported directly to Mr. Reid-Anderson), to convince local Chinese governments to fund the Riverside/Six Flags projects: (i) the governments refused beginning in early 2018; and (ii) Riverside ceased receiving the necessary government funding in April 2018.

Riverside's funding failures rendered it impossible for the China parks to open on time for at least two reasons. First, because Riverside failed to pay for the rides it commissioned, by April 2018 vendors cancelled every ride order Riverside had placed. It is alleged in the Securities Action that FE1 personally spoke with these vendors at trade shows in 2018 and 2019, who were "irate" that Riverside failed to pay for the ride orders. With a development time for themed rides of 36-60 months, and zero rides under development, it was impossible for Six Flags Zhejiang to open in 18 months or for Six Flags Chongqing to open in 24 months.

Second, the Securities Action alleges that as of May 2018, Riverside had only "design drawings" for Six Flags Zhejiang and Chongqing, but theme park construction requires "construction drawings" which cost anywhere between $500,000 and $15 million. During a Six Flags China meeting held in or around May 2018, it is alleged that Six Flags China Park Presidents Mr. Kane and Will Edwards informed the team, including FE1, that Riverside could not afford construction drawings and the process had "stalled out."

By August 2018, Riverside could not afford to make even small payments to vendors, conducted massive layoffs, and was not paying severance owed to former employees. FE1 is quoted in the Securities Action as confirming that "you'd have a floor in Beijing with 100 people and two weeks later there would be nobody there because Riverside dumped them."

**Page 7**

600 Third Avenue, New York, NY 10016   Main: 212.661.1100   Direct: 646.581.9941
NEW YORK   CHICAGO   LOS ANGELES   LONDON   PARIS   TEL AVIV
www.pomlaw.com



Further, according to the account of a second confidential witness in the operative Securities Action complaint, referred to therein as "Former Employee 2" or "FE2",[16] by August 2018, due to Riverside's financial condition it had ceased making payments to Six Flags. Brett Petit, the Company's Senior Vice President of Marketing and Sales, who reported to Mr. Reid-Anderson, is alleged to have told FE2 and others that Riverside missed licensing payments to Six Flags. Six Flags employees in Beijing also allegedly informed FE1 that Riverside owed the Company $18 million, and that executives of Six Flags were going to meet with Riverside's Chairman to discuss the debt.

### E.  Management Was Informed of the Lack of Construction Progress and Riverside's Funding Failures

Management -- including the members of the Board -- knew or recklessly disregarded that throughout the Relevant Period there were massive delays in the China parks' construction: there had been no meaningful construction at any of the parks and Riverside failed to pay its employees and its vendors, rendering timely construction impossible.  FE1 confirmed in the Securities Action that members of the Company's senior management team "knew the whole time that [it] was a mess; there was no money for construction; there was no money for rides; there was no money to pay design people; there was no money for anything."

Beginning in May 2018, it is alleged that FE1 prepared regular presentations and reports on the lack of construction progress at the Zhejiang and Chongqing sites for Messrs. Kane and McKillips.  According to the account of FE1, Mr. McKillips reported directly to Mr. Reid-Anderson and specifically requested that FE1 provide that information for Mr. Reid-Anderson and the Board.

It is alleged in the Securities Action that FE1's highly detailed presentations showed construction progress was "minimal," that the number of employees onsite was down to "less than 10," and that between May 2018 and September 2019 there was no meaningful construction at or progress made on the China parks.  FE1 is alleged to have repeatedly told Mr. McKillips that Six Flags "needed to shut down the China projects," but Mr. McKillips responded that they needed to wait because Riverside owed Six Flags unpaid licensing fees. It is further alleged that FE1 worked with Mr. Kane to compile "master reports" for Mr. McKillips, which Mr. McKillips in turn presented to Mr. Reid-Anderson and the Board.  And the Securities Action alleges, based on the account of FE1, that Mr. Kane had earlier prepared master reports for Mr. Reid-Anderson and the Board detailing that the ride vendors had not been paid.

---

[16]     FE2 is described in the operative complaint in the Securities Action as a former Account Manager at Six Flags who was employed in that role throughout 2018.

600 Third Avenue, New York, NY 10016    Main: 212.661.1100    Direct: 646.581.9941

NEW YORK    CHICAGO    LOS ANGELES    LONDON    PARIS    TEL AVIV
www.pomlaw.com



Given the China parks' massive unaddressed failures, it is alleged that in August 2019, FE1 sent a letter to members of the Company's senior management group announcing his resignation and detailing the untenable circumstances on the ground in China. The Securities Action alleges that FE1 wrote in his resignation letter: "I have been in the theme park and commercial construction business for a very long time. . .[and] I have never seen such a poorly planned project set into motion in this industry." According to the Securities Action, FE1 stressed that Riverside "made it clear they have zero funds remaining to proceed with" and was "forcing abused employees to resign under duress" despite being owed "nearly 3 months back pay". FE1's resignation letter further stated that Riverside's practices were "equivalent to that of illegal child labor" and that it was "astounding" that Six Flags would "continue to do business" with Riverside. According to the account of FE1, at minimum, this letter was sent to Messrs. McKillips and Kane.

F.      **Management Announces Opening Delays While Concealing the Full Extent of the Problems**

On February 14, 2019, Management finally announced a delay in the opening dates of the China parks and a negative revenue adjustment of $15 million for the fourth quarter of 2018. But rather than disclose Riverside's company-specific problems and complete lack of progress, Management falsely blamed "a challenging macroeconomic environment" that "many companies [we]re experiencing."

Management assured stockholders that they had "performed a comprehensive review of our project timelines jointly with [Riverside]" and accordingly revised opening dates, with "[Zhejiang] parks to begin opening in mid to late 2020 versus 2019," "Chongqing parks to begin opening in mid to late 2021 versus 2020, and Nanjing to begin opening in late 2022" -- *i.e.*, modest delays of six to twelve months. Mr. Reid-Anderson claimed Riverside was "continuing to build th[e] parks, and they are still progressing," so that was "ongoing as we speak." Management also claimed that Riverside continued to pay its licensing fees and fund the parks. In response to the disclosure of these delays, the price of Six Flags stock declined by over 14%.

Thereafter, Management continued to issue misleading statements to stockholders. For example, on April 24, 2019, Mr. Reid-Anderson stated that "[Zhejiang] in China is proceeding very nicely. . .There are no delays that we're aware of on any of the [China] parks," and Riverside "[was] very successfully navigating the political and regulatory environment." In May 2019, Mr. Barber represented to stockholders that "[Zhejiang] is in construction," and in July 2019, Mr. Reid-Anderson stated that "[c]onstruction in both [Zhejiang] and Chongqing continues." Mr. Reid-Anderson further assured stockholders that "the timeline that we described 180 days ago [on February 14, 2019] still holds right now." Yet contemporaneously, as alleged in the Securities Action, Riverside was performing mass layoffs in July and August of 2019, FE1 continued to

600 Third Avenue, New York, NY 10016    Main: 212.661.1100    Direct: 646.581.9941

NEW YORK    CHICAGO    LOS ANGELES    LONDON    PARIS    TEL AVIV

www.pomlaw.com



report a complete lack of construction progress, and rides had still not been ordered for the China parks.

### G.  Management Discloses Riverside's Default on Licensing Payments and the Potential Termination of the China Projects

On January 10, 2020, Management admitted that the China parks had encountered significant problems, had not progressed as expected, and might be terminated. Management also disclosed that Riverside "continues to face severe challenges," which "led Riverside to default on its payment obligations to the Company," that Six Flags had "delivered formal notice of default" to Riverside, and that the "outcome is unknown and could range from the continuation of one or more projects to the termination of all Six-Flags branded projects in China." Management further revealed that "in the fourth quarter of 2019, the Company will realize no revenue from the China international agreements and expects a negative $1 million revenue adjustment related to the China international agreements," as well as related "aggregate one-time charges of approximately $10 million." In response to these disclosures, Six Flags' stock price declined by nearly 18%.

### H.  The SEC Issues a Subpoena to Six Flags, Which Management Fails to Disclose

Unbeknownst to stockholders at the time, on February 18, 2020, Six Flags received a subpoena from the SEC (the "SEC Subpoena") concerning the same events and issues described herein, which gave rise to the Securities Action.  The SEC Subpoena demanded production of information concerning "all Board of Directors and Audit Committee meeting minutes; all agreements with Riverside Investment Group Co. Ltd.; documentation supporting the quarterly revenues recorded in connection with the Riverside agreements; documents concerning the cause of negative revenue adjustments related to the Riverside agreements; the identity of persons at Six Flags involved with the Riverside agreements; and all communications with and concerning Riverside." As described further below, however, Management kept stockholders in the dark regarding the existence of the SEC Subpoena for *fifteen months*, until May 18, 2021.[17]

### I.  Management Discloses the Termination of the Riverside Agreements, That Six Flags Would Not Recognize Any Revenue or Income from China Parks, the Recording of Decreased Net Income, and Mr. Barber's "Resignation", Causing the Company's Stock to Plummet

On February 20, 2020, two days after the SEC Subpoena was issued to Six Flags, Management finally revealed to stockholders that the Company had terminated its development agreements with Riverside, that Six Flags would not recognize any revenue or income from the

---

[17]     Upon information and belief, the SEC's investigation remains ongoing.

600 Third Avenue, New York, NY 10016   Main: 212.661.1100   Direct: 646.581.9941

NEW YORK    CHICAGO    LOS ANGELES    LONDON    PARIS    TEL AVIV

www.pomlaw.com



China parks, and that Six Flags had to record decreased net income due to "charges of approximately $10 million related to the company's China development agreements." Management also announced a poor earnings outlook for 2020, driven by "significantly lower revenue contribution from the Company's international development agreements." In addition, Mr. Barber's departure from Six Flags was announced, although his "resignation" would not be effective until August 31, 2020.

In response to these disclosures, Six Flags' stock price declined by more than 16%. In all, Six Flags' stock price declined by more than **50%** over a span of less than two years, from a high of $73.38 per share on June 22, 2018 to close at $31.89 per share on February 20, 2020.[18]

### J.    After Well Over a Year, Management Finally Discloses the SEC Subpoena, and Conflicts with Messrs. Reid-Anderson and Barber

On May 18, 2021, in connection with a complaint filed in federal court by the Company against its insurer, Six Flags publicly disclosed the existence of the SEC Subpoena -- fifteen months after the SEC Subpoena was served on the Company. In the Company's complaint, it was also disclosed that Six Flags retained separate counsel for Messrs. Reid-Anderson and Barber in the Securities Action "in light of the conflict that could arise in the joint defense of Six Flags and Messrs. Reid-Anderson and Barber."[19]

### K.    The Securities Action

Based on the events described above, almost immediately following Management's February 20, 2020 disclosures, the Securities Action was filed in the Northern District of Texas against Six Flags and Messrs. Reid-Anderson and Barber, alleging claims for fraud under the federal securities laws on behalf of investors who purchased or acquired Six Flags stock during the Class Period. The operative complaint was filed in the Securities Action on July 2, 2020, and after the defendants subsequently moved to dismiss, the Securities Action was dismissed with prejudice by the Northern District of Texas on March 3, 2021. Following the dismissal with prejudice of the Securities Action, one of the co-lead plaintiffs to the Securities Action appealed.

On January 18, 2023, the Fifth Circuit **reversed** the erroneous dismissal of the Securities Action by the Northern District of Texas, finding that the defendants' public statements from April 2018 through July 2019 were sufficiently alleged in the operative complaint to have been

---

[18]    Nearly three years later, the Company's stock price has not recovered and currently trades for less than $27 per share.

[19]    The Company's suit against its insurer was resolved in March 2022.



materially false and misleading.  Among other things, with respect to the defendants' challenged statements in 2018, the Fifth Circuit found that "[t]he complaint contains several specific factual allegations from FE1 about the disastrous state of the China parks throughout 2018 that support the conclusion the parks would not open on schedule" and raised "numerous factual allegations about inadequate construction to explain why a reassurance like 'our parks are progressing nicely towards their anticipated opening dates'" was materially misleading.  As to scienter in regards to the challenged 2018 statements, the Fifth Circuit noted that Messrs. Reid-Anderson and Barber "were particularly incentivized in 2018 to increase high-margin international licensing deals to achieve the target EBITDA because revenue recognition occurred independently of the parks' long-term success" and "were motivated to receive equity awards of 600% and 300% of their base salaries."  More importantly, the Fifth Circuit concluded that the allegations regarding FE1's: (a) "weekly presentations" prepared for Messrs. McKillips and Kane, the contents of which were in turn related by Mr. McKillips to Mr. Reid-Anderson and the Board; and (b) "master reports" prepared for Mr. McKillips to present to Mr. Reid-Anderson and the Board, were sufficient to support an inference that Messrs. Reid-Anderson and Barber had "actual knowledge" that their 2018 statements were misleading.

The Fifth Circuit also held that the defendants' challenged public statements in February 2019, April 2019, and July 2019 were sufficiently alleged to be false and misleading.  Among other things, the Fifth Circuit found that the operative Securities Action complaint "adequately alleges Defendants' positive statements about Riverside contained actionable omissions about the company's true financial state" and that "when Defendants told investors that Riverside has 'a lot of assets' and 'continues to pay,' and that their 'financing [for the parks] is in place,' Defendants were omitting crucial information about Riverside's numerous financial woes alleged by FE1." The Fifth Circuit concluded there was "a strong inference of scienter" based on the allegations regarding FE1's August 2019 resignation letter castigating the disastrous state of the parks and FE1's regular reports prepared for Mr. McKillips, as well as FE1's account of construction being "so non-existent that 'weeds [were] growing' on the theme park portion of the Zhejiang park in February 2019."  The Fifth Circuit also found that a "core operations theory" contributed to the inference of scienter.

Per the Fifth Circuit's recent ruling, the erroneous dismissal of the Securities Action is reversed, and the Securities Action is remanded to the Northern District of Texas for further proceedings consistent with the Fifth Circuit's opinion.  Accordingly, the Securities Action is set to proceed towards trial.

600 Third Avenue, New York, NY 10016    Main: 212.661.1100    Direct: 646.581.9941

NEW YORK    CHICAGO    LOS ANGELES    LONDON    PARIS    TEL AVIV

www.pomlaw.com

**L.**      **Evidence of Wrongdoing Obtained Pursuant to 8 *Del. C.* § 220**

Confidential documents previously obtained by the Stockholders from Six Flags pursuant to Section 220[20] have revealed, among other things:



[20]      After negotiations with counsel for the Company and the execution of a confidentiality agreement, Six Flags commenced a "rolling" production of non-public corporate documents to the Stockholders in response to the Inspection Demand, with the last production made on November 18, 2020. Citations herein to documents obtained by the Stockholders from Six Flags pursuant to Section 220 are in the format: "SixFlags_____."

600 Third Avenue, New York, NY 10016     Main: 212.661.1100     Direct: 646.581.9941

NEW YORK     CHICAGO     LOS ANGELES     LONDON     PARIS     TEL AVIV

www.pomlaw.com



- ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

- ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

Accordingly, the Company's own non-public documents, including Board-level materials referenced above, ████████████████████████████████████████████████████. The truth regarding these issues was not timely communicated to shareholders, however, as Management made a series of materially false and misleading statements during the Relevant Period, which gave rise to the Securities Action (and this demand).

## II.    Demand

Accordingly, the Stockholders hereby demand that the Board vindicate the Company's rights by immediately bringing legal action against the wayward fiduciaries that have harmed Six Flags. Specifically, the Stockholders demand that the Board cause Six Flags to file a Complaint asserting claims for breach of fiduciary duty, aiding and abetting breaches of fiduciary duties, unjust enrichment, contribution, and indemnification against Messrs. Reid-Anderson and Barber in the U.S. District Court for the Northern District of Texas. Additionally, the Stockholders demand that the Board cause Six Flags to immediately file an Answer in the Securities Action, and/or file a Cross-Complaint against Messrs. Reid-Anderson and Barber, asserting these claims for relief and such other relief as the Board deems necessary to protect the Company's interests.

600 Third Avenue, New York, NY 10016    Main: 212.661.1100    Direct: 646.581.9941

NEW YORK    CHICAGO    LOS ANGELES    LONDON    PARIS    TEL AVIV

www.pomlaw.com



Further, the Board must investigate independently and in good faith which additional current and former officers and directors of Six Flags (including but not limited to those individuals specifically identified herein as members of Management) breached their fiduciary duties in connection with the events described herein, thus leading to the Company's substantial damages. The Board must further hold any such individuals to account for the damages their fiduciary failures caused the Company.

## III.    Conclusion

We trust that the Board, consistent with its own fiduciary duties of care, good faith, and loyalty, will undertake the actions demanded above promptly. This is especially critical in this particular instance because based on the events described above, including the Company's February 20, 2020 disclosures, at least some portion of the Company's valuable claims might at least arguably become time-barred as of February 20, 2023.[21]

It is axiomatic that directors of a Delaware corporation owe an affirmative duty to protect the interests of the corporation, and that the corporation's claims for relief are valuable corporate assets.[22] Accordingly, to the extent that the Board is not prepared to promptly take the actions demanded herein, in order to preserve the Company's claims arising from the allegations set forth in the Demand, the Stockholders hereby demand that the Board cause the Company to enter into tolling agreements ***immediately*** with each of the individuals identified as wrongdoers in this Demand forthwith, and that you provide written confirmation of the same no later than the close of business on ***Tuesday, February 7, 2023***.[23]

---

[21]    The statute of limitations for breach of fiduciary duty claims under Delaware law is three years.  While the statute of limitations for breach of fiduciary duty based on certain of the events and allegations described herein might arguably expire as soon as February 20, 2023, any claims based on Management's failure to disclose the SEC Subpoena to stockholders until May 18, 2021 would not arguably expire until, at the earliest, May 18, 2024.

[22]    *Nagy v. Bistricer,* 770 A.2d 43, 55-56 & n.23 (Del. Ch. 2000); *Quadrant Structured Prods. Co., Ltd. v. Vertin,* 115 A.3d 535, 548 (Del. Ch. 2015).

[23]    *See, e.g., Ingrao v. Stoppelman*, 2020 WL 7025083 (N.D. Cal. Nov. 30, 2020) (board of directors' failure to timely enter into tolling agreements with alleged wrongdoers identified in stockholder's pre-suit demand under Delaware law was wrongful).

600 Third Avenue, New York, NY 10016    Main: 212.661.1100    Direct: 646.581.9941

NEW YORK    CHICAGO    LOS ANGELES    LONDON    PARIS    TEL AVIV
www.pomlaw.com



We look forward to receiving written confirmation of the Board's actions relative to this Demand and to working together to vindicate the Company's valuable claims against the wrongdoers identified herein.

Sincerely,

Gustavo F. Bruckner
POMERANTZ LLP

and

Brett D. Stecker
SHUMAN, GLENN & STECKER

600 Third Avenue, New York, NY 10016   Main: 212.661.1100   Direct: 646.581.9941

NEW YORK   CHICAGO   LOS ANGELES   LONDON   PARIS   TEL AVIV

www.pomlaw.com

# Exhibit C



February 7, 2023


**BY E-MAIL**

Gustavo Bruckner, Esq.
Pomerantz LLP
600 Third Avenue
New York, NY 10016

   RE: Demand to The Board of Directors of Six Flags Entertainment Corp.


Dear Mr. Bruckner:

  Receipt is acknowledged of your letter to the Board of Directors (the "Board") of Six Flags Entertainment Corp. (the "Company") dated February 1, 2023 (the "Letter") concerning the purported shareholder demands made on behalf of Antonio Dela Cruz and Kathleen Sherwood (the "Demands")[1].  Among other things, the Demands request that the Board take certain actions with regard to specified former officers and directors relating to alleged conduct that occurred beginning in 2018.  The Demands also request that "to the extent that the Board is not prepared to promptly take [such] actions" that "the Board cause the Company to enter into tolling agreements *immediately* with each of the individuals identified as wrongdoers in this demand forthwith," and that "written confirmation of the same" be provided "no later than the close of business on ***Tuesday, February 7, 2023***."[2]

  Please be advised that the Letter has been forwarded to the Board.  The Board will consider these matters at its next scheduled Board meetings, which are presently set for March 7-8, 2023 ("Board Meeting").

---

[1] We note that Mr. Kenny Rama, on whose purported behalf in 2020 you requested an inspection of certain materials under Section 220 of the Delaware Corporate Code, does not join in the requests set forth in the Letter.

[2] Letter at 15 (emphasis in original).


Six Flags Entertainment | 1000 Ballpark Way Suite 400 | Arlington, TX  76011

Gustavo Bruckner, Esq.
February 7, 2023
Page 2

       In the meantime, the Company is endeavoring to obtain for the Board's consideration at the Board Meeting tolling agreements from those individuals identified in the Letter.

       Additionally, please forward to the undersigned proof of Mr. Dela Cruz's and Ms. Sherwood's contemporaneous ownership of the Company's common stock during the Relevant Time Period (as defined in the Letter) up through and including today.  Finally, please provide any information of which you believe the Board should be made aware in connection with its consideration of the Letter.

Very truly yours,

Six Flags Entertainment
Chief Legal Officer

Six Flags Entertainment | 1000 Ballpark Way Suite 400 | Arlington, TX  76011

# Exhibit E



**Gustavo F. Bruckner**

Partner

May 16, 2023

<u>**Via USPS First-Class Mail**</u>

Board of Directors
Six Flags Entertainment Corp.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

<u>**Via Email Only**</u>

Scott D. Musoff
Jenness E. Parker
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001
scott.musoff@skadden.com
jenness.parker@skadden.com

Re:    ***Second Inspection Demand for Inspection of Books and Records Pursuant to 8 Del. C. § 220***

<u>**RESPONSE WITHIN FIVE BUSINESS DAYS REQUIRED**</u>

To the Members of the Board of Directors of Six Flags Entertainment Corp.:

This letter serves as a stockholder demand for inspection of books and records (the "Second Inspection Demand") pursuant to Delaware General Corporation Law, 8 *Del. C.* § 220 ("Section 220").  The undersigned firms represent Antonio Dela Cruz (the "Stockholder"), a current stockholder of Six Flags Entertainment Corp. ("Six Flags" or the "Company").  The Stockholder presently owns shares of Six Flags common stock and has held such stock at all relevant times.  A true and correct copy of the Stockholder's open holdings statement demonstrating the Stockholder's ownership of Six Flags stock is attached hereto as **Exhibit A**. The Stockholder has appointed the undersigned firms to act on the Stockholder's behalf in connection with this Second Inspection Demand by the Special Power of Attorney attached hereto as **Exhibit B**.  Also enclosed as **Exhibit C** is a verification on behalf of the Stockholder



confirming that the statements in this letter are true and correct to the best of the Stockholder's knowledge, information, and belief.

## I.      Facts Giving Rise to the Second Inspection Demand

On May 14, 2020, Stockholder issued his first inspection demand to Six Flags pursuant to Section 220 (the "Initial Inspection Demand"). The purpose of the Initial Inspection Demand was to investigate potential breaches of fiduciary duty and other serious wrongdoing by certain current and former officers and/or members of the Board of Directors (the "Board") of Six Flags, as set forth in detail therein. In sum, Stockholder alleged that a series of materially false and misleading statements and omissions had been made to Six Flags stockholders concerning the development of several multibillion-dollar Six Flags-branded parks in China, which stockholders were repeatedly told would begin opening in 2019, when in reality construction was at a standstill and it was known internally that the Six Flags China parks could not possibly open on time. In response to the Initial Inspection Demand, Stockholder obtained Board-level, non-public documents and records from the Company (the "220 Production").

Stockholder reviewed and analyzed the 220 Production and utilized the 220 Production to serve a pre-suit litigation demand (the "Litigation Demand") on the Board under Delaware law on February 1, 2023.[1] The Stockholder's Litigation Demand demanded, *inter alia*: (i) that the Board initiate an independent, reasonable, good faith investigation and take appropriate action, including filing a lawsuit on the Company's behalf against its wayward "fiduciaries," in order to protect the Company's interests and recover the serious damages caused to Six Flags by their misconduct; (ii) that the Board secure tolling agreements from each of the individuals that were implicated or potentially implicated in the alleged wrongdoing if the Board was not prepared to promptly take the actions demanded in the Litigation Demand;[2] and (iii) that the Board provide written confirmation that such tolling agreements had been secured or would be timely secured no later than February 7, 2023. The Stockholder received no response from the Board or the Company following service of the Litigation Demand.

---

[1]      The allegations in the Litigation Demand, as well as the Initial Inspection Demand, were factually related to allegations made in a securities fraud class action against the Company captioned *In re Six Flags Entertainment Corp.*, Civil Action No. 4:20-cv-00201-P (N.D. Tex.) (the "Securities Action"). The operative complaint was filed in the Securities Action on July 2, 2020, and after the defendants subsequently moved to dismiss, the Securities Action was dismissed with prejudice by the U.S. District Court for the Northern District of Texas on March 3, 2021. Following the dismissal with prejudice of the Securities Action, one of the co-lead plaintiffs to the Securities Action appealed. On January 18, 2023, the U.S. Court of Appeals for the Fifth Circuit reversed the dismissal of the Securities Action, finding that the defendants' challenged public statements from April 2018 through July 2019 were sufficiently alleged in the

600 Third Avenue, New York, NY 10016    Main: 212.661.1100    Direct: 646.581.9941

NEW YORK     CHICAGO     LOS ANGELES     LONDON     PARIS     TEL AVIV
www.pomlaw.com

# POMERANTZLLP

Following the Board's decision not to secure tolling agreements from individuals named in the Litigation Demand and to apparently permit the statute of limitations to expire on any claims against those individuals, Stockholder filed a shareholder derivative action on behalf of Six Flags in the Northern District of Texas so as to ensure that the Company's valuable claims for relief were preserved (the "Derivative Action"). As alleged in the Derivative Action, under these circumstances, where the applicable statute of limitations for Six Flags' breach of fiduciary claims under Delaware law would otherwise expire, the Board's failure to secure tolling agreements amounted to functionally ignoring and wrongfully refusing the Litigation Demand and failing to protect and preserve the Company's corporate assets, in violation of the Board's non-exculpable fiduciary duties of loyalty and good faith to Six Flags and its stockholders.

On March 10, 2023, Stockholder's Counsel received a letter from Jay B. Kasner, Esq. of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), counsel for the Board (the "Refusal"). The Refusal, issued by the same counsel acting on behalf of the Board that is simultaneously representing the defendants in the Securities Action, stated that the Board rejected the Litigation Demand in its entirety, without conducting an investigation and after only two Board meetings on March 7, and March 8, 2023.  Although the Refusal claimed that the Company had secured the requested tolling agreements (presumably after the expiration of the statute of limitations), the Board's lack of any other initiative or investigation into the serious, detailed allegations of the Litigation Demand calls into question whether the Board satisfied its obligation to investigate and consider the Litigation Demand in good faith.

## II.    The Stockholder's Proper Purpose

Stockholder brings this Second Inspection Demand for the proper purposes of: (i) investigating the Board's process of evaluating and refusing the Litigation Demand; (ii) investigating the substantive content of, and obtaining substantive insight into, the Board's decision to refuse the Litigation Demand; and (iii) determining whether the Board's rejection of the Litigation Demand was in good faith, after a reasonable, independent investigation, or whether the Board had a different, ulterior motive for refusing the Litigation Demand.  Stated another way, the purpose of this Second Inspection Demand is to enable the Stockholder and the Stockholder's legal counsel to properly evaluate the Board's rejection of the Litigation Demand and determine whether that rejection constitutes a reasonable, independent, and good faith exercise of the Board's business judgment, as required under Delaware law.  Investigating a

---

operative complaint to have been materially false and misleading, and to have been part of a scheme to defraud Six Flags investors.

2    The Litigation Demand noted that the three-year statute of limitations for breach of fiduciary duty claims under Delaware law would arguably expire as soon as February 20, 2023.



Board's decision to reject a shareholder's litigation demand is a well-established proper purpose. *See La. Mun. Police Emps. Ret. Sys.* v. *Morgan Stanley & Co.*, No. 5682-VCL, 2011 WL 773316, at *4-8 (Del. Ch. Mar. 4, 2011).

### III.    Books and Records Requested

Pursuant to Section 220, the Stockholder hereby demand the right (by Stockholder's attorneys, consultants, or other agents), during the usual hours of business, to inspect the following books and records of the Company and to make copies or extracts therefrom.

1.    All documents concerning the formation of any Board Committee (the "Demand Review Committee") established to discuss, consider, and evaluate the Litigation Demand;

2.    All meeting minutes of the Board, any Demand Review Committee, and/or any other Board Committee, where the Litigation Demand was discussed, considered, and/or evaluated;

3.    Any written report, summary or conclusion by the Board, any Demand Review Committee, and/or any other Board Committee, in connection with the Litigation Demand;

4.    Any presentation materials provided to the Board, any Demand Review Committee, and/or any other Board Committee, which concerns or relates to the Litigation Demand;

5.    All documents reviewed and/or relied upon Board, any Demand Review Committee, and/or any other Board Committee concerning the Litigation Demand and/or the Board's decision to reject the Litigation Demand;

6.    Any other material considered by any member of the Board, any Demand Review Committee, and/or any other Board Committee regarding the Litigation Demand;

7.    The engagement letters of any experts retained by the Board, any Demand Review Committee, and/or any other Board Committee concerning the Litigation Demand;

8.    Documents detailing how the Board determined that Skadden was independent for purposes of acting as counsel to the Board in connection with the Litigation Demand;

600 Third Avenue, New York, NY 10016    Main: 212.661.1100    Direct: 646.581.9941

NEW YORK    CHICAGO    LOS ANGELES    LONDON    PARIS    TEL AVIV

www.pomlaw.com

# POMERANTZLLP

9.    Documents indicating all past work Skadden has performed for Six Flags, the individuals identified in the Litigation Demand, or the individuals named as defendants in the Derivative Action;

10.   All documents reflecting the identity of each witness interviewed by the Board, any Demand Review Committee, and/or any other Board Committee in connection with the Litigation Demand, and reflecting the process by which the Board, any Demand Review Committee, and/or any other Board Committee determined the witnesses it sought to interview and whether any proposed witness or witnesses refused to be interviewed or were otherwise unavailable to participate in the investigation; and

11.   Any transcriptions of the interviews with such witnesses identified in the previous request, and any notes of such witness interviews.

## IV.   Instructions for Compliance

The Stockholder requests that the Company provide or otherwise make available all such information up to the date in which the Company actually and fully complies with this Second Inspection Demand and the requests enumerated herein. The Stockholder further requests that the Company provide or otherwise make available all additions, changes, and corrections to any of the requested information from the time of this Second Inspection Demand to the time (by written confirmation) that this inspection has concluded. Finally, the Stockholder requests that all information, to the extent possible, be produced in PDF-text searchable format, and to the extent the Company wishes to redact any such documents for privilege, that a privilege log be promptly provided.

The Stockholder agrees to treat any materials produced as "attorneys' eyes only" pending the execution of a confidentiality agreement. The Stockholder requests that the materials identified above be made available **within five (5) business days from the date of receipt**. Please feel free to contact me within the requisite timeframe to advise when and where the items requested above will be made available for inspection. Should the Company refuse to comply, the Stockholder will promptly file a complaint in the appropriate jurisdiction.

600 Third Avenue, New York, NY 10016    Main: 212.661.1100    Direct: 646.581.9941

NEW YORK    CHICAGO    LOS ANGELES    LONDON    PARIS    TEL AVIV
www.pomlaw.com



  Stockholder reserves the right to withdraw, modify, and/or supplement this Second Inspection Demand at any time.

Very truly yours,

Gustavo F. Bruckner
POMERANTZ LLP

and

Brett D. Stecker
SHUMAN, GLENN & STECKER

600 Third Avenue, New York, NY 10016 Main: 212.661.1100 Direct: 646.581.9941

NEW YORK CHICAGO LOS ANGELES LONDON PARIS TEL AVIV

www.pomlaw.com

# EXHIBIT A



**Roth Contributory IRA  of**
**ANTONIO DELA CRUZ**

| Account Number | Statement Period |
| --- | --- |
| | **April 1-30, 2023** |

## Investment Detail - Equities (continued)



| | Quantity | Market Price | Market Value | % of Account Assets | Unrealized Gain or (Loss) | Estimated Yield | Estimated Annual Income |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Equities** (continued) | | | *Cost Basis* | | | | |
| **SIX FLAGS ENTERTAINM** | 11.1247 | 24.27000 | 270.00 | | (487.26) | N/A | N/A |
| SYMBOL: SIX | | | *757.26* | | | | |

# EXHIBIT B

## <u>POWER OF ATTORNEY</u>

**KNOW ALL PERSONS BY THESE PRESENTS** that Antonio Dela Cruz does hereby make, constitute, and appoint the law firms of Pomerantz LLP and Shuman, Glenn & Stecker (the "Attorneys") as his true and lawful attorneys-in-fact, and in his name, place, and stead and on his behalf, and for his use and benefit, to make the *Demand to Inspect Books and Records Pursuant to 8 Del. C. § 220* on his behalf as a stockholder of Six Flags Entertainment Corporation ("Six Flags" or the "Company") in the accompanying demand ("Demand") from the Attorneys to the Company, to discuss the demands and factual assertions described in the Demand with any representative of the Company, or such other counsel as may be designated by them or the Company, to modify or supplement the demands set forth in the Demand, to reach such agreements with respect to the scope of the demand set forth in the Demand, and to commence any litigation on his behalf, as the Attorneys deem appropriate.

Antonio Dela Cruz further grants to the Attorneys full power to do and perform all and every act that they may legally do through an attorney-in-fact, and every proper power necessary to carry out the purposes for which this power is granted, with full power of substitution and revocation, hereby ratifying and affirming that which the Attorneys or their substitutes shall lawfully do or cause to be done by virtue of the power conferred herein upon them.

The rights, power, and authorities of said attorneys-in-fact herein granted shall commence and shall be in force and effect from the date hereof, and such rights and powers shall remain in full force and effect until Antonio Dela Cruz tenders a written notice of termination.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of May, 2020.

_____
Antonio Dela Cruz

# EXHIBIT C

## <u>VERIFICATION OF ANTONIO DELA CRUZ</u>

STATE OF CALIFORNIA      )
                          )   ss.

COUNTY OF _____     )

I, Antonio Dela Cruz, hereby declare as follows:

1.    I am a stockholder of Six Flags Entertainment Corporation ("Six Flags" or the "Company").

2.    I have reviewed the *Second Inspection Demand for Inspection of Books and Records Pursuant to 8 Del. C. § 220* (the "Demand") prepared by my counsel. The statements in the Demand as to me and my actions are true and correct and as to other statements of fact and matters set forth therein, are true and correct to the best of my knowledge, information, and belief.

3.    Attached to the Demand is a true and correct copy of my brokerage account statement reflecting my ownership of Six Flags common stock. The documents are true and correct copies of what they purport to be. I have owned shares of Six Flags stock at all relevant times and continue to hold shares in the Company.

I declare under penalty of perjury under the laws of the State of Delaware that the foregoing is true and correct.

Executed this ____12th____ day of May 2023.

_____
Antonio Dela Cruz

SWORN TO AND SUBSCRIBED
Before me this _12th_ day of May 2023

_____SEE ATTACHED_____
Notary Public

My Commission Expires:____

Attachment to
**Verification of Antonio Dela Cruz**

**JURAT**

A Notary Public or other officer completing this certificate verifies only the identity of
the individual who signed the document to which this certificate is attached, and not the
truthfulness, accuracy, or validity of that document.

State of California            )
                               ) ss
County of San Francisco        )

Subscribed and sworn to (or affirmed) before me on this 12th day of May, 2023,
by Antonio Dela Cruz, proved to me on the basis of satisfactory evidence to be the
person(s) who appeared before me.

JIZZA PE ILABAN
Notary Public - California
San Francisco County
Commission # 2359283
My Comm. Expires May 27, 2025

(SEAL)

Signature